# EXHIBIT A

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
CITY OF MODESTO and BRANDON GILLESPIE, in his official capacity as Modesto Chief of Police

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
PACIFIC MEDIA WORKERS GUILD; ANGEL JOSE FLORES; JULISSA RUIZ RAMIREZ; and ALYSSA LEIVA

Electronically Filed
3/25/2026 12:42 PM
Superior Court of California
County of Stanislaus
Hugh K. Swift
Clerk of the Court
By: Elizabeth Fernandez, Deputy

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Stanislaus County Superior Court<br><br>City Towers Courthouse; 801 10th Street, Modesto, CA 95354 | CASE NUMBER:<br>*(Número del Caso):*<br><br>CV-26-003104 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Chessie Thacher (SBN 296767); ACLU Foundation of NorCal; 39 Drumm St., San Francisco, CA 94111

| DATE:<br>*(Fecha)*     3/25/2026 12:42 PM | Clerk, by<br>*(Secretario)* | *Elizabeth Fernandez* | , Deputy<br>*(Adjunto)* |
|---|---|---|---|

Elizabeth Fernandez

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |
|---|---|---|

CHESSIE THACHER (SBN 296767)
cthacher@aclunc.org
SHAILA NATHU (SBN 314203)
snathu@aclunc.org
ANGELICA SALCEDA (SBN 296152)
asalceda@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

*Attorneys for Plaintiffs*

Electronically Filed
3/25/2026 12:42 PM
Superior Court of California
County of Stanislaus
Hugh K. Swift
Clerk of the Court
By: Elizabeth Fernandez, Deputy

$435 PAID

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF STANISLAUS

| | |
|---|---|
| PACIFIC MEDIA WORKERS GUILD; ANGEL JOSE FLORES; JULISSA RUIZ RAMIREZ; and ALYSSA LEIVA;<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>CITY OF MODESTO and BRANDON GILLESPIE, in his official capacity as Modesto Chief of Police,<br><br>　　　　　Defendants. | Case No. CV-26-003104<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**[Cal. Code Civ. Proc. §§ 526, 526a, 1060; Cal. Pen. Code § 409.7; Cal. Const. Art. I, §§ 2, 3, 7; U.S. Const., 1st and 14th Amends. 42 U.S.C. § 1983]** |

This case has been assigned to Judge Mayne, John R. ,
Department Dept 21 for all purposes including Trial.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

**TABLE OF CONTENTS**

INTRODUCTION....................................................................................................... 3

JURISDICTION AND VENUE................................................................................. 6

PARTIES ................................................................................................................... 7

STATEMENT OF FACTS AND LEGAL BACKGROUND...................................... 9

I.      The Ordinance's legislative history, record of selective enforcement, and absurd results demonstrate fatal flaws. ................................................................... 9

      A.      The City Council adopted the original Ordinance in 2019 and then expanded its restrictions in 2021 to target specific speakers. ..................................... 9

      B.      The Modesto Police Department has engaged in selective and disparate enforcement of the Ordinance. ................................................................ 11

      C.      The community's outcry over the Police Department's selective and disparate enforcement. ........................................................................... 14

      D.      The City Council adopted new problematic amendments in 2025. ........ 16

      E.      The amended Ordinance leads to absurd results. ................................... 21

II.     Protests and public assemblies are fundamental to democracy, but present unique risks for attendees............................................................................. 24

III.    The Ordinance misapprehends the importance of a free press and undercuts constitutional and statutory protections for newsgathering at protests. ........... 27

      A.      The press is an essential watchdog at protests. ..................................... 27

      B.      California law specifically ensures the press be able to report at protests. ............. 29

      C.      The press cannot safely report on protests without access to safety gear. .............. 30

IV.     The Ordinance chills speech and restricts the ability of protesters to protect themselves.. 32

      A.      Law-abiding protesters and bystanders risk injury without access to basic safety gear. ........................................................................................... 32

      B.      Omnipresent surveillance presents a significant risk to protesters and exposes them to retaliation for engaging in protected activities........................... 34

      C.      Protesters wear certain face-coverings and other accessories to convey constitutionally protected symbolic expression. ..................................... 38

V.      The Ordinance ignores longstanding law that already provides Modesto with the legal tools to address any unlawful conduct at a protest. ................................. 39

CAUSES OF ACTION .......................................................................................... 42

PRAYER FOR RELIEF......................................................................................... 55

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs PACIFIC MEDIA WORKERS GUILD, ANGEL JOSE FLORES, JULISSA RUIZ RAMIREZ, and ALYSSA LEIVA (collectively, "Plaintiffs") bring this case against the CITY OF MODESTO and BRANDON GILLESPIE, in his official capacity as the Modesto Police Chief (together, "the City" or "Modesto") for deprivation of rights enshrined in federal and state law. Plaintiffs hereby allege as follows.

**INTRODUCTION**

1.    This action challenges unconstitutional provisions in Title 4, Chapter 23, of the Modesto Municipal Code, entitled "Restrictions on Use of Specified Items During Public Assembly," as amended by Ordinance Nos. 3804-C.S. & 3805-C.S. (collectively, "the Ordinance"). Plaintiffs are a group of concerned individuals who seek to peacefully assemble and protest in Modesto, and a reporters' union whose members seek to safely report on such demonstrations. Modesto's Ordinance thwarts each plaintiff's aims by imposing, at *any* public assembly, an overbroad and unworkably vague ban on face coverings and other basic personal safety gear. Because these restrictions infringe Plaintiffs' rights under the Federal Constitution, the California Constitution, and state statutory protections for journalists, they should be invalidated either on their face or as applied to Plaintiffs' protected activities.

2.    As amended, the Ordinance makes it a misdemeanor—punishable up to six months in jail—for any person to "utilize, carry, or possess" nineteen categories of items at "any demonstration, rally, protest, counter-protest, picket line, march, or public assembly." (City of Modesto Ordinance § 4-23.02 (2026) ["Ord."].) This lawsuit targets only the Ordinance's provisions that prohibit personal items and basic safety gear like face coverings, scarves, eyewear, sports equipment, impact-resistant clothing, helmets, gas masks, and padded vests. (*Id.*, §§ 4-23.02(a)(13)-(15), (18)-(19).) Based on the City's own interpretation, the challenged provisions permit people to dress up as "dancing ninjas" and in "inflatable frog suits" that hide their identities, but criminalize the protester who wears a bandana across their nose and the reporter who brings basic safety gear along to a protest.

3.    Many of the personal items banned by the Ordinance are important to Plaintiffs and other members of the public when attending a protest or engaging in other protected activities. People,

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

like plaintiffs Angel Jose Flores, Julissa Ruiz Ramirez, and Alyssa Leiva, often carry some of these items for expressive reasons or to keep themselves safe. Members of the press, including those in the plaintiff Pacific Media Workers Guild ("the NewsGuild"), similarly carry safety gear—helmets, vests, respirator masks, shatterproof goggles—while reporting on public demonstrations. In fact, most journalist organizations now recommend that reporters carry exactly this gear with them to a protest. Banning the gear leaves journalists especially vulnerable when—as authorized by Penal Code section 409.7—they remain at an assembly after a dispersal order to continue reporting on public events and official actions.

4.    In addition to infringing these free speech rights, the Ordinance's overbroad ban on personal items also violates federal and state constitutional guarantees for due process. (*See* U.S. Const. 5th Am; Cal. Const., Art. I, § 7.) Courts examine any government restriction on our fundamental freedoms "for definiteness or certainty of expression." (*Kolender v. Lawson* (1983) 461 U.S. 352, 357.) A law like the Ordinance violates due process guarantees because it does not include "objective factors" to govern enforcement and gives rise to the likelihood that disfavored speech will be targeted. (*Forsyth County v. Nationalist Movement* (1992) 505 U.S. 123, 133.)

5.    Here, a number of the Ordinance's provisions are confusingly drafted, making it unclear *what* exactly the Ordinance applies to and *when*. The Ordinance does not contain any definition of "public assembly," implying that it governs any time two or more people gather in public. And the vague ban on "wearing" any "accessory or item that covers or partially covers the face" includes a labyrinth of confounding exceptions for medical necessity, religious beliefs, and "costumes which obscure the face as part of the expressive function of the costume." (Ord. § 4-23.02(a)13(i)-(iii).) These exceptions create a hodgepodge of absurd contradictions—medical masks are allowed, while bandanas are banned. Costumes that obscure identity are permitted. But wearing a keffiyeh around the face to express support for Palestine could land someone in jail. Sunglasses might be acceptable, but clear goggles are probably forbidden. It all depends on how a police officer views the "accessory."

6.    Taken together, the Ordinance's unclear scheme gives rise to absurd results and the kind of rudderless discretion and selective enforcement that the Constitution abhors. A law cannot

---

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

"entrust lawmaking to the moment-to-moment judgment of the policeman on his beat," or "confer[] on police a virtually unrestrained power to arrest and charge persons with a violation." (*Kolender*, *supra*, 461 U.S. at p. 357; *see also Williams v. Garcetti* (1993) 5 Cal.4th 561, 575.)

7.    Moreover, the Ordinance runs afoul of longstanding, and binding, California law. (*See Auto Equity Sales, Inc. v. Superior Court of Santa Clara* (1962) 57 Cal.2d 450, 455.) Almost fifty years ago, the California Court of Appeal in *Ghafari v. Municipal Court* (1978) 87 Cal.App.3d 255 struck down a criminal statute similar to the Ordinance that had banned public face coverings except when worn "for the purposes of amusement, entertainment, or in compliance with any public health order." (87 Cal.App.3d at p. 260.) The court held that, "in flatly prohibiting anonymous public appearances by persons exercising their First Amendment rights, [the statute] sweeps too broadly." (*Id.* at p. 261.) The court further reasoned that the "very existence" of the overbroad statute was chilling, adding that "where a vague statute 'abuts upon sensitive areas of basic First Amendment freedoms, uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.'" (*Id.* at p. 263 [quoting *Braxton v. Municipal Court* (1973) 10 Cal.3d 138, 151].)

8.    The present moment teaches that the act of protesting is more important, but also more imperiled, than ever. In the last year, federal and state law enforcement have intensified their surveillance of and crackdowns on public demonstrations. Peaceful protesters and journalists have been subjected to invasive facial recognition technology, tear gas, rubber bullets, and, on repeated occasions in cities around the country including in California, violent force. The surveillance can upend one's life, employment, and even immigration status. And the crowd control measures can have wide-ranging impacts too. They do not just target a single individual who might be failing to comply with a lawful order. They affect all those in the vicinity of their use, leading to severe injuries, such as broken eye sockets, fractured skulls, and other lasting health issues. Members of the public and press are essential to documenting these interactions and abuses. But the Ordinance threatens to undermine their safety as they do so.

9.    The rights of free speech, free association, free assembly, free press, and due process are central to upholding our democracy. Democracy is, however, messy. Some measure of "unrest"

5
COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

must be tolerated. (*Terminello v. Chicago* (1949) 337 U.S. 1, 4.) Modesto's interest in addressing such unrest is governed by constitutional limits. And at a protest, "the proper response to potential and actual violence is for the government to ensure an adequate police presence" so that it may arrest "those who actually engage in [unlawful] conduct, rather than [] suppress legitimate First Amendment conduct as a prophylactic measure." (*Collins v. Jordan* (9th Cir. 1996) 110 F.3d 1363, 1372 [discussing *Cox v. Louisiana* (1965) 379 U.S. 536, 551 and *Kunz v. New York* (1951) 340 U.S. 290, 294-95].)

10.    Modesto exceeds constitutional limits in overlooking that it already has the tools to address the unlawful conduct that it worries about. Among other things, California has long criminalized disturbing the peace, destroying property, and disobeying police orders. Should any person engage in such activity while wearing a "mask, false whiskers, or any personal disguise (whether complete or partial) for the purpose of . . . evading or escaping discovery, recognition, or identification," they can be punished under Penal Code section 185. This law has been on the books since 1872.

11.    Officials in Modesto misapprehend the weight of these legal authorities at the expense of their own residents, including Plaintiffs. In 2019, the City Council started with an unconstitutional anti-protest law that targeted specific groups and imposed overbroad restrictions. Subsequent amendments have only made the law more unclear and more unwieldy. Modesto police officers have many lawful tools at their disposal to address unruly behavior at public assemblies; they do not need this unconstitutional one. Plaintiffs therefore respectfully request that the Court declare the challenged provisions unlawful and enjoin the City from chilling their rights, and the rights of the general public, to due process, free speech, free association, free assembly, and a free press.

## JURISDICTION AND VENUE

12.    The Court has jurisdiction over Plaintiffs' claims for declaratory and injunctive relief under Article VI section 10 of the California Constitution and under Code of Civil Procedure sections 410.10, 526, 526a, and 1060.

13.    Venue is proper in this Court pursuant to Code of Civil Procedure section 393 and 395 because the conduct complained of occurred in Stanislaus and because this action proceeds against

public officers in Stanislaus for actions taken "in virtue of [their] office." (Code Civ. Proc., § 393(b).) The relief sought is within this Court's power to grant.

<b><u>PARTIES</u></b>

**<u>Plaintiffs</u>**

14. PACIFIC MEDIA WORKERS GUILD ("the NewsGuild") is a labor union that represents journalists in the Modesto area, including journalists at the Modesto Bee and the Modesto Focus. As a representative union, the NewsGuild advocates for its journalist members' working conditions, negotiates contracts with newsrooms, helps its members prepare for challenging assignments (such as covering protests), mentors student journalists, and works to defend quality journalism. It also advises and trains its members about best practices when covering protests. Because journalists are frequently injured by law enforcement's use of crowd control methods, including tear gas and rubber bullets, the NewsGuild specifically recommends that all members covering protests carry basic safety gear, including respirator masks, helmets, and goggles. The NewsGuild's members would like to be able to bring and use this basic safety gear when needed while covering public assemblies without threat of arrest and criminal sanction. The NewsGuild worries that having to choose between personal safety and arrest will impair their members' constitutionally protected right to report on public assemblies and undercut their statutory right to remain at a protest after a dispersal order is issued. The NewsGuild's members are taxpayers in Modesto and the State of California. The NewsGuild's members have paid taxes in Modesto within the past year and the NewsGuild has been assessed and/or paid taxes to the State of California within one year of filing this action.

15. ANGEL JOSE FLORES is a local Modesto resident of Mexican American descent. He is a father and works as a school bus driver. On June 14, 2025, Mr. Flores attended an "ICE Out" protest in downtown Modesto. The protest was organized by a Modesto-centered group known as the Central Valley Black, Indigenous, and People of Color Coalition ("the Coalition"). Mr. Flores wore a gaiter-style facial covering to the protest for his own comfort and to protect his anonymity out of fear of retaliation for engaging in protected free speech activity. Within minutes of his arrival, Modesto police officers arrested Mr. Flores for wearing the mask in violation of the

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Ordinance. He was held in custody for 12 hours and no charges were ever filed. Mr. Flores would like to attend future protests in Modesto, but because of the Ordinance and the police's history of selective and disparate enforcement detailed herein, he fears doing so. Mr. Flores is confused as to why the officers arrested him, but not others, for wearing masks that covered roughly the same amount of their faces at the protest. Mr. Flores is a taxpayer in Modesto and the State of California. Mr. Flores has paid taxes in Modesto within the past year and has been assessed and/or paid taxes to the State of California within one year of filing this action.

16.    JULISSA RUIZ RAMIREZ grew up in the Modesto area and is a co-founder of the Coalition, which is centered in Stanislaus County. Ms. Ramirez regularly organizes and attends protests in Modesto on a range of controversial issues touching on immigration enforcement, police conduct, income inequality, food insecurity, and the war in Gaza. At these events, Ms. Ramirez often wears a checkered scarf called a keffiyeh to cover her face as a way of expressing support for Palestine and to maintain a degree of anonymity out of fear of retaliation for engaging in protected free speech activity. Activists opposing her positions have targeted and doxed Ms. Ramirez in retaliation for her public advocacy. She is concerned that if she protests at certain events without a face covering in Modesto, the online targeting and harassment will increase. Ms. Ramirez would like to organize and attend future protests in Modesto, but because of the Ordinance and the police's history of selective and disparate enforcement detailed herein, she fears doing so. Ms. Ramirez is particularly afraid that the City will enforce the Ordinance in an arbitrary and biased manner, as well as prevent her from wearing a keffiyeh facial covering at future protests. Given increasing news reports about how quickly protests can turn chaotic, Ms. Ramirez would also like to carry basic safety gear, such as goggles, a protective vest, and a helmet when attending demonstrations. But for the confusion and risk of arrest created by the Ordinance, Ms. Ramirez would bring such gear with her to some protests while engaging in protected peaceful assembly and free speech activities. Not being able to wear this face covering or to carry this gear chills Ms. Ramirez's free speech rights. Ms. Ramirez is a taxpayer in Modesto and the State of California. Ms. Ramirez has paid taxes in Modesto within the past year and has been assessed and/or paid taxes to the State of California within one year of filing this action.

8

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

17. ALYSSA LEIVA is a member of the Coalition and a frequent attendee at Modesto protests. At local protests, Ms. Leiva often wears a keffiyeh as a facial covering to express her support for Palestine and to maintain a degree of anonymity out of fear of retaliation for engaging in protected free speech activity. Activists opposing her positions have targeted and doxed Ms. Leiva in retaliation for her public advocacy. She is concerned that if she protests in Modesto at certain events without a face covering, the online targeting and harassment will increase. Ms. Leiva would like to attend future protests in Modesto, but because of the Ordinance and the police's history of selective and disparate enforcement detailed herein, she fears doing so. Ms. Leiva is particularly afraid that the City will enforce the Ordinance in an arbitrary and biased manner, as well as prevent her from wearing a keffiyeh facial covering. But for the confusion and risk of arrest created by the Ordinance, Ms. Leiva would continue to wear a keffiyeh as a face covering while engaging in protected peaceful assembly and free speech activities. Not being able to wear this covering chills Ms. Leiva's free speech rights. Ms. Leiva is a taxpayer in Modesto and the State of California. Ms. Leiva has paid taxes in Modesto within the past year and has been assessed and/or paid taxes to the State of California within one year of filing this action

**Defendants**

18. Defendant CITY OF MODESTO is a charter city and municipal corporation duly created and existing under the California Constitution and state law. The City is responsible for amending, approving, and adopting the Ordinance set forth at Section 4-23.02 of the Municipal Code.

19. Defendant BRANDON GILLESPIE is the Modesto Chief of Police. Mr. Gillespie oversees the Modesto Police Department, which enforces the challenged Ordinance, issues citations, and supports prosecutions alleged thereunder.

### STATEMENT OF FACTS AND LEGAL BACKGROUND

**I. The Ordinance's legislative history, record of selective enforcement, and absurd results demonstrate fatal flaws.**

    **A. The City Council adopted the original Ordinance in 2019 and then expanded its restrictions in 2021 to target specific speakers.**

20. Modesto enacted the first version of the Ordinance on August 13, 2019 as an urgency measure to take effect before a "Straight Pride" event scheduled to occur just eleven days later on

---

9

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

August 24. The original ordinance prohibited individuals from "utiliz[ing], carry[ing], or possess[ing]" specified items while attending any "demonstration, rally, protest, counter-protest, picket line, march, or public assembly." Among the prohibited items were "the wearing of a mask, scarf, bandana, or any other accessory or item that covers or partially covers the face, shields the wearer's face from view, and conceals the wearer's identity, except for coverings worn due to religious beliefs, practices or observances or due to medical necessity."[1]

21.   When presenting the original version of the Ordinance to the City Council, then-Police Chief Galen Carroll explained that the restrictions were necessary because groups associated with ideologies of the "Proud Boys and Antifa" were likely to attend the Straight Pride event. He further advised that "masks are only brought to events so you have complete anonymity to do whatever you want, to commit crimes and th[en] you can't be identified later." Chief Carroll displayed two slides to illustrate his interpretation. The first was entitled "Rallies / Protests." It portrayed a single photo of a crowd gathered around an "Antifa" flag. The second slide, entitled "Proud Boys / Antifa," showed a photo of people purportedly affiliated with those two groups.[2]

22.   During the legislative deliberations, the City Council expressed animus toward the Proud Boys, Antifa, and the Straight Pride event organizers. The supporting materials in the Council's agenda packet identified only these three groups. Then-Councilmember Kristin Ah You stated that she became supportive of the legislation as soon as she learned that "the Proud Boys and Antifa were . . . invited" to the Straight Pride event and that she "want[ed] no part of this in our community."[3]

23.   In the fall of 2021, the Police Department urged the City Council to expand the original version of the Ordinance to prohibit metal containers, gas masks, helmets, laser pointing devices, umbrellas "in the absence of rain," and impact-resistant clothing. Police Lieutenant T.J. Moffett

---

[1] Modesto, Cal., Ordinance No. 3701-C.S. at p. 85 (Aug. 13, 2019) (codified at Modesto Mun. Code tit. 4, ch. 23, § 2(a)), https://tinyurl.com/mrr4fsw2.

[2] City of Modesto, *8/13/19 – City of Modesto Council Meeting*, https://tinyurl.com/yev4f44v (timestamps 3:15:29; 3:03:48; 3:02:45; 3:03:08).

[3] City of Modesto, *8/13/19 – City of Modesto Council Meeting*, https://tinyurl.com/yev4f44v (timestamp 3:20:09); Modesto, Cal., Ordinance No. 3701-C.S. at p. 80 (Aug. 13, 2019) (codified at Modesto Mun. Code tit. 4, ch. 23, § 2(a)(13)), https://tinyurl.com/mrr4fsw2.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

stated that the restrictions would "only" be enforced when "a specific event or events might lead to violence or other acts designed to prevent the exercise of constitutional rights."[4]

24.  To support the ban on helmets, tactical and impact-resistant gear, Lieutenant Moffett asserted that this gear is "confrontational garb" neither "designed nor intended to facilitate peaceful assembly or the exercise of constitutional rights." He further claimed that that this gear "may provide a level of intimidation to peaceful participants," can be used as a weapon or to hide identity, or can be "used as a tool to resist/overcome the lawful authority of officers, or in escalation of conflict with other protesters." With respect to "gas masks or similar breathing devices," his comments echoed the June 23, 2021 Council Agenda Report's assertion that "[n]on-authorized persons in possession of such masks during a public assembly have no justification for their possession, other than a desire to overcome crowd control techniques used by law enforcement." Lieutenant Moffett did not cite specific examples of a helmet or tactical and impact-resistant gear itself being used as a weapon. Nor did he discuss the common safety uses of helmets, such as when riding a motorcycle, skateboard, or bicycle.[5]

25.  The City Council unanimously adopted the expanded list of banned items as a non-urgency measure one month later on September 7, 2021.[6]

**B. The Modesto Police Department has engaged in selective and disparate enforcement of the Ordinance.**

26.  The original Ordinance was in effect at the time the 2019 Straight Pride event and the amended Ordinance was in effect for multiple demonstrations between 2021 and 2025. Notwithstanding, many members of the community still attended these events wearing face coverings and carrying banned items. The Modesto Police Department did not, however, report making any arrests for violations of the Ordinance at these prior events. Instead, Modesto arrested

---

[4] City of Modesto, *8/10/21 – City of Modesto Council Meeting*, https://tinyurl.com/5facxjcb (timestamp 2:41:36); *see also* Modesto, Cal., Ordinance No. 3735-C.S. (Aug. 20, 2021) (codified at Modesto Mun. Code tit. 4, ch. 23, § 2(a)), https://tinyurl.com/c6e2hwm7.

[5] City of Modesto, *8/10/21 – City of Modesto Council Meeting*, https://tinyurl.com/5facxjcb (timestamps 2:44:39; 2:45:40; 2:45:48).

[6] City of Modesto, *9/7/21 – City of Modesto Council Meeting Agenda*, https://tinyurl.com/3dr2b2x8 (Item 3).

individuals for allegedly violating the Ordinance for the first (and only) time on June 14, 2025.[7]

27.   Two protests took place in downtown Modesto on June 14. One protest coalesced around a "No Kings" message and was organized by local progressive organizations as part of a broader national movement opposed to President Trump's executive actions. The second protest took place near the 10th Street Plaza and was partially organized by the Coalition. The Coalition encouraged the public to come together to express an "ICE Out" message in protest of ramped-up immigration enforcement tactics and mass arrests in California and across the country. In preparation, Modesto police installed a surveillance camera in the Plaza where the ICE Out protest was scheduled and planned to conduct surveillance via airborne drones.[8]

28.   On the day of the protests, Modesto police estimated that the No Kings protest had a crowd of approximately 2,000 to 3,000 people. According to police estimates, the ICE Out protest was much smaller and drew approximately 150 attendees. Pictures show that it was largely attended by people of color. Though the No Kings crowd was diverse, it was far whiter and more affluent than the crowd at the ICE Out protest. Both protest groups included people wearing masks and other accessories that covered their faces. But law enforcement reported no arrests under the Ordinance at the No Kings protest even though it had promised a "zero tolerance" approach. The four people arrested on June 14 for wearing a mask were all participants in the ICE Out rally.[9]

29.    One of the June 14 arrestees was Plaintiff Angel Jose Flores, who has worn a mask as part of his regular routine for nearly a decade. Mr. Flores has done so for different reasons, including to stay warm, calm his nerves, and minimize the risk of illness while at work, at the

---

[7] *Compare* Exs. 13 & 5-22 *with* Ex. 4, City of Modesto, *Council Agenda Report re: Urgency Ordinance and Non-Urgency Ordinance Amending the City of Modesto Municipal Code Title 4 Chapter 23*, City Council Meeting Agenda Packet (Dec. 2, 2025) 675-96, access at https://tinyurl.com/44ha6ea4; City of Modesto, *Community Police Review Board Meeting,* YouTube (Jul. 16, 2025) https://tinyurl.com/2n96myf8 (timestamp: 53:14).

[8] City of Modesto, *Community Police Review Board Meeting,* YouTube (Jul. 16, 2025) https://tinyurl.com/2n96myf8 (timestamp 14:44-30:30).

[9] *See* City of Modesto, *Community Police Review Board Meeting*, YouTube (Jul. 16, 2025), https://tinyurl.com/2n96myf8 (timestamp 11:24-24:00); Julietta Bisharayan, *Modesto's 'No Kings' protest begins at 10th St. Plaza with hundreds in attendance*, Modesto Bee (Jun. 16, 2025), https://tinyurl.com/5n66uph7; Julietta Bisharyan, Maria Luisa Gigueroa and Trevor Morgan, *Arrests at weekend protest are decried at Modesto police review board meeting*, Modesto Bee (Jun. 20, 2025), https://tinyurl.com/399hem3r.

gym, and in other crowded places. Consistent with this practice, Mr. Flores was wearing a gaiter-type face covering at the ICE Out protest. He had been motivated to attend the rally after seeing news reports about the federal government's aggressive campaign to arrest and detain immigrants in Los Angeles. The ICE Out protest was one of the first protests that Mr. Flores had ever attended and he was apprehensive about going to such a public demonstration. Still, he wanted to be there to peacefully stand up for—in his own words—the "disappeared and the voiceless."

30.    Within twenty minutes of Mr. Flores's arrival at the ICE Out protest, Modesto police officers detained and arrested him. Officers led Mr. Flores to a police vehicle, confiscated his mask, and searched him. They next drove Mr. Flores to a nearby alley where additional police officers were present. He was then transported to the Modesto jail. When Mr. Flores asked one of the officers why this was happening, the officer indicated that Mr. Flores was going to jail for wearing a mask. There was no suggestion or evidence that Mr. Flores had been wearing his mask to commit a separate criminal act at the protest. Mr. Flores remained in jail for almost 12 hours before being released just before midnight with a citation for violating Modesto Municipal Code section 4-23.02(a)(13) and Penal Code section 148(a)(1).

31.    That same evening, Chief Gillespie recounted the day's protest activity to the Mayor and City Council in an email. With respect to the arrest of Mr. Flores and the others alleged to have worn masks, the Chief wrote the arrests "were made early and intentionally to remove agitators who showed clear intent to not follow the law and potentially disrupt an otherwise lawful and peaceful gathering."

32.    On August 11, the City Attorney announced that it would not be filing criminal charges "in connection with the June 14 face-covering violations" at the ICE Out rally. The City Attorney urged that, in "the future," "all protest organizers and community members . . . familiarize themselves with applicable laws and work collaboratively with the City . . . ."[10]

_____

[10] City of Modesto, *City Elects to Move Forward: Continues to Encourage Awareness and Adherence to Local Laws*, (Aug. 11, 2025), https://tinyurl.com/3y4v9xwm.

13
COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

**C. The community's outcry over the Police Department's selective and disparate enforcement.**

33. Frustrated by the Modesto Police Department's differential treatment of the ICE Out and No Kings protests, members of the public attended the very next City Council meeting on June 24 and the Community Police Review Board meeting on July 16. At both, speakers questioned why the Ordinance was enforced only at the ICE Out rally, even though the No Kings protest drew exponentially more participants, many of whom wore face coverings and accessories that ostensibly violated the Ordinance.

34. During the July 16 Community Police Review Board meeting, Chief Gillespie provided his department's account of the day. In so doing, he disclosed that officers had conducted surveillance of the protesters via airborne drones and had installed at least one security camera at the 10th Street Plaza on the eve of the ICE Out protests. The Chief also revealed that some officers were deployed in plain clothes to monitor protesters and usher arrestees into unmarked cars.[11]

35. To justify the arrests, Chief Gillespie stated that officers had used their discretion and arrested "the most egregious" violators of the anti-mask provision. The Chief, in defining what he meant by "most egregious," explained that he felt "very confident" that the individuals arrested were wearing masks to conceal their identity. He did not mention any other basis—unlawful or otherwise—for arresting the individuals. Without reference to any evidence of the Coalition's specific involvement, the Chief falsely stated that the Coalition had encouraged people to violate the Ordinance at the ICE Out rally.[12]

36. The Chief further suggested that it would be the responsibility of any individual wearing a mask to approach law enforcement and affirmatively inform officers if they were wearing a mask pursuant to the Ordinance's religious or medical exemptions. But, the Chief insisted, he would not be "the one who decides," continuing that "the court process" via a judge or jury would

---

[11] City of Modesto, *Community Police Review Board Meeting,* YouTube (Jul. 16, 2025) https://tinyurl.com/2n96myf8 (timestamps: 14:46-15:20; 15:57-16:10).

[12] City of Modesto, *Community Police Review Board Meeting,* YouTube (Jul. 16, 2025) https://tinyurl.com/2n96myf8 (timestamp: 22:17-23:59).

ultimately "work those things out." The Chief deemed it "common sense" that the ICE Out arrestees would not qualify for any exemption.[13]

37.    Many members of the public were dissatisfied with Chief Gillespie's vague explanations. They engaged in a sustained community effort to press their concerns at City Council meetings on July 22, August 12, August 26, September 9, September 23, October 14, October 28, and November 4. The Council refused to agendize concerns over the Ordinance at these meetings.

38.    In addition, the NewsGuild, together with the American Civil Liberties Union of Northern California, the First Amendment Coalition, and the Northern California chapter of the Society of Professional Journalists, wrote multiple advocacy letters to the City Council. The advocacy was targeted and sustained so as to try and avoid the need for litigation. The organizations emphasized that the Ordinance's issues extended beyond the ban on face coverings and led to real-world harms for members of the public and press alike. The press rights groups, spearheaded by the First Amendment Coalition's Advocacy Director Ginny LaRoe, highlighted that, since 2017, the U.S. Press Freedom Tracker had documented more than 1,000 instances of journalists being injured at protests by law enforcement and others. The groups also stressed that, given the uptick in press injuries at public demonstrations, reporters now regularly rely on the safety gear that the Ordinance prohibits.[14]

39.    Eventually, the City Council asked the Community Police Review Board to review the Ordinance and make a recommendation as to how the Council should proceed. The review board formed an ad hoc committee, which concluded that prohibiting masks at public assemblies has a "chilling effect on free speech and assembly;" that "[s]ymbolic acts such as a mask or face covering with artistic or graphic expressions could be argued as a freedom of speech;" that the Ordinance gives rise to due process concerns related to arbitrary enforcement and discrimination;

---

[13] City of Modesto, *Community Police Review Board Meeting*, YouTube (Jul. 16, 2025) https://tinyurl.com/2n96myf8 (timestamp: 55:06-55:52).

[14] *Letter from ACLU NorCal* (Jul. 18, 2025), https://tinyurl.com/mr2cbf5y; *Letter from First Amendment Coalition, Pacific Media Workers Guild and SPJ NorCal* (Jul. 21, 2025), https://tinyurl.com/mwj9smnw; *Letter from ACLU NorCal and First Amendment Coalition* (Oct. 9, 2025), https://tinyurl.com/44fmfhra; *Letter from ACLU NorCal and First Amendment Coalition* (Dec. 2, 2025), https://tinyurl.com/y5sfnyb9.

and that the Ordinance "risk[s] deterring people from attending protest altogether." The committee also noted that the Ordinance's criminalization of protesters wearing masks at peaceful protests "punishes a substantial amount of constitutionally protected activity along with any unprotected conduct." The Community Police Review Board voted to recommend that the Council amend the Ordinance's troubling provisions on September 17, 2025.[15]

40.  Amidst this ongoing advocacy, groups in Modesto held a second No Kings protest on October 18. Chief Gillespie threatened to enforce the Ordinance on the Department's Facebook page. Officers handed out cards, like the one below, which emphasized that certain banned items, including face coverings and tactical vests, were illegal to wear.



### D.  The City Council adopted new problematic amendments in 2025.

41.  Almost six months after the arrests at the ICE Out rally, the City Council considered amending the Ordinance in open session on December 2, 2025. The proposed changes were as follows. Additions appeared in **bold underline** and deletions in ~~strikethrough~~.

> **Section 4-23.02 Restrictions**
> (a) No person shall utilize, carry, or possess the following items or articles while attending or participating in any demonstration, rally, protest, counter-protest, picket line, march, or public assembly:
>
> (13) The wearing of a mask, scarf, bandana or any other accessory or item that covers or partially covers the face shielding the wearer's face from view and conceals the wearer's identity, except for**:**

---

[15] City of Modesto, Community Police Review Board Meeting, YouTube (Sept. 17, 2025) https://tinyurl.com/mc8um944 (timestamp: 2:41:25).

**(i)** coverings worn due to religious beliefs, practices, or observances. **For purposes of this section, the religious exemption will apply to any individual wearing a religious garment that covers their face including, but not limited to hijabs, niqabs, burkas and the functional equivalent**;

**(ii)** ~~or~~ **coverings worn** due to medical necessity. **For purposes of this section, the medical necessity exemption shall apply to any individuals who are wearing medical grade masks including but not limited to a surgical mask, disposable face mask, N95 mask, KN95 mask, elastomeric mask, and/or the functional equivalent but not for balaclavas, ski masks or the like; and**

**(iii) the restrictions of Section 4-23.02 (a)(13) do not apply to costumes which obscure the face as part of the expressive function of the costume including, coverings worn as part of a costume in connection with a holiday event (e.g. Halloween), masquerade event (e.g. Mardi Gras), theatrical or other entertainment event, and/or the functional equivalent.**

(15) Any **hardshell** impact resistant helmet, including, but not limited to: motorcycle helmets, bicycle helmets, sports helmets, or ballistic helmets~~;~~. **This provision does not include softshell bicycle/sports helmets**;

(17) Any umbrellas in the absence of rain~~.~~ **or being used to protect from extreme heat.** ~~During rainy weather an~~ **When an umbrella may be used based on these weather conditions, the** umbrella shall not exceed sixteen (16) inches in its longest dimension when fully collapsed and shall have a blunt end;[16]

42.  As relevant to this litigation, the City left unchanged the Ordinance's bans on: "Any gas masks or similar breathing devices" (Ord. § 4-23.02(a)(14)); "Any professionally manufactured or personally fabricated equipment or clothing designed to be bullet-resistant, fragment-resistant, stab-resistant, or impact resistant, including but not limited to: riot control gear, sports equipment, bullet-resistant vests, flak jackets, or stab-resistant vests" (*Id.*, § 4-23.02(a)(18)); and "Load-bearing or similar 'tactical' vests designed to carry weapons, tactical equipment, or armor plates commonly used by law enforcement or military institutions" (*Id.*, § 4-23.02(a)(19)). The Ordinance also left in place a provision affording the City's Police Chief broad discretion to modify any prohibition for a parade so long as "the modification does not impair or threaten public safety." (*Id.*, § 4-23.02(f).)[17]

---

[16] City of Modesto, Ordinance No. 3805-C.S. (Jan. 8, 2026), https://tinyurl.com/44y3bhwf.

[17] The Ordinance carried over pre-existing provisions prohibiting weapons, like "projectile launchers," and items that could be used as weapons, like sharpened metal rods and plastic piping. (Ord. §§ 4-23.02(a)(1)-(8), 10-12, 16-17.) These weapon bans are not the subject of this lawsuit.

43. Consistent with prior versions of the Ordinance, the supporting legislative materials and findings again identified the "Proud Boys" and "Antifa" by name, suggesting that the groups had a "reputation for violence." The materials emphasized an "increase in public protests" in Modesto, stating that the City "cannot adopt a 'wait-and-see' approach." The materials asserted that the "constitutionality" of the amendments was "supported by the City's substantial interest in safeguarding its citizens against violence and in protecting its police force from the type of violence that has occurred at demonstrations in Los Angeles, Oakland, Berkeley, Chicago and Portland." The findings did not include any details as to the timing, events, or nature of "the violence" beyond these general references to city names. The legislative materials also failed to mention the press's need to have access to basic safety gear while documenting and informing the public on protests.[18]

44. With respect to the ban on masks and accessories covering the face, the legislative materials asserted that the "[t]here is an increased risk that masked individuals will utilize their anonymity to commit acts of violence or vandalism without concern of identification and apprehension, disrupting the ability of others to safely assemble and demonstrate peacefully." The materials gave little weight to concerns around protester anonymity, concluding that "cameras are recording us constantly out in public spaces such as at City Hall, at the 10th Street Plaza or on major public rights-of ways," and "iPhone cameras, Ring cameras and the like establishes that virtually all of our movements within the public rights of ways are subject to possible video recordation." The materials further noted that "several of the individuals who expressed the concern for their anonymity during protests have appeared unmasked" at "Modesto City Council Meetings" although "these meetings are regularly broadcast to a large audience."[19]

45. As for the other banned items, the legislative materials stated: "tactical gear worn at prior protests in the City, and other forms of tactical gear such as gas masks, bullet-resistant vests, flak

---

[18] City of Modesto, *Council Agenda Report* (Nov. 26, 2025), https://tinyurl.com/3k7r3err at p. 4; *see also* City of Modesto, Ordinance No. 3805-C.S. (Jan. 8, 2026), https://tinyurl.com/44y3bhwf.

[19] City of Modesto, *Council Agenda Report* (Nov. 26, 2025), https://tinyurl.com/3k7r3err at p. 5; City of Modesto, Ordinance No. 3805-C.S. (Jan. 8, 2026), https://tinyurl.com/44y3bhwf at p. 6.

18
COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

jackets, stab resistant vests, and/or load bearing vests, are all associated with the potential for violent clashes." The restrictions, the materials continued, "are also directed at limiting other items" such as "hardshell helmets and glass or metal water bottles that can, and have been weaponized, while still allowing for peaceful expressive activity."[20]

46.   Chief Gillespie, joined by a specially retained attorney who had drafted the original Ordinance and was tasked with proposing the new amendments, made a presentation at the City Council meeting on December 2, 2025. The presentation largely emphasized the public safety points in the legislative materials. The presentation also attempted to justify the need for the Ordinance by showing selected images and videos of protests in Modesto that had primarily occurred between 2020 and 2022 where people wore masks and other banned items. A few photos showed protesters wearing balaclavas, gaiters, or ski masks alongside others wearing cloth or surgical masks, hats, and sunglasses. Often this attire resulted in equally obscured facial features, only some of which was criminalized.[21] Further, the pictures of people wearing these accessories and gear demonstrated that the Ordinance was either ineffectual or just never enforced.

47.   In presenting the images from these prior protests to the City Council, Chief Gillespie commented that those "wearing your typical medical style mask" were "not addressed [by the officers] because those [masks] have never been a target of what we see in this prohibition." But he asserted, somewhat paradoxically, that as a general matter face coverings are "used to hide identities, intimidate, and avoid accountability for criminal acts." The Chief further claimed that hard-shelled helmets serve "as body armor," and that tactical vests are used "to conceal objects."[22]

48.   The City's retained counsel made a similar observation about the mask ban: "The whole purpose is to reduce violence and vandalism to limit the individuals who might mask themselves to be committing violent acts, to be anonymous, and to avoid accountability." Even though the masks depicting rainbows in some of these pictures significantly obscured peoples' identity, she

---

[20] City of Modesto, Ordinance No. 3805-C.S. (Jan. 8, 2026), https://tinyurl.com/44y3bhwf at 2, 5.

[21] City of Modesto, *12/2/2025 – City of Modesto Council Meeting,* YouTube (Dec. 2, 2025) https://tinyurl.com/3vkstntx (timestamp: 1:08:55; 1:14:25-1:17:05).

[22] City of Modesto, *12/2/2025 – City of Modesto Council Meeting,* YouTube (Dec. 2, 2025) https://tinyurl.com/3vkstntx (timestamps 1:14:06; 1:18:10; 1:27:26).

stated that they were "not a problem." She then went on to explain the costume exemption as follows: "Let me be clear: If you're dressed as Snow White or you're dressed as a dancing ninja or a regular ninja or you're dressed as a frog, those are elements of expressive activity." No clarification was offered as to how to determine when something was a "costume" or if an actual medical or religious reason was needed to cover one's face.[23]

49.    Echoing the silence in the legislative materials, the presentation did not address any of the concerns raised by the public or the press rights groups about safety gear serving a life-saving and vital function when observing public demonstrations.

50.    The public was quick to highlight the illogical results flowing from the amendments. One community member expressed confusion about whether he could be arrested for wearing a Snow White costume and a mask as part of a street theater act. Expanding on this question, another commenter observed: "So a person who comes in that Snow White costume with that mask is now given more freedom than the same exact person who goes to their car, takes off the Snow White mask, puts on a yellow bandana, and walks back into the protest?" He then asked: "If I was going to come to a protest in a costume as a masked protester, for example, is now my mask finally a part of my expressive right to then wear that mask?"[24]

51.    Another commenter objected that the Ordinance "likens peaceful protesters wearing masks to violent criminals." And asked: "Does the City seriously believe that, on Halloween, a person is any less dangerous or their identity is any less concealed?" "By creating an arbitrary exception," he said, "the City admits that a mask alone is not a danger. The perceived danger is a mask in a political setting."[25]

---

[23] City of Modesto, *12/2/2025 – City of Modesto Council Meeting,* YouTube (Dec. 2, 2025) https://tinyurl.com/3vkstntx (timestamps 1:12:40; 1:32:40; 2:44:05; 2:45:01).

[24] City of Modesto, *12/2/2025 – City of Modesto Council Meeting,* YouTube (Dec. 2, 2025) https://tinyurl.com/3vkstntx (timestamps 1:43:15; 1:58:19; 1:58:58).

[25] City of Modesto, *12/2/2025 – City of Modesto Council Meeting,* YouTube (Dec. 2, 2025) https://tinyurl.com/3vkstntx (timestamp: 2:12:30-2:15:30).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

**E. The amended Ordinance leads to absurd results.**

52.    As forecasted at the December 2, 2025 City Council meeting, the amended Ordinance does lead to absurd results. The tables below capture some of the photographs presented to the Council or show some of the costumes referred to during its deliberations. The difference between the attire is subtle, but the consequences are not. The lefthand column shows items that are allowed, while the right-hand column shows items that expose anyone who utilizes, carries, or even possesses them at "any public assembly" to arrest and six months in jail.

**TABLE 1[26]**

| ALLOWED | SUBJECT TO ARREST AND JAIL TIME |
|---|---|
| Council Presentation (timestamp 1:15:45) | Agenda Report Index – Exhibit 3 |
| Agenda Report Index – Exhibit 18 | Agenda Report Index – Exhibit 9 |

[26] The Frog Costume appears in an article by Abigail Dollins entitled *See how Portland keeps it 'weird' as ICE patrols streets*, USA Today (Oct. 16, 2025), https://tinyurl.com/5n87bpk4/. The Ninja Costume can be purchased from Michael's for $29.99, https://tinyurl.com/25sjsrdt. All other pictures appeared in the City Council Presentation, the Agenda Report Index of Exhibits, or both. *See* City of Modesto, *Council Agenda Report re: Urgency Ordinance and Non-Urgency Ordinance Amending the City of Modesto Municipal Code Title 4 Chapter 23*, City Council Meeting Agenda Packet, Index of Exhibits (Dec. 2, 2025) access at https://tinyurl.com/44ha6ea4; *see also* City of Modesto, *12/2/2025 – City of Modesto Council Meeting*, YouTube (Dec. 2, 2025), https://tinyurl.com/449hp5f5 (timestamp 1:15:45).

21
COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

| ALLOWED | SUBJECT TO ARREST AND JAIL TIME |
|---|---|
| Agenda Report Index – Exhibit 21 | Agenda Report Index – Exhibit 4 |
| Agenda Report Index – Exhibit 11 | Agenda Report Index – Exhibit 11 |
| Frog Costume | Agenda Report Index – Exhibit 16 |
| Ninja Costume | Agenda Report Index – Exhibit 4 |

53.    The Ordinance also bars journalists from wearing the standard gear pictured in Table 2, leaving them to weigh the risk of arrest and jail time against their professional duty to report public events and their personal safety when covering public demonstrations. Yet the Ordinance, simultaneously permits people to dress up in costumes featuring Snow White, Darth Vader, or potentially even an ICE agent in protective gear.

**TABLE 2[27]**

| ALLOWED | BANNED | BANNED |
|---|---|---|
| Darth Vader Costume | Press in Helmet with Gas Mask | Press in Helmet with Vest |

54.    And the Ordinance leaves much speculation about whether this bicyclist possessing a prohibited helmet would run afoul of the Ordinance during Modesto's Annual "Bike N'Trike" celebration at Roosevelt Park, where community members gather for food and to do "hands-on activities" besides riding bicycles.[28]



[27] The Darth Vader costume can be purchased on Etsy for $61.25. *See* ProCosplayProps, *Handmade Star Wars Inspired Darth Vader Cosplay Costume*, Etsy (Mar. 1, 2026), https://tinyurl.com/mr262zay. The press picture in the middle features a high school student covering a Portland Black Lives Matter protest for her high school paper. *See* Lisa Grace Lednicer, *How a high school journalist geared up to cover protests in Portland, Oregon* (Aug. 20, 2020) https://tinyurl.com/36s8na8a. The press picture on the right is of independent journalist Jake Lee Green, who—as discussed at Paragraph 80—was injured covering a protest in Modesto.

[28] *See* Modesto Children Museum, *Annual Crowd-Drawing Celebration Coming Back to Modesto. Where, When,* https://tinyurl.com/2d8eht73

## II. Protests and public assemblies are fundamental to democracy, but present unique risks for attendees.

55.    The "Framers of our Constitution" considered "freedom of speech[,] a free press, [and] the right of peaceable assembly to lie at the foundation of a government based upon the consent of an informed citizenry—a government dedicated to the establishment of justice and the preservation of liberty." (*Bates v. City of Little Rock* (1960) 361 U.S. 516, 522-23.) Enshrined in both the U.S. and the California Constitutions, these special freedoms must be "protected not only against heavy-handed frontal attack, but also from being stifled by more subtle government interference." (*Id.* at p. 523; *Ghafari*, *supra*, 87 Cal.App.3d at p. 260 [quoting *Bates*].)

56.    Given the importance of these rights, robust safeguards exist to protect the act of protesting whether in the form of marches and demonstrations (*Edwards v. South Carolina* (1963) 372 U.S. 229); picketing (*Police Dep't of Chicago v. Mosley* (1972) 408 U.S. 92); or the distribution of leaflets (*Schneider v. State of New Jersey, Town of Irvington* (1939) 308 U.S. 147; *Org. for a Better Austin v. Keefe* (1971) 402 U.S. 415). In California, courts have concluded that state constitutional guarantees for the rights of free speech encompass a "protective provision more definitive and inclusive than the First Amendment." (*Wilson v. Superior Court* (1975) 13 Cal.3d 652, 658.)

57.    Equally robust protections exist for the press when covering the news under both federal law and state law. (*See Richmond Newspapers, Inc. v. Virginia* (1980) 448 U.S. 555, 576 [recognizing First Amendment protection for newsgathering because "without some protection for seeking out the news, freedom of the press could be eviscerated"]; *San Jose Mercury News v. Municipal Court* (1982) 30 Cal.3d 498, 508 [noting that under the California constitution "potential infringements of the people's need for informed speech call for specially astute analysis"]; *Nicholson v. McClatchy Newspapers* (1986) 177 Cal.App.3d 509, 513 ["[T]he First Amendment protects the ordinary news gathering techniques of reporters."].)

58.    "Demonstrations can be expected when the government acts in highly controversial ways, or other events occur that excite or arouse the passions of the citizenry." (*Collins*, *supra*, 110 F.3d at p. 1372 [citing *Cox v. Louisiana* (1965) 379 U.S. 536, 551].) First Amendment activities cannot

24
COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

"be banned simply because prior similar activity led to or involved instances of violence." (*Ibid*.) Nor can officials punish people at a public assembly just because others might find their speech offensive or objectionable (*Cohen v. California* (1971) 403 U.S.15, 25-26; *Snyder v. Phelps* (2011) 562 U.S. 443, 458); or because others present are engaged in criminal activity (*N.A.A.C.P. v. Claiborne Hardware Co.* (1982) 458 U.S. 886, 916; *see also Index Newspapers LLC v. U.S. Marshals Serv.* (9th Cir. 2020) 977 F.3d 817, 834 ["The many peaceful protesters, journalists, and members of the general public cannot be punished for the violent acts of others."].)

59.    Plaintiffs contend that Modesto grossly misjudges the weight of these protections, but they do agree with the City in one important respect: protests and public demonstrations can put people at risk. This risk does not, however, stem primarily from the bogeyman protester throwing his helmet or masking her face. Nor does it come from members of the press wearing basic safety gear and reporting on public demonstrations.

60.    Rather, the risk can often come from law enforcement's use of "kinetic energy projectiles and chemical agents" when officers attempt to disperse an assembly, protest, or demonstration. Officers—who are authorized to use these "less lethal" crowd control measures under Penal Code section 13652—may deploy "rubber bullets [and] beanbag rounds" as well as "chloroacetophenone tear gas," "2-chlorobenzalmalononitrile gas," "pepper balls, pepper spray, [and] oleoresin capsicum." (Pen. Code, § 13652, subd. (d); *see also* Modesto Police Department, *Modesto PD Policy Manual* ("MPD Policy") at p. 71-72, 544 (Jul. 1, 2024), https://tinyurl.com/kjrtuc7s.)

61.    These measures do not just inflict a transient harm on a few "bad actors." They have broadly diffuse impacts that can be very detrimental to anyone in the vicinity of their use—law-abiding protesters and journalists included. For instance, rubber bullets have an irregular shape that can cause them to tumble and ricochet, resulting in unpredictable trajectories that lead to bystander injuries. Rubber bullets are also fired at extremely high velocities and, when fired at close range, are capable of breaking bones, fracturing a skull, or destroying an eye socket. Tear gas that is deployed in tight spaces can cause chemical burns, breathing problems, agitation, disorientation, sensations of suffocation, severe pain, and damage to the eyes or other mucous

25

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

membranes of anyone who comes in contact. Sometimes the fired tear gas canisters themselves hit a person's head or body, causing skull fractures and even death.[29]

62.    California law and Modesto Police's policy for responding to public assemblies explicitly recognize the risk of collateral impact on bystanders. Both require that officers "minimize the possible incidental impact of their use of kinetic energy projectiles and chemical agents on bystanders, medical personnel, journalists, or other unintended targets." (Pen. Code, § 13652, (subd. (b)(6)); MPD Policy 466 at p. 431-438, https://tinyurl.com/kjrtuc7s.)

63.    In light of the gravity of these risks, groups like Physicians for Human Rights which document the adverse health impacts of less lethal crowd control methods advise anyone attending a protest to carry "scarves or bandanas large enough to cover [the] face from nose to chin" and "[s]hatter-resistant eye protection (e.g. shatter-resistant sunglasses, swim goggles, or a gas mask)" to protect against chemical agents. They further advise anyone who wears contact lenses to "keep a full facial gas mask or goggles on at all times." The American Academy of Ophthalmology also emphasizes that goggles may help to provide eye protection from projectiles like rubber bullets.[30]

64.    The accessories, face coverings, and safety gear banned by the Ordinance, such as goggles, gas masks, helmets, and vests, can lessen the detrimental effects of less-lethal crowd control measures when people are complying with dispersal orders. This safety gear is not the exclusive province of people intent on defying lawful police orders or disturbing the peace. And regardless, if an individual were to wear some of this gear *and* defy lawful orders, the City would be able to address the situation even without the Ordinance because it would have—in the words of the *Ghafari* court—much more narrowly tailored "legal armamentarium" at its disposal. (87

---

[29] *See* generally Physicians for Human Rights ("PHR") & International Network of Civil Liberties Organizations ("INCLO"), *Lethal in Disguise 2: How Crowd Control Weapons Impact Health and Human* Rights, (Mar. 1, 2023), https://tinyurl.com/3s7znw63; PHR & INCLO, *Lethal in Disguise: The Health Consequences of Crowd Control Weapons*, (Mar. 1, 2016), https://tinyurl.com/yn6z8faa.

[30] *See Preparing for, Protecting Against, and Treating Tear Gas and Other Chemical Irritant Exposure: A Protestor's Guide*, Physicians for Human Rights (2025), https://tinyurl.com/yvzdfyfa; Louryn Strampe, Lauren Goode, Boone Ashworth, *How to Protest Safely: What to Bring, What to Do, and What to Avoid*, WIRED (Jun. 11, 2025), https://tinyurl.com/bjpx3urb; *Eye Protection for Tear Gas and other Hazards: A Protest Safety Guide*, American Academy of Ophthalmology (Jan. 15, 2026), https://tinyurl.com/2pd3b7nk.

Cal.App.2d at p. 262.) As discussed in more detail below, officers do not need the Ordinance because they already have the authority to arrest any protester concealing their identity while committing an unlawful act like failing to disperse, causing a riot, resisting arrest, and so on.

65.   Modesto, motivated by its singular view of the "Proud Boys" and "Antifa," has imposed a blanket ban on even possessing certain types of face coverings and basic safety gear at *any* public assembly. These restrictions put everyone in Modesto at risk. But the risks do manifest differently for the press and the public and thus cause different constitutional harms. The next two sections elucidate these harms—first for journalists, then for protesters, while the final section discusses other available law enforcement tools to help maintain public safety in the City.

**III.   The Ordinance misapprehends the importance of a free press and undercuts constitutional and statutory protections for newsgathering at protests.**

**A.   The press is an essential watchdog at protests.**

66.   The U.S. Constitution "specifically selected" the press to serve "an important role in the discussion of public affairs" and to be "a powerful antidote to any abuses of power by governmental officials." (*Mills v. Alabama* (1966) 384 U.S. 214, 219.) For "a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations." (*Cox*, *supra*, 420 U.S. at pp. 491–92.) "Without the information provided by the press, most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government." (*Ibid.*) Indeed, the public has a protected right to receive reporting from a free press. (*See Stanley v. Georgia* (1969) 394 U.S. 557, 564 ["It is now well established that the Constitution protects the right to receive information and ideas."].)

67.   Because the press is "the information-gathering agent of the public," the public has a strong interest in ensuring that reporters have access to public affairs and protecting that access. (*Nixon v. Warner Communications, Inc.* (1978) 435 U.S. 589, 609.) Such protections safeguard the newsgathering process and all predicates for it, including the press' ability to access places traditionally open to the public and observe events there. (*Richmond Newspapers Inc. v. Virginia*

(1980) 448 U.S. 555, 576-77 [recognizing that the First Amendment protects the "right of access" as part of the broader "right to gather information" because journalists cannot report on events that they cannot observe]; *Garcia v. County of Alameda* (9th Cir. 2025) 150 F.4th 1224, 1231 [holding that observation of a public event was protected by the First Amendment because it was "predicate for, and thus inextricably intertwined with" reporting on the event].)

68.    Protests—and how the government responds to them—are matters of the utmost public concern. Accordingly, courts have recognized that the press can have a protected right to remain in active dispersal areas to report on law enforcement protest response. (*See Index Newspapers LLC*, *supra*, 977 F.3d at p. 834; *Los Angeles Press Club v. Noem* (C.D. Cal. 2025) 799 F.Supp.3d 1036, 1045; *Goyette v. City of Minneapolis* (D. Minn. 2021) 338 F.R.D. 109, 116; *see also Garcia*, *supra*, 150 F.4th at p. 1230 [firsthand observation is "quintessential function of a reporter"].)

69.    Absent the lens of a reporter, camera operator, or videographer, the public would not have the full picture of a demonstration, including the unruliness of a crowd and any uses of force. Nor would the public have a frame to push back against official narratives that may be misleading or even false. If it were not for on-scene reporters, for example, the public might have believed the government's initial (false) accounts that Kent State students gunned down by the National Guard on May 4, 1970 were armed—which they were not.[31]

70.    In a recent a*mici curiae* brief authored by the Reporters Committee for Freedom of the Press and joined by 44 news and advocacy organizations, the groups highlighted other examples of times when reporters provided the public with essential facts. Among the examples cited was a 1968 Report by President Lydon B. Johnson's Kerner Commission that found reporters had played an important role in uncovering misleading government accounts that a protest had been egged on by "nests of snipers." In reality, reporters on the ground observed that the "snipers" were different

---

[31] *See* Robert Giles, <u>When Truth Mattered: The Kent State Shootings 50 Years Later</u> (Mission Point Press 2020) (news editor detailing efforts to report truth amidst conflicting initial reports). For modern-day analogue, see Nathan O'Neal, *ICE Claims Repeatedly Undercut by Video*, Fox9 KMSP (Feb. 25, 2026), https://tinyurl.com/3a24xt2m.

law enforcement groups "shooting at each other."[32]

71.   The Reporters Committee brief cites more recent examples as well, the titles of which reveal their import:

- Alex Horton, *In Violent Protest Incidents a Theme Emerges: Videos Contradict Police Accounts*, Wash. Post (June 6, 2020), https://perma.cc/UTU8-5VX7;

- Bill Hutchinson, *Trump Says LA is Under Siege, but the Mayor and Governor Paint a Different Picture*, ABC News (June 10, 2025), https://bit.ly/4p6wyHN;

- Bill Kirkos, et al. *Federal Judge Says Border Patrol Chief Admitted He Lied in Ruling Limiting Agents' Use of Force in Chicago*, CNN (Nov. 7, 2025) https://perma.cc/S6DW-NBAR;

- Claire Rush & Melissa Goldin, *FACT FOCUS: Trump Paints a Grim Portrait of Portland. The Story on the Ground is Much Less Extreme*, Associated Press (Oct. 9, 2025), https://perma.cc/U5C9- BNYA;

**B.  California law specifically ensures the press be able to report at protests.**

72.   Given the press's important role of reporting on protests and public assemblies, California includes a statutory protection for journalists so that they may remain in an area after an unlawful assembly is declared and a dispersal order is given. Senate Bill 98, passed in 2021 and codified at Penal Code section 409.7, ensures the right of the press to observe and record law enforcement activities at public protests.

73.   In enacting Section 409.7, the Legislature recognized that, although existing "California law protects members of the press from being stopped when entering closed areas during emergencies and natural disasters to gather information, these protections don't extend to protest events such as demonstrations, marches, protests, or rallies where individuals largely engage their First Amendment right to speech."[33]

74.   The bill's author stated that it was enacted following widespread assaults and arrests of reporters covering the protests in response to the killing of George Floyd in 2020. "In California and across the country police have arrested, detained, and have physically assaulted journalists

[32] *See Los Angeles Press Club v. Noem* (9th Cir. Nov. 25, 2025), Case No. 25-5975, Dkt. No. 46.1, available at https://tinyurl.com/ym4zbsua; *see also id.* at p. 23 (citing Report of the National Advisory Commission on Civil Disorders, 202 (1968) https://perma.cc/D3J2-SFGQ.).

[33] Assem. Pub. Safety Committee Analysis, California Senate Bill No. 98, California 2021- 2022 Regular Session (Jul. 13, 2021), available at https://perma.cc/N5YX-YAEQ.

with rubber bullets, pepper spray, tear gas, batons, and fists. In many cases there are strong indications that the officers injuring journalists knew their targets were members of the press. Members of the press risk their personal safety and well-being each time they attend protest events to get the public the information they need, but rubber bullets, teargas, and even arrest cannot be the norm for an essential pillar of our democracy." (*Ibid.*)

75.   Section 409.7 to the Penal Code reads as follows, in relevant part:

409.7. (a) If peace officers . . . close the immediate area surrounding any emergency field command post or any other command post, or establish a police line, or rolling closure at a demonstration, march, protest, or rally where individuals are engaged in activity that is protected pursuant to the First Amendment to the United States Constitution or Article I of the California Constitution, the following requirements shall apply:

(1) A duly authorized representative of any news service, online news service, newspaper, or radio or television station or network may enter the closed areas described in this section.
(2) A peace officer or other law enforcement officer shall not intentionally assault, interfere with, or obstruct the duly authorized representative of any news service, online news service, newspaper, or radio or television station or network who is gathering, receiving, or processing information for communication to the public
(3) A duly authorized representative of any news service, online news service, newspaper, or radio or television station or network that is in a closed area described in this section shall not be cited for the failure to disperse, a violation of a curfew, or a violation of paragraph (1) of subdivision (a) of Section 148, for gathering, receiving, or processing information[.]

**C.   The press cannot safely report on protests without access to safety gear.**

76.   The press, including the NewsGuild and its members, face chaotic and sometimes dangerous environments when reporting on protests. This truism, while accurate across the country, is particularly resonant in California because of Penal Code section 409.7. Reporting from an area where police are engaged in crowd control activities puts journalists in the crosshairs at the exact moment when crowd dispersal measures are most likely to be deployed.

77.   Journalists at a protest are routinely impacted by rubber bullets with unpredictable trajectories and easily dispersed tear gas. During the Black Lives Matter protests in 2020, for example, the Reporters Committee tallied hundreds of physical attacks on reporters, most due to crowd control weapons at protests. The injuries ranged from concussions to broken bones. One reporter, journalist Linda Tirado, lost sight in one of her eyes after being shot in the head with a

non-lethal munition.[34] The incident was reminiscent of a defining moment in the era of Vietnam War protests, when police deployed tear gas and the canister struck long-time reporter Ruben Salazar in the head, killing him while he was covering the National Chicano Moratorium in Los Angeles.[35]

78.   More recently, in *Los Angeles Press Club v. City of Los Angeles* (C.D. Cal. 2025) 799 F.Supp.3d 1007, 1015, journalists covering protests over the government's immigration crackdown sued the city of Los Angeles for unlawful and violent tactics by police. Pictures of the injuries sustained show members of the press with bloody head gashes, bruises, and welts on their chests, stomachs, and legs. The court, in issuing an injunction, recounted a "long and unfortunate saga" of officers striking journalists and others not engaged in any criminal activity with projectiles, munitions, stinger grenades, and bean bag shots, as well as with batons and other force. (*Ibid.*  [citing *Crespo v. City of Los Angeles* (C.D. Cal. 2000) No. 2:00-cv-08869 GHK (RC); *Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles* (C.D. Cal. 2007) 246 F.R.D. 621, 624; *Black Lives Matter Los Angeles v. City of Los Angeles* (C.D. Cal. Apr. 28, 2021) No. CV-20-5027-CBM-ASX, 2021 WL 3163306, at *2].)[36]

79.   The *Los Angeles Press Club* court is not alone in its findings. Courts have repeatedly recognized that, when the government unleashes crowd control weapons targeting or impacting journalists at a protest, it can have a chilling effect on constitutionally protected newsgathering and, consequently, on the public's access to reporting on these matters. (*See Index Newspapers*, *supra*, 977 F.3d at pp. 828-29 [affirming that crowd control measures on plaintiff journalists chilled their First Amendment rights]; *Dickinson (a.k.a. "the Portland Chicken") v. Trump*, Case No. 3:25-cv-02170-SI, (D. Or. Feb. 3, 2026) __ F.Supp.3d__, 2026 WL 279917, at *6, 9.)

---

[34] *See* Reporters Comm. for Freedom of the Press, *Press Freedoms in the United States 2020*, at p. 8 (2021), https://tinyurl.com/khbj7mr7.); *see also* Linda Tirado, *I Came to the Minneapolis Protests to Cover Police Aggression. Then I Became the Victim of It*, NBC News (Jun. 1, 2020), https://tinyurl.com/3rttmw74.

[35] *See* Raul A. Reyes, *Prominent Latino journalist Ruben Salazar, Killed 50 Years Ago, Tackled Racism, Identity*, NBC News (Aug. 28, 2020), https://tinyurl.com/ytz5vhae.

[36] *See also* Human Rights Watch, *US: Excessive Force Against LA Protesters* (Aug. 18, 2025), https://tinyurl.com/3bxmskh8 (multiple incidents of use of force against press, including shooting of LA Daily News Reporter above the ear with less lethal projectile followed by tear gas).

---

80. Modesto journalists are similarly at risk. During the August 2022 Straight Pride Event, independent photojournalist Jake Lee Green was documenting officers who seemed to be indiscriminately firing pepper ball rounds into a crowd of protesters when he himself was hit. The pepper ball exploded against his leg and released powdered chemical irritants into his body. The powdery substance got into his eyes, lungs, and equipment. It took weeks for Mr. Green's injury to heal. Before being shot, he had not engaged in any unlawful conduct and had his press credentials on his hat so they could easily be seen.[37]

81. Given the risks that the press faces when covering protests, journalists increasingly consider it standard practice to carry basic safety gear to a public demonstration. Professional organizations, like the Committee to Protect Journalists, advise that members of the press carry a safety kit, including protective goggles, tear gas respirators, and hard-shell helmets. These items are essential to ensuring journalists are able to protect their vital organs from crowd control weapons and to continue reporting even from areas where tear gas is deployed.[38]  But the press is prohibited from wearing or possessing every one of these items under the Ordinance.

82. Simply stated, journalists cannot do their jobs when they are on the receiving end of direct, or indirect, use of force without basic safety gear to shield them. Nor can they do to their jobs if they cannot see or breathe. Here, by denying the press the right to even carry safety gear, Modesto jeopardizes the NewsGuild's members' and other journalists' physical safety, thwarts their ability to gather (and the public's right to receive) firsthand news, and, for all practical purposes, excludes the press from unlawful assemblies in violation of Penal Code section 409.7.

## IV. The Ordinance chills speech and restricts the ability of protesters to protect themselves.

### A. Law-abiding protesters and bystanders risk injury without access to basic safety gear.

83. Similar to journalists covering protests, peaceful protesters who are complying with, or

---

[37] *See* Press Freedom Tracker, *Independent Journalist Shot with Pepper Ball at Modesto Protest*, https://tinyurl.com/47eaaryw.

[38] Committee to Protect Journalists, *Physical and digital safety: Civil Disorder* (Sept. 10, 2018), https://tinyurl.com/2vnux7tu; Committee to Protect Journalists, *A Guide to PPE*, https://tinyurl.com/2hcmk2m2.

---

attempting to comply with, lawful orders can be impacted by less-lethal munitions. Plaintiffs and other members of the public should not be forced to choose between foregoing their physical safety and risking criminal sanctions when seeking to exercise their constitutionally protected right to peaceful assembly. Ms. Ramirez, for example, has no intent to defy any dispersal orders or commit a violent act at a protest, but she still wishes to bring a helmet and goggles in her backpack in case officers opt to use unpredictable rubber bullets or easily dispersed tear gas. The Ordinance, however, would subject her to six months in jail for doing so.

84.   Recent events in California demonstrate that the risk of bodily harm to individuals in the protest context is not hypothetical. To take just a few examples: at a rally in Santa Ana, a Department of Homeland Security officer fired a nonlethal round that hit twenty-one-year-old Kaden Rummler, who was standing just a few feet away. Rummler underwent six hours of surgery and permanently lost vision in his left eye.[39] A 23-year-old autistic man at an anti-ICE protest in Los Angeles also permanently lost vision in his eye after being hit with a projectile fired by law enforcement.[40] And at protest over the murder of George Floyd in Sacramento, police officers injured Navy veteran Danny Garza, who was acting as a legal observer when a bean bag round hit him in the face causing traumatic brain injury. The city recently settled Mr. Garza's lawsuit for $2.2 million.[41]

85.   The reality is that dispersal orders are not always clear or audible, and people may not have a reasonable opportunity to disperse. Thus, despite best efforts, even those acting in good faith can easily become caught up with non-compliant individuals in a chaotic environment. At a No Kings protest in Los Angeles, for instance, Christopher Fernandez, an intensive care nurse, did

---

[39] Ruben Vives and Itzel Luna, *Anti-Ice Protester Blinded by Federal Agent During Demonstration in Santa Ana, Family Says,* LA Times (Jan. 13, 2025), https://tinyurl.com/5cfdnc6p (also describing that an individual attempting to record the aftermath of Rummler's injury was shot at the back of the head and neck by pepper balls).

[40] James Queally and Libor Jany, *LAPD Fired Munition at Anti-ICE Protest that Left Man Blind in One Eye,* LA Times (Mar. 19, 2026) https://tinyurl.com/2tjmf7hh.

[41] Steve Large, *Sacramento to pay $2.2 million to man injured by police during George Floyd protests - CBS Sacramento,* CBS News (Feb. 9, 2026), https://tinyurl.com/5duaxwnn.

not hear any dispersal order before he was shot in the back of his left thigh with a foam projectile while rendering aid to protesters injured by kinetic impact projectiles and tear gas.[42]

86.    Individuals who are not attempting to break the law should be permitted to protect themselves from serious physical harm if they want to carry or use basic safety equipment at protests, especially when situations become highly volatile. Modesto ignores this reality. The Ordinance prohibits basic safety gear that could mitigate severe harms on the mistaken assumption that only people who want to engage in violence carry this gear. In so doing, the Ordinance sweeps far too broadly.

### B. Omnipresent surveillance presents a significant risk to protesters and exposes them to retaliation for engaging in protected activities.

87.    In addition to physical injury, the Ordinance subjects peaceful, law-abiding protesters like Plaintiffs to another distinct risk: enhanced surveillance by government and private actors. As both public and private actors increasingly rely on invasive technologies to identify protesters, many members of the public worry that their protected expression could lead to negative, life-altering repercussions if they are identified at a particular protest. Face coverings serve as a basic means of protecting individuals' ability to freely associate and speak out on matters of public concern. The ability to wear them implicates constitutional rights and should not be contingent on the pretense of a sincere "religious belief" or "medical necessity," or the discretion of an officer evaluating the expressiveness of a "costume."[43]

---

[42] *US: Excessive Force Against LA Protesters*, Human Rights Watch (Aug. 18, 2025), https://tinyurl.com/3bxmskh8 (also describing the experience of Sergio Espejo, at the same protest, who stated he only heard deputies make an inaudible announcement only before they began firing tear gas and stun grenades. After a flash bang device exploded upon impact on his hand, he was rushed to the hospital where the top two inches of his left index finger were amputated.).

[43] *See* Andy Greenberg & Lily Hay Newman, *How to Protest Safely in the Age of Surveillance*, WIRED (Jan. 8, 2026), https://tinyurl.com/4rrw69b2; Nicholas Fandos, *In an Online World, a New Generation of Protesters Chooses Anonymity*, New York Times (May 2, 2024), https://tinyurl.com/huyjje8z; Joseph Denney & Inga Kristina Trauthig, *How Digital Surveillance Deters Protest Participation*, Univ. of Texas at Austin, Center for Media Engagement, (Mar. 9, 2022), https://tinyurl.com/juhawfm9.

88.    Government surveillance of protests is no secret, but its scope today is unprecedented. Across California, law enforcement agencies maintain an extensive surveillance infrastructure.[44] More locally, the Modesto Police Department compiles live video and data from hundreds of traffic cameras, automatic license plate readers, and body-worn cameras into its "Real Time Crime Center."[45] Some of this data has, as Modesto admits, been shared with federal agencies, including Customs & Border Patrol, the IRS Criminal Investigations Department, and the Department of Veterans Affairs, in violation of state law.[46]

89.    Research shows that "ethnic minorities [are] at greater risk of oversurveillance" by the government during and after a protest.[47] Indeed, Modesto specifically amped up its surveillance for the ICE Out rally, deploying airborne drones and specially placing a security camera at the 10th Street Plaza to monitor the protest. No reports established that the same enhanced surveillance measures were taken in preparation for the No Kings protest on June 14.[48]

90.    Private actors also generate vast amounts of visual data about people in public spaces. Security cameras, now commonplace features of businesses and homes, are part of the broader surveillance ecosystem.[49] And nearly every person over 16 years old owns a phone equipped with a camera that can film or photograph the people around them.[50]

---

[44] *See, e.g.*, *ACLU Investigation Uncovers Footage from Widespread Aerial Surveillance of Racial Justice Protests* (Nov. 16, 2021), https://tinyurl.com/3p6fyfpp (California Highway Patrol recorded protesters from the skies in dozens of California cities after murder of George Floyd).

[45] Maria Luis Figueroa, *Modesto police's real-time crime center captures video around city. "Like an episode of 'Cops'"* Modesto Bee (Feb. 8, 2025), https://tinyurl.com/34rxa8wf.

[46] Facebook, *Modesto Police Department* (Mar. 13, 2026), https://tinyurl.com/3r53za62; *see also* Julietta Bisharyan, *Modesto Police Find Federal Agencies Had Prohibited Access to License Plate Data* (Mar. 13, 2026), https://tinyurl.com/k9aba33f.

[47] Privacy International, *Ethnic Minorities at Greater Risk of Oversurveillance After Protests* (June 15, 2020), https://tinyurl.com/2mj47src.

[48] City of Modesto, Community Police Review Board Meeting, YouTube (Jul. 16, 2025) https://tinyurl.com/2n96myf8 (timestamp 14:44-30:30).

[49] *See* Sam Sabin, *Doorbell cams, surveillance tech face growing backlash*, Axios (Feb. 17, 2026), https://tinyurl.com/mtvxvyzu.

[50] *See* Darrell M. West, *How technology is altering citizen protests*, Brookings (Sept. 30, 2025), https://tinyurl.com/bdfdbtsc.

---

35
COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

91.    The large amount of private information that can be gathered via surveillance is supercharged by the increasing ubiquity of facial recognition technology. Today, a single photograph of a person's face can be used to identify them almost instantaneously. Technologies produced by data analytics companies like Palantir and Clearview AI help officers run pictures through government databases to seek a visual match or build up an individual's dossier. A match can quickly reveal a person's name, date of birth, immigration status, and other personal data. ICE's use of this facial recognition technology is well documented, but other agencies as well as private actors are increasingly using it as well.[51]

92.    For some individuals, showing their face—and thus revealing their identity—at a protest over a controversial issue can jeopardize their safety, immigration status, employment, and mental well-being. As the *Ghafari* court held when striking down California's similar ban on face coverings in public, enforcement of the statute either "inhibits the exercise of free speech" or risks harming "the speaker who dares." (87 Cal.App.3d at p. 261.) Mere identification in connection with speech has caused professors to face abrupt termination,[52] and students to suffer disciplinary action[53] and embarrassing public campaigns.[54] Some corporate executives have called for employers to blacklist or refuse to hire individuals who espouse certain viewpoints.[55]

---

[51] *See* Jay Stanley, *Face Recognition and the 'Trump Terror': A Marriage Made in Hell*, ACLU (Nov. 13, 2025), https://tinyurl.com/39sjrvvr*; see also* Jude Joffe-Block, *A new lawsuit alleges DHS illegally tracked and intimidated observers*, NPR (Feb. 23, 2026), https://tinyurl.com/krk3cwnj; Adam Geller, *Private groups work to identify and report student protesters for possible deportation*, AP News (Mar. 28, 2025), https://tinyurl.com/36dezxv5.

[52] Anna Liz Nichols, *Lawsuit alleges former University of Michigan employees were fired for participating in protests*, Michigan Advance (May 2, 2025),  https://tinyurl.com/ycxe7sby.

[53] Arielle Robinson, *Tulane accuses students who participated in peaceful, off-campus protest of conduct violations* (Mar. 31, 2025), https://tinyurl.com/4ybzda86.

[54] *See, e.g.,* Tristan Hernandez & Esma Okutan, *'Doxxing truck' targets Yale, Harvard students on the day of The Game*, Yale News (Nov. 18, 2023) https://tinyurl.com/5n6za24h; Gabe Stut, *Family homes of Berkeley Law students targeted by conservative media group*, JWeekly (Jan. 17, 2023), https://tinyurl.com/348rcjap; Accuracy in Media, *Accuracy in Media brings mobile billboard to UW commencement (*Jun. 24, 2025), https://tinyurl.com/2wcv7fpj; *see also* Maya Mirsky, *Truck that doxxes alleged antisemites returns to UC Berkeley*, JWEEKLY (Feb. 6, 2024), https://tinyurl.com/24uf6wex.

[55] Clifford D. Solomon, *Op-Ed: Don't Hire My Anti-Semitic Law Students*, WALL ST. J. (Oct. 15, 2023), https://tinyurl.com/5tnr6atb.

93.    Additionally, in a practice known as "doxxing," private actors often publicly identify protesters with opposing views to harass them, harm their employment prospects, or shame them into silence. Victims of doxxing also frequently become the target of death threats, sexual harassment, and a malicious prank called "swatting," in which individuals make fake emergency calls to send a large, armed police response to the victim's home.[56]

94.    One concrete example showing the impact of face coverings is the case of Mahmoud Khalil, a lawful permanent resident and outspoken pro-Palestine advocate at Columbia University. Mr. Khalil, unlike many of the others with whom he associated, chose not to wear a mask at protests. He was thus readily identified by the group Canary Mission, which compiles public databases about individuals who advocate against Israel's actions in Gaza.[57] The group urged the government to detain Mr. Khalil, which it did for more than 100 days, causing him to miss the birth of his child. He is currently in deportation proceedings despite having committed no crime.[58]

95.    At the December 2, 2025 City Council meeting, a member of the public supporting the Ordinance stated that, if someone cares enough to protest about an issue, they should show their face when doing so. This statement ignores the reality that, for some, the stakes to maintaining one's anonymity in connection with controversial speech could not be higher. As has long been recognized, "anonymity is a shield from the tyranny of the majority." (*McIntyre v. Ohio Elections Comm'n* (1995) 514 U.S. 334, 357.) It "exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." (*Ibid.*) The statement also ignores our country's historical tradition, whereby even at the time of the nation's founding and the debate

---

[56] *See* Micah Lee, *How Right-Wing Extremists Stalk, Dox, and Harass their Enemies, The Intercept* (Sept. 6, 2017), https://tinyurl.com/45jaan4v; Emily Gorcenski, *Case #6847303: A Tale of Twitter's Broke Harassment Standards*, Medium (Oct. 17, 2017), https://tinyurl.com/bde8zmee.

[57] Canary Mission, *Welcome to Canary Mission* (last accessed Mar. 24, 2026) https://tinyurl.com/y69tzc4k.

[58] Michael Wilson, Michael Rothfeld and Ana Ley, *How Mahmoud Khalil, a Columbia Student Activist, Landed in Federal Detention*, New York Times (Mar. 16, 2025), https://tinyurl.com/jvtze7k9; Jonah E. Bromwich, *A Year After His Arrest, Mahmoud Khalil Lives in Limbo and in Fear*, New York Times (Mar. 8, 2026), https://tinyurl.com/3r4aync8.

over the Constitution, pamphleteers like the author of *Common Sense* and *The Federalist Papers* expressed their opinions anonymously.[59]

### C. Protesters wear certain face-coverings and other accessories to convey constitutionally protected symbolic expression.

96.    The Ordinance leads to yet one more free speech injury. It curtails the rights of the public—including Mr. Flores, Ms. Ramirez, and Ms. Leiva—to engage in symbolic expressive speech conveyed by their choice of face coverings and other accessories that "cover[] or partially cover[] the face from view and conceal[] the wearer's identity."

97.    The First Amendment's protections extend beyond "actual speech" to encompass "symbolic or expressive conduct." (*Virginia v. Black* (2003) 538 U.S. 343, 358; *Texas v. Johnson* (1989) 491 U.S. 397, 404 [flag burning is protected speech]; *Tinker v. Des Moines Independent Community School Dist.* (1969) 393 U.S. 503, 505 [wearing black armband at school in protest of Vietnam War is protected speech]; *Brown v. Louisiana* (1966) 383 U.S. 131, 141–142 [sit-in conveyed expressive message].)

98.    Masks are commonly worn at protests to communicate a political message or reflect support for a particular group or movement. The Ordinance undermines this protected expression and makes content-based distinctions about certain types of attire. It broadly bans face coverings that a police officer decides are not worn as a costume or for a religious or medical reason. But there is no compelling, or even rational, reason why the gaiter worn by Mr. Flores should be subject to criminal punishment, while other masks or costumes covering the same proportion (or more) of a protester's face would be acceptable. (*See Williams v. Pryor* (11th Cir. 2001) 240 F.3d 944, 948 & fn.2 [recognizing that the "irrationality of government attempts to regulate the dress and grooming of adults" are among the exceptional circumstances in which laws are found unconstitutional even under rational basis review].)

99.    There is also no compelling reason why Ms. Ramirez and Ms. Leiva, along with other members of the public, should not be able to wear a keffiyeh scarf to cover their faces as a symbol

---

[59] *See, e.g.,* L Wachoub, *Protecting Anonymous Speech Used to be 'Common Sense'*, Institute of Free Speech (Jan. 10, 2014), https://tinyurl.com/yyt5su9t.

of Palestinian solidarity, freedom, and defiance.[60] The Ordinance also targets other items that convey well-recognized expressive messages. Gas masks, for example, are often worn to protests to convey messages about environmental injustice.[61] And people often wear bandanas to express solidary with farmworkers—especially with female farmworkers, who are known to wear bandanas to shield themselves not only from dust and sun, but also from the unwanted attention of male co-workers and supervisors.[62]

**V. The Ordinance ignores longstanding law that already provides Modesto with the legal tools to address any unlawful conduct at a protest.**

100. Neither the First Amendment nor California law protects violent or otherwise unlawful activity. While "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation," the government may respond when unlawful acts do occur or when "advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." (*Brandenburg v. Ohio* (1968) 395 U.S. 444, 447.)

101. As the *Ghafari* court noted when it struck down California's state-wide ban on masks, where "protected activities may be involved," the Penal Code provides "police with the legal armamentarium to deal effectively" with disturbances at public assemblies. (87 Cal.App.3d at pp. 260, 262; *see also People v. Smith* (1967) 248 Cal.App.2d 134 [prosecution under a broad general statute is barred when the same acts are prohibited by a specific, more narrowly drawn statute]; *In re Williamson* (1969) 43 Cal.2d 651; *People v. Gilbert* (1969) 1 Cal.3d 475.)

---

[60] *See* Samaa Khullar, *Everything You've Heard About the Keffiyeh Is Wrong*, The Nation (Jul. 24, 2024), https://tinyurl.com/y727u29h [describing how the keffiyeh's historical role to help Palestinians conceal their identities from colonial authorities helped it to grow into a "shorthand for Palestinian struggle"].

[61] *See* Finis Dunway, *Gas Masks, Pogo, and the Ecological Indian: Earth Day and the Visual Politics of American Environmentalism*, 60 American Quarterly 67,  75, (Mar. 2008), available at https://tinyurl.com/5xzryyem [noting that protesters have historically worn gas masks to "express their outrage at the increasing levels of lead, carbon monoxide, and other pollutants in the atmosphere"]).

[62] *See* Lily Dayton, *Fields of Fear,* California Health Report (Aug. 15, 2014), https://tinyurl.com/5n76hs4u (detailing how organizations use white bandanas as a symbol of solidarity with women farmworkers facing sexual violence).

102. Thus, here, Modesto may take action when unlawful conduct intertwined with constitutionally protected activity arises. Among the Penal Code provisions at the City's disposal is section 407, which prohibits "unlawful assemblies," defined as "two or more persons assembl[ing] together to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous manner." Meanwhile, sections 404.6 and 406 criminalize inciting a riot or assembling together for a rout, and section 408 punishes any participation in such a rout or unlawful assembly. Section 409, in turn, criminalizes any person who remains at the scene of a "riot, rout, or unlawful assembly" after having received a clear, lawful order to disperse with sufficient time to comply. Where a riot might involve a "paramilitary" organization, the law imposes additional penalties as well. (Pen. Code, § 11460.)

103. Additionally, Modesto would have the ability under Penal Code section 148 to arrest people who are willfully resisting, delaying, or obstructing officers or emergency medical technicians. It could also arrest people under section 415 for disturbing the peace by fighting, noise, or offensive words that are "inherently likely to provoke an immediate violent reaction." Or it could employ section 416, which prohibits two or more people from assembling "for the purpose of disturbing the public peace" and then failing to disperse when ordered. (*Cf. In re Brown* (1973) 9 Cal.3d 612, 617-24 [construing statute more narrowly to comply with constitutional parameters]; *see also NAACP v. Claiborne Hardware* (1982) 458 U.S. 886, 908 [individual wrongdoing does not transform an otherwise lawful assembly into an unlawful assembly].)

104. Modesto would also be able to arrest and punish individuals engaging in other illegal acts during a public assembly. Statutes available to the City in this regard include Penal Code sections 594 (prohibiting vandalism), 463 (looting), 459 (burglary), 451 (arson), 602 (trespassing), and even 594.4 (defacing memorials). Of course, if an individual were to wear a mask for the purpose

of hiding their identity while committing any of these enumerated unlawful acts or other crimes, Modesto would be able to arrest and hold that person accountable under Penal Code section 185.[63]

105. What Modesto cannot do, however, is prophylactically shut down the right of the public and the press to wear certain accessories, face coverings, and basic safety gear when gathering to exercise their constitutional rights. Much to the City's chagrin, Modesto is legally bound to tolerate some amount of "waiting-and-seeing" at a protest. (*See Ghafari*, *supra*, 87 Cal.App.3d at p. 262; *Cox*, *supra*, 379 U.S. at p. 551.) Wearing certain attire at a protest or public demonstration that offends people or which some might associate with a group known for violent conduct is not *per se* illegal. (*See United States v. Mongol Nation* (2023) 56 F.4th 1244, 1249 [display of white nationalist group's collective membership marks constituted "expressive conduct communicating a person's association with the Mongol Nation, and his or her support for their views"].)

106. Although anonymity and basic safety gear could lend themselves to some abuse, the law and "our society accord[] greater weight to the value of free speech than to the dangers of its misuse." (*McIntyre*, *supra*, 514 U.S. at p. 357.) Where, as here, "we are dealing with First Amendment rights, 'broad prophylactic rules are suspect' and 'precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.'" (*Castro v. Superior Court* (1970) 9 Cal.App.3d 675, 683 [quoting *NAACP v. Button* (1963) 371 U.S. 415, 438]; *Alford v. Municipal Court* (1972) 26 Cal.App.3d 244, 247.) And if there were ever any uncertainty that Modesto has failed this precision test, "the benefit of any doubt" must be given "to protecting rather than stifling speech." (*Federal Election Comm'n v. Wisconsin Right to Life, Inc.* (2007) 551 U.S. 449, 469; *In re Kay* (1970) 1 Cal.3d 930, 941 ["The 'threat of sanctions may deter almost as potently as the application of sanctions . . . ."] [quoting *Burton v. Municipal Court* (1968) 68 Cal.2d 684, 691].)

---

[63] Federal law also criminalizes certain acts that might interfere with the constitutional rights of others. (*See* 18 U.S.C. § 241 [prohibiting two or more people from "conspir[ing] to injure, oppress, threaten, or intimidate" others "in the free exercise or enjoyment" of any constitutional right or federal statutory right]; *id.*, § 245 [criminalizing interference with federally protected activities]; *id.*, § 249 [criminalizing hate crimes]; *District of Columbia v. Heller* (2008) 554 U.S. 570, 621 [citing *Presser v. Illinois* (1886) 116 U.S. 252 for principle that the Second Amendment "does not prevent the prohibition of private paramilitary organizations" parading with weapons].)

## FIRST CAUSE OF ACTION

**Violation of Freedom of Speech and Assembly**
**(First and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983)**

107. Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

108. The First Amendment, as applied to state and local government agencies and officials by the Fourteenth Amendment, prohibits government entities from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble . . . ." The First Amendment protects the right to advocate, protest, assemble, and engage in expressive association, as well as the right of the press to gather, and the public to receive, news. The Ordinance is substantially overbroad on its face and impermissibly burdens these protected speech, expressive conduct, associational, and free press rights.

109. Constitutional principles protecting free expression and a free press are at their strongest when expressive activity takes place in parks or on public streets and sidewalks—exactly where the Ordinance applies. These public spaces are considered "traditional public fora that time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." (*Boos v. Barry* (1988) 485 U.S. 312, 318 [internal quotations omitted].) "In such places, the government's ability to restrict expressive activity is 'very limited.'" (*Ibid.* [quoting *United States v. Grace* (1983) 461 U.S. 171, 177].)

110. For any incursion into the realm of First Amendment rights in traditional public fora, courts apply heightened constitutional scrutiny. The "government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" (*Reed v. Town of Gilbert* (2015) 576 U.S. 155, 163 [quoting *Police Dept. of Chicago v. Mosley*, *supra*, 408 U.S. at p. 95]; *see also Ashcroft v. ACLU* (2002) 535 U.S. 564, 573.)

111. A law is deemed to be content-based, and thus "presumptively unconstitutional" and subject to strict scrutiny, if it is: (1) expressly targeted at speech on the basis of content (*Reed*, *supra*, 576 U.S. at p. 163); (2) facially content-neutral but borne of a discriminatory purpose or

42
COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

justification (*id.* at p. 164); or (3) prompted by the prospect of an adverse audience response (*Forsyth County*, *supra*, 505 U.S. at p. 134.) A content-based restriction fails strict scrutiny if not "narrowly tailored to serve compelling state interests." (*Reed*, *supra*, 576 U.S. at pp. 163-64; *Forsyth County*, *supra*, 505 U.S. at p. 124 [strict scrutiny applies if an otherwise content-neutral law is adopted because of a "disagreement with the message the speech conveys"].)

112. Intermediate scrutiny, in turn, applies to any restriction or law that is content-neutral and which concerns the time, place, or manner of an expressive activity. Under this test, the government must show that: (1) a law "furthers an important or substantial governmental interest;" (2) "the governmental interest is unrelated to the suppression of free expression;" and (3) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." (*United States v. O'Brien* (1968) 391 U.S. 367, 377.)  A law must be "narrowly tailored to serve a significant governmental interest" and cannot be "substantially broader than necessary to achieve the government's interest." (*Ward v. Rock Against Racism* (1989) 491 U.S. 781, 791 [citing *Clark v. Community for Creative Non-Violence* (1984) 468 U.S. 288, 293]; *see also McCullen v. Coakley* (2014) 573 U.S. 464, 486 [government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals"].)

113. The Ordinance fails under both constitutional tests because it is not narrowly tailored to serve the governmental interests asserted and because it punishes a substantially broader amount of express activity than is necessary. (*See McCullen v. Coakley* (2014) 573 U.S. 464, 486 [government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals"].)

114. Modesto maintains that it has a "significant governmental interest" in preventing the use of "hardshell helmets" as a weapon and "tactical gear, including gas masks [and] gear that further heightens individuals feeling that they can operate free of any accountability as to violent acts." It also explains that its "face covering provision is needed because various individuals wish to conceal their identity during public demonstrations so that they can be free from accountability for their criminal actions." Modesto asserts that these restrictions are necessary to further its

"substantial interest in safeguarding its citizens against violence" and protecting the property of citizens and the City against damage and destruction.[64]

115.  As the legislative history of the Ordinance dating back to 2019 demonstrates, Modesto adopted the Ordinance with a discriminatory purpose in mind—primarily its concern about the Proud Boys, Antifa, and a fear of what might happen at a Straight Pride event. The City has now twice amended the Ordinance with reference to these groups and no others. Their invocation as justification for the Ordinance is, at a minimum, suspect, as are the Ordinance's content-based restrictions on face coverings depending on style, fashion, and expressive message. Juxtaposing the Ordinance's explicit and complete ban on "balaclavas, ski masks, or the like" with its more favorable treatment of rainbow masks and full costumes gives rise to the inference that officials are impermissibly picking between speakers and their anticipated speech. (*See Reed*, *supra*, 576 U.S. at pp. 163-64; *Rosenberger v. Rector & Visitors of University of Virginia* (1995) 515 U.S. 819, 829 [government "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction"].)

116.  Even if considered content neutral, the Ordinance violates the First Amendment as an unreasonable time, place, manner restriction that is substantially overbroad because it sweeps in a great deal of activity that is either directly protected under the First Amendment, or a predicate for such activity. (*Griswold v. Connecticut* (1965) 381 U.S. 479, 481 [recognizing that protecting "peripheral rights" is necessary to protecting the freedom of speech and press].) It is immaterial to the First Amendment analysis that some of the speech swept into the Ordinance's ambit might be offensive or off-putting to other protesters and members of the public. (*See National Socialist Party of America v. Skokie* (1977) 432 U.S. 43, 43-44 [affirming free speech right to parade in uniforms displaying the swastika]; *see also Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston* (1995) 515 U.S. 557, 569 [collecting symbolic speech cases].)

---

[64] City of Modesto, *Council Agenda Report re: Urgency Ordinance and Non-Urgency Ordinance Amending the City of Modesto Municipal Code Title 4 Chapter 23*, City Council Meeting Agenda Packet at pp. 649-51 (Dec. 2, 2025) access at https://tinyurl.com/44ha6ea4.

117. At protests, Mr. Flores, Ms. Ramirez, and Ms. Leiva, as well as other members of the public, would like to continue exercising their rights to engage in protected speech, expression, assembly and association while maintaining their anonymity, their expressive message, and their personal safety. Similarly, the NewsGuild, its members, and other reporters would like to be able to access basic safety gear when reporting at public demonstrations, especially if crowd control measures are anticipated or deployed. But the Ordinance forces members of the public to choose between these interests. The choice chills, deters, and infringes their constitutional rights. (*See Steffel v. Thompson* (1974) 415 U.S. 452, 462 [observing that people should not have to choose "between the Scylla of intentionally flouting state law and the Charybdis of forgoing . . . constitutionally protected activity in order to avoid . . . a criminal proceeding"].)

118. The Ordinance further chills, deters, and infringes First Amendment rights by imposing overbroad restrictions on face coverings that ignore protections for anonymous speech, treat anonymous costumes more favorably than political speech, and lead to highly discretionary and irrational results. The City's vague scheme bans certain facial coverings, while permitting numerous poorly defined exceptions—including for costumes that cloak one's entire body and obscure identity completely. These provisions render the Ordinance both woefully under and over-inclusive, as well as dangerously susceptible to viewpoint discrimination. (*See Texas v. Johnson*, *supra*, 491 U.S. at p. 414 ["If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."].)

119. Equally nonsensical and unworkable is the Ordinance's ban on "impact-resistant" clothing (which would include leather motorcycle jackets), helmets (whether tucked into one's bag or worn on one's head), and other safety gear. Members of the public ride their bicycles, motorcycles, scooters, and skateboards to protests, and the law requires that some of them wear helmets when doing so. (Vehicle Code § 21212; 27803.)

120. In addition, Plaintiffs, as well as many other members of the public and the press, want to wear protective vests, eyewear, and helmets given the increasing likelihood that they could sustain an injury to their torsos or heads while at a protest. The City certainly does not have a legitimate

interest in barring journalists from wearing this gear while newsgathering, and its unclear why the City needs to bar the gear that protects these vital areas since the police should not be aiming for them when deploying less lethal munitions. (*See* Pen. Code, § 13652, subd. (b)(9) [prohibiting aiming any kinetic energy projectile at "the head, neck, or any other vital organs" while dispersing an unlawful assembly]; *Modesto PD Policy Manual* 46 (Jul. 1, 2024) Policy Nos. 300.3, 308, 309 [stipulating that officers generally should not target a suspect's head, neck, chest, or groin with less lethal weapons].)

121. Moreover, while Plaintiffs do not quarrel with Modesto's more general assertion that public safety is an important governmental interest, the Ordinance is not narrowly tailored to address this interest. As set forth in Section V, the City has many other legal tools to deal with disturbances of the peace, property damage, and other violence at a protest or public assembly.

122. For these reasons, sections 4-23.02(a)(13)-(15) and (18)-(19) of the Ordinance should be declared unconstitutional in violation of protections for free speech, free association, free assembly, and a free press set forth in the First Amendment.

## SECOND CAUSE OF ACTION

### Violation of Freedom of Speech and Assembly
### (Article I, Sections 2 and 3 of the California Constitution)

123. Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

124. The California Constitution, Article I section 2 prohibits laws that "restrain or abridge liberty of speech or press." (*See also Gilbert v. Nat'l Enquirer, Inc.* (1996) 43 Cal.App.4th 1135, 1144.) It "provides an even broader guarantee of the right of free speech and the press than does the First Amendment." (*Ibid.*; *see also Wilson*, *supra*, 13 Cal.3d 652 at p. 658.) Article I, section 3 protects the right to "assemble freely to consult for the common good."

125. Although "the California Constitution is an independent document and its constitutional protections are separate from and not dependent upon the federal Constitution," the framework for evaluating infringements proceeds along similar lines. (*Los Angeles Alliance for Survival*, *supra*, 22 Cal.4th at p. 366 [citing Cal. Const., art. I, § 24].) "[I]n analyzing speech restrictions under the

California Constitution, California courts employ the same time, place and manner test as the federal courts." (*Prigmore v. City of Redding* (2012) 211 Cal.App.4th 1322, 1336; *Best Friends Animal Society v. Macerich Westside Pavilion Property LLC* (2011) 193 Cal.App.4th 168, 175 ["When analyzing time, place and manner restrictions, we may utilize California law as well as federal constitutional standards."].)

126. In light of this state law and for the same reasons as set forth in the related federal cause of action, sections 4-23.02(a)(13)-(15), (18)-(19) of the Ordinance should be declared unconstitutional in violation of protections for free speech, free association, free assembly, and a free press set forth in Article I, sections 2 and 3.

127. These sections of the Ordinance should also be declared unconstitutional given the California Court of Appeal's binding decision in *Ghafari* recognizing that anonymity can be "essential to the exercise of constitutional rights." (87 Cal.App.3d at p. 260.) The *Ghafari* court concluded that a law which "flatly prohibits anonymity under circumstances where . . . protected activities may be involved" is unconstitutional unless (1) required by a "compelling state interest" and (2) "implemented in the least restrictive manner possible." (*Ibid.*) For the reasons stated above, Modesto cannot satisfy this test.

128. *Ghafari*'s expansive protection for anonymous speech is bolstered by Article I, section 1 of the California Constitution, which guarantees an "inalienable" right to privacy and which was adopted in connection with concerns over the surveillance of civil rights protesters in the 1960s and 1970s. (*See* Nicole A. Ozer, *Golden State Sword: The History and Future of California's Constitutional Right to Privacy to Defend and Promote Rights, Justice, and Democracy in the Modern Digital Age* (2024) Berkeley Tech. L.J., 963, 963-67.) As California state courts have recognized, one of the principal purposes of the constitutional protection of associational privacy is to free an individual to follow the dictates of his conscience by ensuring that he need not avoid any ties simply because they might displease those who control his personal or professional destiny." (*Britt v. Superior Court* (1978) 20 Cal.3d 844, 854-55 [quotations omitted]; *see also ZL Techs., Inc. v. Does 1-7* (2017) 13 Cal.App.5th 603, 632 [noting broader privacy rights for anonymous speech under the California Constitution as compared to the Federal Constitution].)

47
COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### THIRD CAUSE OF ACTION

#### Violation of Due Process—Void for Vagueness
#### (Fourteenth Amendment of the U.S. Constitution; 42 U.S.C. § 1983)

129. Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

130. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." To satisfy due process, a law must be sufficiently definite to provide (1) adequate notice of the conduct proscribed and (2) sufficient guidelines for officials so that arbitrary and discriminatory enforcement does not occur. (*United States v. Williams* (2008) 553 U.S. 285, 304.) When, as here, First Amendment rights are implicated, "a more stringent vagueness test" applies. (*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.* (1982) 455 U.S. 489, 499.) The greater degree of specificity is required to ensure that ambiguity does not chill protected speech and expression. (*F.C.C. v. Fox Television Stations, Inc.* (2012) 567 U.S. 239, 253-54; *Forsyth*, *supra*, 505 U.S. at p. 133.)

131. The Ordinance violates due process by failing to provide adequate notice of when it applies. It broadly prohibits "utiliz[ing], carry[ing], or possess[ing]" certain items at any "public assembly." Yet it does not define what a "public assembly" means, implying that it governs any time two or more people gather in public places. Such an application would sweep in everything from large public demonstrations to a couple holding up a poster on the street corner, not to mention when people come together in public parks for children's sporting events and picnics.

132. The Ordinance also violates due process by failing to provide adequate notice of what conduct it prohibits. It bans the "wearing of a mask, scarf, bandana or any other accessory or item that covers or partially covers the face shielding the wearer's face from view and conceals the wearer's identity." (Ord. § (a)13(i)-(iii).) It imposes no intent element about concealing one's identity, and leaves ambiguous the extent to which one's face and identity must be obscured before attire triggers criminality. Wide-brimmed hats and big sunglasses would ostensibly be banned by the Ordinance's text, but clear shatter-proof goggles for the public or the press might—

---

48
COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

or might not—be acceptable. It all depends on how a police officer views the accessory. Such inconsistencies are needlessly confusing.

133. The labyrinth of the Ordinance's confounding exceptions for medical necessity, religious beliefs, and costumes complicates the ban on face coverings yet further. It is particularly unclear what constitutes "costumes which obscure the face as part of the expressive function of the costume including, coverings worn as part of a costume in connection with a holiday event (e.g. Halloween), masquerade event (e.g. Mardi Gras), a theatrical or other entertainment event, and/or the functional equivalent." (*Id.* § (a)13(iii).) The definition is unworkable and permits the exception to swallow the entirety of the Ordinance, unless a police officer—in his unbounded discretion—decides otherwise. The terms also leave open significant questions as to whether peaceful protesters like Ms. Ramirez and Ms. Leiva could wear around their faces expressive and symbolic items like a keffiyeh scarf.

134. Also ambiguous is the meaning of the provision banning "balaclavas, ski masks, *or the like*" as a carve-out to the exception concerning "coverings worn for medical necessity." (*Id.* § (a)13(ii) [emphasis added].) It is uncertain, for example, if the gaiter that Mr. Flores was wearing and for which he was arrested would fall within this category. Similarly ambiguous are the Ordinance's bans on "impact resistant" clothing and "load-bearing or similar 'tactical' vests." (*Id.* § (a)18-19.) Anything made of leather, such as a motorcycle jacket, could qualify as impact resistant, and the vests that many journalists wear when covering protests would likely be covered by both provisions.

135. Furthermore, the Ordinance's failure to provide adequate guidelines and more well-defined terms gives rise to arbitrary, selective, and disproportionate enforcement problems. The lack of articulated standards to govern enforcement creates a risk that Modesto police officers will condition their application of the Ordinance based on the speaker or the viewpoint and content of that speaker's speech. A possibility that is more than theoretical given the police's history of enforcement. Also troubling is the expansive breadth of the Ordinance's provision affording the City's Police Chief discretion to modify any prohibition for a parade so long as "the modification does not impair or threaten public safety." (4-23.02(f).)

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

136. A law cannot "entrust lawmaking to the moment-to-moment judgment of the policeman on his beat," or "confer[] on police a virtually unrestrained power to arrest and charge persons with a violation." (*Kolender*, *supra*, 461 U.S. at p. 360 [citing *Smith v. Goguen* (1974) 415 U.S. 566, 575 and *Lewis v. City of New Orleans* (1974) 415 U.S. 130, 135] [internal quotations omitted].) Where, as here, a law allows for the rudderless discretion of restrictions that impact free speech rights, then it is subject to facial invalidation unless the government can identify a "binding judicial or administrative construction" or "well-established practice" confining officials' enforcement. (*City of Lakewood v. Plain Dealer Publ'g* (1988) 468 U.S. 750, 770; *see Coates v. City of Cincinnati* (1971) 402 U.S. 611.) Modesto has identified neither.

137. For these reasons, sections 4-23.02(a)(13)-(15) and (18)-(19) of the Ordinance should be declared unconstitutional in violation of due process protections under the Fourteenth Amendment to the U.S. Constitution.

### FOURTH CAUSE OF ACTION

**Violation of Due Process—Void for Vagueness**
**(Article I, Section 7 of the California Constitution)**

138. Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

139. Article I, section 7 of the California Constitution provides that a "person may not be deprived of life, liberty, or property without due process of law." The analysis for due process violations under state law is similar to the analysis under federal law. That is, a law must be sufficiently definite to provide adequate notice of the conduct proscribed and provide sufficient guidelines for officials so that arbitrary and discriminatory enforcement does not occur. When free speech rights are at stake, an even greater degree of specificity is required to ensure that ambiguity does not chill protected speech. (*Franklin v. Leland Stanford Junior Univ.* (1985) 172 Cal.App.3d 322, 347.) A law may not "impermissibly delegate[] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." (*Williams v. Garcetti*, *supra*, 5 Cal.4th at pp. 567-68 [citing *Grayned v. City of Rockford* (1972) 408 U.S. 104, 108-109].)

140. In light of this state law and for the same reasons as set forth in the related federal cause of action, sections 4-23.02(a)(13)-(15) and (18)-(19) of the Ordinance also violate California due process protections and should be declared unconstitutional. (*See In re Marriage of Siller* (1986) 187 Cal.App.3d 36, 49 [holding that statutes "impinging upon constitutional rights (usually of free speech)" may be "declared invalid in their entirety if piecemeal adjudication of the legality of the statute would entail the vague or uncertain future application of the statute, thereby inhibiting the exercise of constitutional rights"].)

141. Section 13 of the Ordinance, in particular, should be declared unconstitutional for the additional reason that it violates Article I, section 7's equal protection clause. The Ordinance draws unconstitutional distinctions between, on the one hand, anonymous persons wishing to communicate directly on political or public issues and, on the other hand, anonymous costume-wearers at public "holiday event[s], "masquerade event[s]", and "theatrical or other entertainment event[s], and/or the functional equivalent." (4-23.02(a)(13)(iii).) This classification scheme subverts core free speech protections and improperly metes out differential treatment on the basis of speech. (*See Ghafari*, *supra*, 87 Cal.App.3d at p. 265 [citing *Mosley*, *supra*, 408 U.S. at pp. 95-96 and *Wirta v. Alameda-Contra Costa Transit Dist.* (1967) 68 Cal.2d 51, 57].)

142. In particular, Section 13 elevates "theatrical or other entertainment event[s] and/or the functional equivalent" above core political speech in violation of state law without any reasonable or rational basis. Such a scheme falls far-below the constitutionally-required standard that any classification impacting free speech rights be as narrowly tailored as possible to support a compelling state interest. (*See Serrano v. Priest* (1976) 18 Cal.3d 728, 767-78 ["In applying our constitutional provisions guaranteeing equal protection of the laws, we still continue to apply strict and searching judicial scrutiny to legislative classifications, which because of their impact on those individual rights and liberties which lie at the core of our free and representative form of government are properly considered 'fundamental.'"].)

143. The state's prior ban on face masks, which *Ghafari* invalidated, had similar a categorical distinction between anonymous speakers and "anonymous public issue communication," and this distinction also provided the court an additional reason to find the law unconstitutional. (87

Cal.App.3d at p. 265.) Specifically, *Ghafari* ruled that, because the state statute "affect[ed] First Amendment rights, it [wa]s not clothed with the usual presumption of constitutionality which most legislation enjoys in the face of an equal protection argument." (*Ibid.*) "Rather, '*the state* must first establish that it has a *compelling* interest which justifies the law and then demonstrate that the distinctions drawn by the law are *necessary* to further that purpose." (*Ibid.* [itals. in original] [quoting *People v. Olivas* (1976) 17 Cal.3d 236, 251].) As in *Ghafari*, and for the reasons stated above, Modesto cannot satisfy this test.

## FIFTH CAUSE OF ACTION

### Violation of California Statutory Law
### (Penal Code § 409.7)

144. Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

145. Penal Code section 409.7 codifies constitutional protections for a free press by safeguarding journalists' access when reporting on protests and public demonstrations. It prohibits law enforcement from citing journalists who are in the midst of "gathering, receiving, or processing information" for failing to disperse after an unlawful assembly is declared or for violating a curfew. It further protects journalists engaged in newsgathering from being cited for willful resistance, delay, or obstructing an officer in violation of Penal Code section 148(a)(1).

146. Section 409.7 was, "[a]ccording to the author," intended to "prohibit law enforcement from obstructing, detaining, assaulting or otherwise preventing the press from fulfilling their constitutional mandate in relaying information regarding these events." (Senate Rules Comm., Analysis of Assemb. B. 98, at 5 (May 20, 2021).) It thereby recognizes that press in the midst of newsgathering do not present a safety risk and so are entitled to carry out their constitutional newsgathering mandate after a dispersal order is issued. (*Ibid.*; *see also Goyette*, *supra*, 338 F.R.D. at p. 116 [finding that journalists who reported on protest activity from an active dispersal area were engaged in constitutionally protected newsgathering]; *Index Newspapers LLC*, *supra*, 977 F.3d at p. 834 ["The many peaceful protesters, journalists, and members of the general public cannot be punished for the violent acts of others."].)

147. The Legislature drafted Section 409.7 to follow long established press protections set forth at Penal Code sections 409.5 and 409.6, which safeguard reporters' access when reporting at the sites of natural disasters and avalanches. In interpreting Section 409.5, the California Court of Appeal observed that "the news media must be afforded special access to disaster sites in order that they may properly perform their function of informing the public." (*Leiserson v. City of San Diego* (1986) 184 Cal.App.3d 41, 51.) The same is true for members of the press.

148. The Ordinance's vague and overbroad bans on face coverings, "gas masks or similar breathing devices," protective helmets, and impact-resistant clothing thwart the press's constitutional mandate and the public's right to receive firsthand news. Journalists reporting at protests are often directly in harm's way, either as the target of violence or as lawful observers in the vicinity of less lethal crowd control measures. Many of the banned items are among every journalist's basic safety kit, including the kits of many NewsGuild members. They should not be criminalized for carrying such gear to protect against tear gas, assault, and "less lethal" munitions.

149. The City's complete ban on carrying basic safety gear is, for all practical purposes, a de facto exclusion of the press at public events where crowd dispersal measures are deployed. The City has no compelling reason to impair the predicates needed by journalists to report the news. (*See, e.g.*, *Garcia*, *supra*, 150 F.4th at p. 1231 [laws that restrict not only speech itself, but also actions that are a "predicate for" speech or that are "inextricably intertwined with speech" will trigger First Amendment scrutiny].)

150. Sections 4-23.02(a)(13)-(15) and (18)-(19) of the Ordinance, when enforced against journalists engaged in newsgathering at a protest or public assembly, violate Penal Code section 409.7, as well as the state and federal constitutional rights that animate Section 409.7's statutory protections, and should be declared unlawful.

## SIXTH CAUSE OF ACTION

**Taxpayer Action to Prevent Illegal Expenditure of Public Funds**
**(Code Civ. Proc. § 526a)**

151. Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

152. Plaintiff Pacific Media Workers Guild is a reporters' union that represents journalists in Northern California and the Central Valley, including in Modesto. Its members have paid taxes in Modesto within the past year and have been assessed and/or paid taxes to the State of California within one year of filing this action. Plaintiffs Angel Jose Flores, Julissa Ruiz Ramirez, and Alyssa Leiva have also each paid taxes in Modesto within the past year and have been assessed and/or paid taxes to the State of California within one year of filing this action.

153. The Modesto City Council adopted, enacted, and amended the Ordinance. Defendant Brandon Gillespie is an officer, agent, or person acting in an official capacity on behalf of the City, and is subject to suit under Code of Civil Procedure section 526a as well as pursuant to the common law theory of taxpayer standing. (*See California Assn. for Safety Educ. v. Brown* (1994) 30 Cal.App.4th 1264, 1281; *see also Los Altos Prop. Owners Assn. v. Hutcheon* (1977) 69 Cal.App.3d 22, 26.) Chief Gillespie oversees members of the Modesto Police Department, which is charged with enforcing the law, including the Ordinance. The Modesto Police Department enforces the Ordinance by arresting and issuing citations to individuals for alleged violations.

154. Enforcement of Sections 4-23.02(a)(13)-(15) and (18)-(19) of the Ordinance violates, or will violate, Article I, Sections 2, 3, and 7 of the California Constitution and Penal Code section 409.7 and that this conduct constitutes an illegal expenditure of tax funds.

155. By making arrests, issuing citations, and prosecuting criminal charges under Sections 4-23.02(a)(13)-(15) and (18)-(19) of the Ordinance, the City engages in conduct constituting an illegal expenditure, a waste of public funds, an ultra vires action, and/or a failure to perform a duty specifically enjoined in violation of Code of Civil Procedure section 526a and the common law.

156. Plaintiffs have an interest in enjoining the unlawful expenditure of tax funds. Pursuant to Code of Civil Procedure sections 526, 526a, 1060, the common law, and this Court's equitable power, Plaintiffs seek declaratory and injunctive relief to prevent continued harm and to protect both themselves and the public from enforcement of the Ordinance. They have no plain, speedy, and adequate alternative remedy at law

157. Unless compelled by this Court to comply with its legal obligations, the City will continue to enforce the Ordinance.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

A.    Declare that sections 4-23.02(a)(13)-(15) and (18)-(19) of Title 4, Chapter 23, of the Modesto Municipal Code, entitled "Restrictions on Use of Specified Items During Public Assembly," violate the First and Fourteenth Amendments of the U.S. Constitution; Article I, sections 2, 3, and 7 of the California Constitution; and California Penal Code section 409.7; and are therefore void and unenforceable;

B.    Issue a preliminary and permanent injunction prohibiting the City from enforcing sections 4-23.02(a)(13)-(15) and (18)-(19) of the Ordinance and prohibiting the City from issuing any citations or from prosecuting any criminal sanctions under these sections;

C.    Award Plaintiffs' reasonable attorneys' fees pursuant to California Civil Code section 52 and California Civil Procedure Code section 1021.5;

D.    Order such other relief that the Court deems necessary to address the harm to Plaintiffs or which the Court may determine is warranted, just, or proper.

Dated: March 25, 2026                    Respectfully submitted,

ACLU FOUNDATION OF
NORTHERN CALIFORNIA, INC.


_____
CHESSIE THACHER (SBN 296767)
cthacher@aclunc.org
SHAILA NATHU (SBN 314203)
snathu@aclunc.org
ANGELICA SALCEDA (SBN 296152)
asalceda@aclunc.org

*Attorneys for Plaintiffs*

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER: 296767 | *FOR COURT USE ONLY* |
|---|---|---|

NAME: Chessie Thacher

FIRM NAME: American Civil Liberties Union Foundation of Northern California, Inc.

STREET ADDRESS: 39 Drumm Street

CITY: San Francisco   STATE: CA   ZIP CODE: 94111

TELEPHONE NO.: (415) 621-2493   FAX NO.:

EMAIL ADDRESS: cthacher@aclunc.org

ATTORNEY FOR (name): PACIFIC MEDIA WORKERS GUILD, et al.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF STANISLAUS**

STREET ADDRESS: 801 10th Street

MAILING ADDRESS:

CITY AND ZIP CODE: Modesto, CA 95354

BRANCH NAME: City Towers Courthouse

*FOR COURT USE ONLY*

Electronically Filed
3/25/2026 12:42 PM
Superior Court of California
County of Stanislaus
Hugh K. Swift
Clerk of the Court
By: Elizabeth Fernandez, Deputy

CASE NAME:
PACIFIC MEDIA WORKERS GUILD, ET AL. v. CITY OF MODESTO, ET AL.

| **CIVIL CASE COVER SHEET**  [x] **Unlimited** (Amount demanded exceeds $35,000)  [ ] **Limited** (Amount demanded is $35,000 or less) | **Complex Case Designation**  [ ] Counter   [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | CASE NUMBER:  CV-26-003104 |
|---|---|---|
| | | JUDGE:  DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1.  Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Asbestos**
[ ] Asbestos (04)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/Unfair business practice (07)
[x] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Employment Development Department (EDD)**
[ ] EDD decision review (48)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.404)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Comprehensive groundwater adjudication (47)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (*not specified above*) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (*not specified above*) (43)

Judicial Council of California, courts.ca.gov
Rev. January 1, 2026, Mandatory Form
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740
Cal. Stds. Jud. Admin., std. 3.10

**Civil Case Cover Sheet**

CM-010, Page 1 of 3



CM-010

2.  Is this case complex under rule 3.400 of the California Rules of Court?  ☐ Yes  ☒ No

    If the case is complex, mark the factors requiring exceptional judicial management:

    a.  ☐  Large number of separately represented parties

    b.  ☐  Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve

    c.  ☐  Substantial amount of documentary evidence

    d.  ☐  Large number of witnesses

    e.  ☐  Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court

    f.  ☐  Substantial postjudgment judicial supervision

3.  Remedies sought *(check all that apply):*

    a.  ☐  monetary

    b.  ☒  nonmonetary; declaratory or injunctive relief

    c.  ☐  punitive

4.  Number of causes of action *(specify):* 6

5.  Is this case a class action suit?  ☐ Yes  ☒ No

6.  If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: March 25, 2026

Chessie Thacher (SBN 296767)
_____
(TYPE OR PRINT NAME)

▶ _Chessie Thacher_ _____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

---

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.

- File this cover sheet in addition to any cover sheet required by local court rule.

- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.

- Unless this is a collections case under rule 3.740 of the California Rules of Court or a complex case, this cover sheet will be used for statistical purposes only.

---

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on pages 1 and 2. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 of the California Rules of Court is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $35,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment.  The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**SEE PAGE 3 FOR INFORMATION PURPOSES ONLY.**

---

Rev. January 1, 2026

**Civil Case Cover Sheet**

**CM-010**, Page 2 of 3



## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/ Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Asbestos**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/Wrongful Death

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Product Liability *(not asbestos or toxic/ environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collections Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord-tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition re Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Employment Development Department (EDD)**
EDD Decision Review (48) *(if the case involves an Employment Development Department decision, check this item instead of Wrongful Termination or Other Employment)*

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Comprehensive Groundwater Adjudication (47)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister-State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only Injunctive Relief Only *(non-harassment)*
Mechanic's Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition



**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF STANISLAUS**
801 10th Street 4th Floor
Modesto, CA 95354
ADR clerk: (209) 530-3100
www.stanislaus.courts.ca.gov.

# Alternative Dispute Resolution Information Packet

Recognizing that many civil disputes can be resolved without the time and expense of traditional civil litigation, the Superior Court of California, County of Stanislaus, strongly encourages parties in general civil cases to explore and pursue the use of Alternative Dispute Resolution.

## What is Alternative Dispute Resolution?

Alternative Dispute Resolution (ADR) is the general term applied to a wide variety of dispute resolution processes which are alternatives to lawsuits. Trained impartial persons, called "neutrals", resolve disputes or help parties resolve disputes themselves. The types of ADR options available are:

- Arbitration
- Mediation
- Neutral Evaluation

All ADR processes offer a partial or complete alternative to traditional court litigation for resolving disputes. At the present time, Stanislaus County Superior Court offers Mediation and Arbitration.

## What are the advantages of using ADR?

- ➢ **ADR can save time (FASTER).** Even in complex cases, a dispute can often be resolved in a matter of months, even weeks through ADR, while a lawsuit can take years.
- ➢ **ADR can save money (CHEAPER).** By resolving cases earlier, ADR can save parties money that might otherwise be spent on litigation costs (court, attorney, and expert witness fees).
- ➢ **ADR encourages participation.** Parties have the opportunity to work together, rather than against each other by expressing their own interest and concerns to resolve thedispute.
- ➢ **ADR provides control and flexibility.** Parties can choose the ADR method most appropriate for their situation that will best serve their needs.
- ➢ **ADR can provide greater satisfaction and improved outcomes.** Surveys indicate that people who have used ADR are more satisfied than people who went through traditional litigation. The ADR atmosphere encourages cooperation and communication rather than the adversarial atmosphere found in litigation.

## ADR may not be suitable for every dispute and may not be to your advantage.

- ➢ The neutral will charge a fee for their services if the dispute is not resolved within the allotted time.
- ➢ Lawsuits must be brought within specified periods of time, known as statutes of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in the ADR process.
- ➢ If a dispute is not resolved through ADR, the parties may still have to put time and money into a lawsuit

## What are my ADR Options?

Stanislaus County Superior Court currently offers pre-screened panelists with experience and training in each of the following areas.  It is the policy of the Superior Court of California that all parties are required to meet-and-confer with the opposing side before the Case Management Conference pursuant to rule 3.724 of the California Rules of Court.

### ❖ ARBITRATION

In arbitration, a neutral person called an "arbitrator" presides at the hearing. The arbitrator hears arguments, makes legal rulings, and evaluates the evidence determining the facts from each side. The arbitrator applies the law to the facts of each case and makes an award based upon the merits. Arbitration awards may be entered as judgments in accordance with the agreement of the parties or, where there is no agreement, in accordance with the California statutes. Arbitration is less formal than a trial, and the rules of evidence are often relaxed.  These hearings are not held in court.

1. _Binding arbitration_ means that the parties waive their right to a trial and agree to accept the arbitrator's final decision. Generally, there is no right to appeal an arbitrator's decision.
2. _Non-Binding arbitration_ means that the parties are free to request a trial with the court if they do not accept the arbitrator's decision.

**Cases for which Arbitration may be appropriate:** Arbitration is best for cases where the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time and expense of a trial. It may also be appropriate for complex matters.

**Operation/Court Policy.** Pursuant to Code of Civil Procedures § 1141.11, all civil actions in which the amount in controversy will not exceed $50,000 shall be submitted to arbitration. A case is ordered to arbitration after the Case Management Conference.  The neutral is chosen from the Courts approved panel, located on our website at www.stanislaus.courts.ca.gov.

**Cost.** There is no cost to the parties for judicial arbitration. [Local Rule 3.07 (1)]

### ❖ MEDIATION

In mediation, a neutral person called a "mediator" facilitates communication among parties, helps parties clarify facts, identify legal issues, explore options and arrive at a mutually acceptable resolution. Mediation is a voluntary, informal and confidential process held out of court.

**Cases for which Mediation may be appropriate:** Mediation may be particularly useful when parties have a relationship they want to preserve. If family members, neighbors or business partners have a dispute, mediation may be the best process to use.

**Operation/Court Policy.** All parties to a dispute may voluntarily agree to submit their case to mediation, either through a court appointment or through a private arrangement. A list of neutral providers who are trained and experienced have been reviewed and approved by the Court. The list can be found at www.stanislaus.courts.ca.gov. Litigants are not limited to a mediator on the court list and may select any mediator agreed upon by all the parties in private mediation. A mediation provider need not be an attorney.

1. _Private Mediation._ Parties to a civil action can agree to mediate their dispute with a mediator of their choice without court assistance.
2. _Court Mediation._ Upon stipulation of the parties, the parties may either personally select their mediator from the court approved list of neutrals or request the court to make the selection from the said list. The court will confirm the selected mediator and notice parties by mail.

**Cost.** Generally, the cost of _private mediation_ ranges from $100-$300 per hour and is shared equally by the parties. The cost of _court mediation_ is $400 total ($200 per side) for the first two hours. In the event that mediation extends beyond two hours and parties determine it would be beneficial to continue the mediation process, the parties will independently be responsible for compensating the mediator in an amount set by the mediator.

### ❖ Additional Information

Under the Dispute Resolution Program Act (DRPA) funding, the court partners with Stanislaus County Mediation Center to provide free mediation services to litigants in small claims matters and cases involving unlawful detainer. For more information on the specific ADR programs of the Stanislaus County Superior Court, please review the Local Rules available on the Court's website at www.stanislaus.courts.ca.gov.

STAN-100

| ATTORNEY FOR PLAINTIFF *(name, bar card, and address)*: | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:                    FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*: | |

**SUPERIOR COURT OF CALIFORNIA, STANISLAUS COUNTY**

MAILING ADDRESS: **801 10TH STREET, 4TH FLOOR**

CITY AND ZIP CODE: **MODESTO, CA 95354**

BRANCH NAME: **MODESTO**

| **STIPULATION AND ORDER TO ADR** | |
|---|---|
| CASE NAME: | CASE NUMBER: |

The parties or by and through their attorneys' of record stipulate that the claims in this action shall be submitted to the following alternative dispute resolution process:

☐ Voluntary Mediation

☐ Private Mediation

☐ Judicial Arbitration

☐ Private Arbitration

☐ Voluntary Mediation in lieu of Judicial Arbitration

| **This box is to be filled out for Voluntary Mediation and Neutral Evaluation only.** |
|---|
| ☐ In accordance with Stanislaus County Rule of Court 3.10(D)(4) and 3.11(C)(2) this form must be signed by the agreed upon mediator. If both parties agree the court will select a mediator for the case. |
| ☐ It is Stipulated that_____(Name of mediator) shall serve as the neutral for this case.<br><br>_____    _____<br>Signature of Mediator                 Date |
| ☐ It is Stipulated that the Court select a mediator for this case. |
| **For Voluntary Mediation this form must be completed and returned with $400 ($200 from the plaintiffs and $200 from the defendants).** |

► _____    ► _____

SIGNATURE                    DATE        SIGNATURE                    DATE

_____    _____

PLAINTIFF OR PLAINTIFF'S ATTORNEY        DEFENDANT OR DEFANDANT'S ATTORNEY

February 27. 2018       **STIPULATION AND ORDER TO ADR**
(Mandatory)

STAN-220

| *Name and Address)*: | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS *(Optional)*:          FAX NO. *(Optional)*: | |
| **SUPERIOR COURT OF CALIFORNIA, STANISLAUS COUNTY**<br>MAILING ADDRESS:  **801 10TH STREET, 4TH FLOOR**<br>CITY AND ZIP CODE:  **MODESTO, CA 95354**<br>BRANCH NAME:  **MODESTO** | |
| CASE NAME: | |
| **NOTICE OF DATE, TIME AND PLACE OF MEDIATION** | CASE NUMBER: |

All parties to this case are notified that this matter has been set for Mediation on

_____, 20__, at the hour of _____, at this address:

_____

_____

_____

Date: _____          Signature: _____

                                        Print Name: _____

July 1, 2006 (voluntary)          **Notice of Date, Time and Place of Mediation**

STAN-230

| MEDIATOR *(Name and Address)*: | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.: | |
| E-MAIL ADDRESS *(Optional)*:        FAX NO. *(Optional)*: | |

**SUPERIOR COURT OF CALIFORNIA, STANISLAUS COUNTY**
MAILING ADDRESS: **801 10TH STREET, 4TH FLOOR**
CITY AND ZIP CODE: **MODESTO, CA 95354**
BRANCH NAME: **MODESTO**

CASE NAME:

| **MEDIATOR'S REPORT** | CASE NUMBER: |
|---|---|

1. Mediation *(check one)*

   ☐ did not take place, because _____

   _____

   _____

   _____.

   ☐ is continuing until _____.

   ☐ took place on _____ and is completed.

2. The mediation ended in *(check one)*

   ☐ full agreement.

   ☐ partial agreement.

   ☐ no agreement.

_____          ▶ _____
(TYPE OR PRINT NAME)                        (SIGNATURE OF MEDIATOR)

                                     _____
                                                    Date:

NOTE: Within 10 days of the end of the mediation process or by the ADR completion deadline set by the court, the mediator must forward a copy of this report to the ADR Clerk at the Stanislaus County Courthouse. Please do not include any confidential information on this form (see *Evidence Code* §1121).

July 1, 2006 (mandatory)                **MEDIATOR'S REPORT**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (NAME, ADDRESS, PHONE, BAR NUMBER) | *FOR COURT USE ONLY* |
|---|---|
| Chessie Thacher (SBN: 296767)<br>American Civil Liberties Union Foundation of Northern California, Inc.<br>39 Drumm Street, San Francisco, CA 94111<br>Telephone No.: (415) 621-2493<br>cthacher@aclunc.org<br><br>Attorney for:  PACIFIC MEDIA WORKERS GUILD, et al. | Electronically Filed<br>3/25/2026 12:42 PM<br>Superior Court of California<br>County of Stanislaus<br>Hugh K. Swift<br>Clerk of the Court<br>By: Elizabeth Fernandez, Deputy |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF STANISLAUS**
Street Address:    City Towers Bldg., 801 10th St, 4th Floor,  Modesto, CA 95354
Civil Clerk's Office:  801 10th Street, 4th Floor, Modesto, CA  95354

**Plaintiff/Petitioner:**  PACIFIC MEDIA WORKERS GUILD, et al.
**Defendant/Respondent:**  CITY OF MODESTO, et al.

| **NOTICE OF CASE MANAGEMENT CONFERENCE** | CASE NUMBER<br>CV-26-003104 |
|---|---|

1.  NOTICE is given that a **Case Management Conference** has been scheduled as follows:

Hearing: 7/27/2026 2:00 PM
Date:_____Time:_____AM/PM

This case is assigned to Judge _____Mayne, John R._____, Dept __Dept. 21__, for all purposes, including trial.

        *Departments 21 & 22 are located at 801 10th Street, 6th Floor, Modesto, CA 95354

        *Departments 23 & 24 are located at 801 10th Street, 4th Floor, Modesto, CA  95354

        **All filings shall be filed in the Clerk's Office at the City Towers, 4th Floor address.**
..........................................................................................................................................................

        **You have 30 calendar days to file a written response with this court after the legal papers and the summons were served on you.  You must also serve a copy of your written response on the plaintiff.**

2.  You must file and serve a completed *Case Management Conference Statement* at least **fifteen (15) calendar days** before the case management conference.

3.  You must be familiar with the case and be fully prepared to participate effectively in the case management conference.

4.  At the case management conference the Court may make pretrial orders, including the following:

    a.  An order establishing a discovery schedule.

    b.  An order referring the case to arbitration.

    c.  An order dismissing fictitious defendants.

    d.  An order scheduling exchange of expert witness information.

    e.  An order setting subsequent conferences and the trial date.

    f.  Other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.).

Date: 3/25/2026 12:42 PM    by *Elizabeth Fernandez*  Elizabeth Fernandez_____Deputy Clerk

| CV003<br>Mandatory<br>Form | **--SANCTIONS--**<br>If you do not file the *Case Management Statement* required by local rule, or attend the case management conference or participate effectively in the conference, the court may impose sanctions (including dismissal of the case, striking of the answer, and payment of money). | |
|---|---|---|

11/10

## Rule 3.110.  Time for Service of Complaint, Cross-Complaint, and Response

(a)  [Application] This rule applies to the service of pleadings in civil cases except for collection cases under Rule 3.740 (a), Unlawful detainer actions,  proceedings, under the Family Code, and other proceedings for which different service requirements are prescribed by law.

(b)  [Service of complaint]  The complaint must be served on all named defendants and proofs of service on those defendants must be filed with the court within 60 days after the filing of the complaint.  When the complaint is amended to add a defendant, the added defendant must be served and proof of service must be filed within 30 days after the filing of the amended complaint.

(c)  [Service of cross-complaint] A cross-complaint against a party who has appeared in the action must be accompanied by proof of service of the cross-complaint at the time it is filed.  If the cross-complaint adds new parties, the cross-complaint must be served on all parties and proofs of service on the new parties must be filed within 30 days of the filing of the cross-complaint.

(d)  [Timing of responsive pleadings]  The parties may stipulate without leave of court to one 15-day extension beyond the 30-day time period prescribed for the response after service of the initial complaint.

(e)  [Modification of timing: application for order extending time]  The court, on its own motion or on the application of a party, may extend or otherwise modify the times provided in (b) - (d).  An application for a court order extending the time to serve a pleading must be filed before the time for service has elapsed.  The application must be accompanied by a declaration showing why service has not been completed, documenting the efforts that have been made to complete service, and specifying the date by which service is proposed to be completed.

(f)  [Failure to serve]  If a party fails to serve and file pleadings as required under this rule, and has not obtained an order extending time to serve its pleadings, the court may issue an Order to Show Cause why sanctions shall not be imposed.

(g)  [Request for entry of default]  If a responsive pleading is not served within the time limits specified in this rule and no extension of time has been granted, the plaintiff must file a request for entry of default within 10 days after the time for service has elapsed.  The court may issue an Order to Show Cause why sanctions should not be imposed if the plaintiff fails to timely file the request for the entry of default.

(h)  [Default judgment]  When a default is entered, the party who requested the entry of default must obtain a default judgment against the defaulting party within 45 days after the default was entered, unless the court has granted an extension of time.  The court may issue an Order to Show Cause why sanctions should not be imposed if that party fails to obtain entry of judgment against a defaulting party or to request an extension of time to apply for a default judgment within that time.

(i)  [Order to Show Cause]  Responsive papers to an Order to Show Cause issued under this rule must be filed and served at least 5 calendar days before the hearing.

POS-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA, INC.<br>Chessie Thacher SBN 296767<br>39 Drumm Street<br>San Francisco, CA 94111<br>TELEPHONE NO: (415) 621-2493    FAX NO *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*: cthacher@aclunc.org<br>ATTORNEY FOR *(Name)*: Plaintiff | *FOR COURT USE ONLY*<br><br>Electronically Filed<br>3/30/2026 2:39 PM<br>Superior Court of California<br>County of Stanislaus<br>Hugh K. Swift<br>Clerk of the Court<br>By: Automated Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF   Stanislaus
STREET ADDRESS:   801 10th Street 4th Floor
MAILING ADDRESS:
CITY AND ZIP CODE:   Modesto, 95354
BRANCH NAME:   Modesto

| | |
|---|---|
| PLAINTIFF / PETITIONER:   PACIFIC MEDIA WORKERS GUILD, et al<br>DEFENDANT / RESPONDENT:   CITY OF MODESTO, et al | CASE NUMBER:<br>CV-26-003104 |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>15521477 (27808193) |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. [X] Summons
   b. [X] Complaint
   c. [X] Alternative Dispute Resolution (ADR) Package
   d. [X] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] Cross-Complaint
   f. [X] Other *(specify documents)*:   Notice of Case Management Conference
3. a. Party served *(specify name of party as shown on documents served)*:
      City of Modesto
   b. [X] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
      Reyna Mendoza - Dept. City Clerk - Person Authorized to Accept Service of Process
4. Address where the party was served:
   1010 10th St Suite 6600, Modesto, CA 95354
5. I served the party *(check proper box)*
   a. [X] **by personal service**. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*:   Thu, Mar 26 2026     (2) at *(time)*:   11:32 AM
   b. [ ] **by substituted service**. On *(date)*:           at *(time)*:               I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*:             from *(city)*:                 or [ ] a declaration of mailing is attached.
      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Page 1 of 2<br>Code of Civil Procedure, § 417.10 |

| PLAINTIFF / PETITIONER: PACIFIC MEDIA WORKERS GUILD, et al | CASE NUMBER: |
|---|---|
| DEFENDANT / RESPONDENT: CITY OF MODESTO, et al | CV-26-003104 |

5.  c. ☐ **by mail and acknowledgment of receipt of service**. I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

   (1) on *(date)*:                                      (2) from *(city)*:

   (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

   (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

   d. ☐ **by other means** *(specify means of service and authorizing code section)*:

   ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

   a. ☐ as an individual defendant.

   b. ☐ as the person sued under the fictitious name of *(specify)*:

   c. ☐ as occupant.

   d. ☒ On behalf of *(specify)*:    City of Modesto

   under the following Code of Civil Procedure section:

   ☐ 416.10 (corporation)                          ☐ 415.95 (business organization, form unknown)
   ☐ 416.20 (defunct corporation)                  ☐ 416.60 (minor)
   ☐ 416.30 (joint stock company/association)      ☐ 416.70 (ward or conservatee)
   ☐ 416.40 (association or partnership)            ☐ 416.90 (authorized person)
   ☒ 416.50 (public entity)                         ☐ 415.46 (occupant)
   ☐ other:

7. **Person who served papers**

   a. Name:                     Kelly Gonzalez

   b. Address:                  5341 Old Redwood Highway, Suite 310, Petaluma, CA  94954

   c. Telephone number:         800-938-8815

   d. **The fee** for service was:   $200.00

   e. I am:

   (1) ☐ not a registered California process server.

   (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

   (3) ☒ a registered California process server:

   (i) ☐ owner   ☐ employee   ☒ independent contractor

   (ii) Registration No:   25-0020

   (iii) County:   Stanislaus

8. ☒ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

   or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date:   March 30, 2026

Kelly Gonzalez

_____
(NAME OF PERSON WHO SERVED PAPERS / SHERIFF OR MARSHAL)

InfoTrack US, Inc. - P000634
5341 Old Redwood Highway, Suite 310
Petaluma, CA  94954
800-938-8815

_____
(SIGNATURE)

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA, INC.<br>Chessie Thacher SBN 296767<br>39 Drumm Street<br>San Francisco, CA 94111<br>TELEPHONE NO: (415) 621-2493    FAX NO *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*: cthacher@aclunc.org<br>ATTORNEY FOR *(Name)*: Plaintiff | Electronically Filed<br>3/30/2026 2:39 PM<br>Superior Court of California<br>County of Stanislaus<br>Hugh K. Swift<br>Clerk of the Court<br>By: Automated Clerk |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF   Stanislaus |
|---|
| STREET ADDRESS:   801 10th Street 4th Floor |
| MAILING ADDRESS: |
| CITY AND ZIP CODE:   Modesto, 95354 |
| BRANCH NAME:   Modesto |

| PLAINTIFF / PETITIONER:   PACIFIC MEDIA WORKERS GUILD, et al<br>DEFENDANT / RESPONDENT:   CITY OF MODESTO, et al | CASE NUMBER:<br>CV-26-003104 |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>15521474 (27808194) |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. [X] Summons
   b. [X] Complaint
   c. [X] Alternative Dispute Resolution (ADR) Package
   d. [X] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] Cross-Complaint
   f. [X] Other *(specify documents)*:    Notice of Case Management Conference

3. a. Party served *(specify name of party as shown on documents served)*:
      BRANDON GILLESPIE, in his official capacity as Modesto Chief of Police
   b. [X] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
      Person Authorized to Accept Service of Process

4. Address where the party was served:
   600 10th St, Modesto, CA 95354

5. I served the party *(check proper box)*
   a. [ ] **by personal service**. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*:                    (2) at *(time)*:
   b. [X] **by substituted service**. On *(date)*:   Fri, Mar 27 2026             at *(time)*:   09:42 AM            I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:
      Beatrice Diaz, Police Civilian Supervisor
      (1) [X] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      (4) [X] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*:
         from *(city)*:                                            or [X] a declaration of mailing is attached.
      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

| PLAINTIFF / PETITIONER: PACIFIC MEDIA WORKERS GUILD, et al | CASE NUMBER: |
|---|---|
| DEFENDANT / RESPONDENT: CITY OF MODESTO, et al | CV-26-003104 |

5.  c.  [ ]  **by mail and acknowledgment of receipt of service**. I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date)*:                        (2) from *(city)*:

    (3) [ ] with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

    (4) [ ] to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d.  [ ]  **by other means** *(specify means of service and authorizing code section)*:

    [ ] Additional page describing service is attached.

6.  The "Notice to the Person Served" (on the summons) was completed as follows:

  a.  [ ]  as an individual defendant.

  b.  [ ]  as the person sued under the fictitious name of *(specify)*:

  c.  [ ]  as occupant.

  d.  [X]  On behalf of *(specify)*:    BRANDON GILLESPIE, in his official capacity as Modesto Chief of Police

    under the following Code of Civil Procedure section:

| | |
|---|---|
| [ ] 416.10 (corporation) | [ ] 415.95 (business organization, form unknown) |
| [ ] 416.20 (defunct corporation) | [ ] 416.60 (minor) |
| [ ] 416.30 (joint stock company/association) | [ ] 416.70 (ward or conservatee) |
| [ ] 416.40 (association or partnership) | [ ] 416.90 (authorized person) |
| [X] 416.50 (public entity) | [ ] 415.46 (occupant) |
| [ ] other: | |

7.  **Person who served papers**

  a.  Name:               Kelly Gonzalez

  b.  Address:          5341 Old Redwood Highway, Suite 310, Petaluma, CA  94954

  c.  Telephone number:     800-938-8815

  d.  **The fee** for service was:   $225.00

  e.  I am:

    (1) [ ] not a registered California process server.

    (2) [ ] exempt from registration under Business and Professions Code section 22350(b).

    (3) [X] a registered California process server:

        (i) [ ] owner  [ ] employee  [X] independent contractor

        (ii) Registration No:  25-0020

        (iii) County:  Stanislaus

8.  [X]  **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9.  [ ]  **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date:   March 30, 2026

Kelly Gonzalez
_____
(NAME OF PERSON WHO SERVED PAPERS / SHERIFF OR MARSHAL)

InfoTrack US, Inc. - P000634
5341 Old Redwood Highway, Suite 310
Petaluma, CA  94954
800-938-8815

*(signature)*
_____
(SIGNATURE)

MC-031

| PLAINTIFF / PETITIONER:    PACIFIC MEDIA WORKERS GUILD, et al | CASE NUMBER: |
|---|---|
| DEFENDANT / RESPONDENT:    CITY OF MODESTO, et al | CV-26-003104 |

## DECLARATION OF MAILING
(This form must be attached to another form or court paper before it can be filed in court.)

I am a citizen of the United States, over the age of 18 and not a party to the within action. My business address is 5341 Old Redwood Highway, Suite 310, Petaluma, CA  94954.

On 3/28/2026, after substituted service under section CCP 415.20(a) or 415.20(b) or FRCP 4(e)(2)(B) or FRCP 4(h)(1)(B) was made (if applicable), I mailed copies of the:

Summons, Notice of Case Management Conference, Civil Case Cover Sheet, Complaint, Alternative Dispute Resolution Information Package

to the person to be served at the place where the copies were left by placing a true copy thereof enclosed in a sealed envelope, with First Class postage thereon fully prepaid, in the United States Mail at Petaluma, CA, addressed as follows:

BRANDON GILLESPIE, in his official capacity as Modesto Chief of Police
Person Authorized to Accept Service of Process
600 10th St
Modesto, CA 95354.

**I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.**

Date:    3/28/2026

Chelsea Treis
_____
(TYPE OR PRINT NAME)

_____
(SIGNATURE OF DECLARANT)

☐ Attorney for    ☐ Plaintiff    ☐ Petitioner    ☐ Defendant
☐ Respondent    ☒ Other *(Specify):* InfoTrack US, Inc.