CHESSIE THACHER (SBN 296767)
cthacher@aclunc.org
ANGELICA SALCEDA (SBN 296152)
asalceda@aclunc.org
SHAILA NATHU (SBN 314203)
snathu@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493


Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC MEDIA WORKERS GUILD; ANGEL JOSE FLORES; JULISSA RUIZ RAMIREZ; ALYSSA LEIVA;<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>CITY OF MODESTO, BRANDON GILLESPIE, in his official capacity as Modesto Chief of Police,<br><br>　　　　Defendants. | CASE NO. 2:26-CV-01623-JAM-CKD<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. John A. Mendez<br>Courtroom: 6, 14th Floor<br>Date: June 30, 2026<br>Time: 1:00 p.m. |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................................... 3

INDEX OF EXHIBITS………….............................................................................................6

INTRODUCTION ................................................................................................................... 11

STATEMENT OF FACTS...................................................................................................... 12

I.    Events Leading up to the Ordinance and Early Amendments by the City Council............... 12

II.   Selective and Disparate Ordinance Enforcement .................................................... 14

III.  Recent Amendments Giving Rise to Absurd Results ............................................... 15

IV.   Protests are Fundamental to Democracy, but Present Unique Risks to Plaintiffs................. 18

    A.    Plaintiff Pacific Media Workers Guild ("the NewsGuild") ......................................18

    B.    The Individual Plaintiffs ................................................................................ 19

LEGAL STANDARD .............................................................................................................. 20

ARGUMENT........................................................................................................................... 21

I.    Plaintiffs are Likely to Prevail on Their Free Speech and Section 409.7 Claims ................. 21

    A.    Heightened constitutional scrutiny applies. ............................................................. 21

    B.    The Ordinance is content based and fails strict scrutiny........................................... 22

    C.    Even if content-neutral, the Ordinance unreasonably burdens protected expression…24

        1. Robust safeguards exist to protect free speech and free press. ....................... 25

        2. Free speech can lead to unrest and expose people to the risk of injury…........  25

        3. The Ordinance chills free speech by banning gear that mitigates risk ............ 26

        4. The Ordinance prevents the press from being able to safely do their
           jobs and violates California Penal Code 409.7……………………………….27

        5. The Ordinance ignores privacy interests and exposes people to
           collateral harm..............................................................................................28

        6. The Ordinance criminalizes protected expression…………………………...... 29

    D.    The Ordinance is not narrowly tailored. ................................................................. 30

II.   Plaintiffs Are Likely to Prevail on Their Due Process Claims............................................. 31

    A.    The Ordinance is unconstitutionally vague............................................................... 30

    B.    The Ordinance's ambiguity leads to selective enforcement problems. ..................... 32

    C.    The Ordinance invades protected due process liberty interests................................. 32

    D.    The Ordinance violates due process equal protection............................................... 33

III.  Plaintiffs will Face Irreparable Harm Absent a Court Order ............................................... 33

IV.   The Balance of Equities and Public Interest Favors Granting an Injunction ........................ 34

V.    No Bond Should be Required................................................................................................ 35

CONCLUSION........................................................................................................................ 35

## TABLE OF AUTHORITIES

Cases .................................................................................................................................Page(s)

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)........................................ 20, 21

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ............................................ 23

*Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012) ................................................................ 34

*Bates v. City of Little Rock*, 361 U.S. 516 (1960)........................................................................... 25

*Bible Club v. Placentia Yorba Linda Sch. Dist.*, 573 F. Supp. 2d 1291 (C.D. Cal 2008)................ 35

*Boos v. Barry*, 485 U.S. 312 (1988)................................................................................................ 21

*Braxton v. Municipal Court*, 10 Cal. 3d 138 (1973).......................................................................... 21

*Brown v. Louisiana*, 383 U.S. 131 (1966)........................................................................................ 29

*City of Houston v. Hill*, 482 U.S. 451 (1987) .................................................................................. 31

*City of Lakewood v. Plain Dealer Publ'g*, 486 U.S. 750 (1988) ....................................................... 32

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) ..................................................................... 24, 31

*Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996)............................................................................ 24

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
657 F.3d 936 (9th Cir. 2011) ................................................................................................... 30

*DeWeese v. Town of Palm Beach*, 812 F.2d 1365 (11th Cir. 1987) .................................................. 33

*Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959 (9th Cir. 2001) ........................................ 27

*Edwards v. South Carolina*, 372 U.S. 229 (1963) ........................................................................... 25

*Elrod v. Burns*, 427 U.S. 347 (1976) .............................................................................................. 35

*Garcia v. County of Alameda*, 150 F.4th 1224 (9th Cir. 2025)................................................... 27, 28

*Gatto v. County of Sonoma*, 98 Cal. App. 4th 744 (2002) ............................................................... 32

*Ghafari v. Municipal Court*, 87 Cal. App. 3d 255 (1978)............................................................. *passim*

*Goyette v. City of Minneapolis*, 338 F.R.D. 109 (D. Minn. 2021) .................................................... 27

*Grayned v. City of Rockford*,  408 U.S. 104 (1972)......................................................................... 31

*Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017)...................................................................... 21

## TABLE OF AUTHORITIES CONTINUED

*In re Brown*, 9 Cal.3d 612 (1973)................................................................................26

*In re Watts*, 298 F.3d 1077 (9th Cir. 2022) .................................................................12

*Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020).............27

*Jorgenson v. Cassiday*, 320 F.3d 906 (9th Cir. 2003) ..................................................35

*Klein v. City of San Clemente*, 584 F.3d 1196 (9th Cir. 2009).....................................34

*Kohls v. Bonta*, 752 F. Supp. 3d 1177 (E.D. Cal. 2025) ....................................21, 24, 33, 34

*Los Angeles All. for Survival v. City of Los Angeles*, 22 Cal. 4th 352 (2000)...............21

*McCullen v. Coakley*, 573 U.S. 464 (2014).................................................................22

*Moody v. NetChoice*, 603 U.S. 707 (2024)..................................................................24

*NAACP v. Alabama*, 357 U.S. 449 (1958) ...................................................................28

*NAACP v. Button*, 371 U.S. 415 (1963).......................................................................31

*NAACP v. Claiborne Hardware*, 458 U.S. 886 (1982)..................................................30

*Nken v. Holder*, 556 U.S. 418 (2009)..........................................................................34

*Nunez by Nunez v. City of San Diego*, 114 F.3d 935 (9th Cir. 1997) .......................31, 33

*Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971).................................................25

*Parr v. Municipal Court*, 3 Cal. 3d 861 (1971)............................................................23

*State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*,
766 F.2d 1319 (9th Cir.), *amended*, 775 F.2d 998 (9th Cir. 1985)................................35

*Police Dept. of Chicago v. Mosley*, 408 U.S. 92 (1972).........................................22, 25, 33

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .........................................................21, 22

*Richmond Newspaper, Inc. v. Virginia*, 448 U.S. 555 (1980)........................................25

*Schneider v. Town of Irvington*, 308 U.S. 147 (1939) ..................................................25

*Snyder v. Phelps*, 562 U.S. 443 (2011) .......................................................................24

*Terminello v. Chicago*, 337 U.S. 1 (1949) ...................................................................26

*Texas v. Johnson*, 491 U.S. 397 (1989)........................................................................30

## TABLE OF AUTHORITIES CONTINUED

*Tinker v. Des Moines Indep., Comm. Sch. Dist.*, 393 U.S. 503 (1969)..........................................30

*United States v. Mongol Nation*, 56 F.4th 1244, 1249 (9th Cir. 2023)…………………………...30

*Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013) ...........................................................24

*Williams v. Garcetti*, 5 Cal. 4th 561 (1993) ...................................................................................32

*Williams v. Pryor*, 240 F.3d 944 (11th Cir. 2001) ..........................................................................33

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..............................................................21

Statutes ..........................................................................................................................Page(s)

Cal. Const. Art I................................................................................................................... 8, 17

Cal. Penal Code § 404.6...................................................................................................... 31

Cal. Penal Code § 406......................................................................................................... 31

Cal. Penal Code § 408......................................................................................................... 31

Cal. Penal Code § 409......................................................................................................... 31

Cal. Penal Code § 148......................................................................................................... 31

Cal. Penal Code § 415......................................................................................................... 31

Cal. Penal Code § 416......................................................................................................... 31

Cal. Penal Code § 594......................................................................................................... 31

Cal Penal Code § 463.......................................................................................................... 31

Cal Penal Code § 459.......................................................................................................... 31

Cal Penal Code § 451.......................................................................................................... 31

Cal Penal Code § 602.......................................................................................................... 31

Cal Penal Code § 594.4....................................................................................................... 31

Cal Penal Code § 11460....................................................................................................... 31

Cal. Penal Code § 409.7 ................................................................................................ *passim*

Cal. Penal Code § 185.............................................................................................................. 8

U.S. Const., Amends. I and XIV ................................................................................... *passim*

**INDEX OF SUPPORTING EXHIBITS ATTACHED TO**
**PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE ("RJN")**

| Exhibit: | RJN No.: | Description: |
|---|---|---|
| Exhibit A | 0001-0010 | City of Modesto Ordinance No. 3701-C.S., dated Aug. 13, 2019 |
| Exhibit B | 0011-0018 | Transcript of August 13, 2019 Modesto City Council Meeting |
| Exhibit C | 0019-0028 | City of Modesto Ordinance No. 3735-C.S., dated Aug. 10, 2021 |
| Exhibit D | 0029-0033 | City of Modesto, Council Agenda Report, dated June 23, 2021 |
| Exhibit E | 0034-0044 | Transcript of Aug.10, 2021 Modesto City Council Meeting |
| Exhibit F | 0045-0094 | City of Modesto, Council Agenda Report, dated Nov. 25, 2025 |
| Exhibit G | 0095-0115 | Transcript of Dec. 2, 2025 Modesto City Council Meeting |
| Exhibit H | 0116-0126 | City of Modesto Ordinance No. 3805-C.S., dated Jan. 6, 2026 |
| Exhibit I | 0127-0129 | City of Modesto, Municode Library, Municipal Code 4-23.02 |
| Exhibit J | 0130-0139 | Assembly Public Safety Committee Analysis, California Senate Bill No. 98 |

## INDEX OF DECLARATIONS AND EXHIBITS
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

| Exhibit: | Description: |
|---|---|
| **Declaration of Annie Sciacca [ECF No. 13-1]** | |
| Exhibit A | Crisis Ready Media, Guide on Personal Protective Equipment |
| Exhibit B | Committee to Protect Journalists, Guide to Personal Protective Equipment |
| Exhibit C | Letter, dated July 21, 2025, by First Amendment Coalition, Society for Protection of Journalists NorCal, and Pacific Media Workers Guild to Modesto City Council re Ordinance |
| **Declaration of Michael Applegate [ECF No. 13-2]** | |
| Exhibit A | Photograph re October 29, 2025 Use of Force Incident |
| **Declaration of Jake Lee Green [ECF No. 13-3]** | |
| Exhibit A | Photographs re Protesters |
| Exhibit B | Photographs re Protesters |
| Exhibit C | Photographs re Protesters |
| Exhibit D | Still images from Video re Protester Interactions |
| Exhibit E | Photograph of Green re June 2022 Use of Force Incident |
| Exhibit F | Photograph re Press Safety Gear |
| Exhibit G | Photograph re Reporters in Press Safety Gear |
| Exhibit H | Photograph re August 2022 Use of Force Incident |
| Exhibit I | Freedom of the Press Tracker Report re August 2022 Use of Force Incident |
| Exhibit J | Photographs re Press Safety Gear |
| Exhibit K | Photograph re 2021 Use of Force Incident |

*Index Continued Next Page*

PLAINTIFFS' MPA IN SUPP. OF PRELIM. INJ.                                    PAGE 7
CASE NO. 2:26-CV-01623-JAM-CKD

## INDEX OF DECLARATIONS AND EXHIBITS
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

| Exhibit: | Description: |
|---|---|
| **Declaration of Joseph Fitzgerald Rodriguez [ECF No. 13-4]** | |
| Exhibit A | Screenshot Image re 2020 Use of Force Incident |
| Exhibit B | Social Media Post, dated June 9, 2025 |
| Exhibit C | Social Media Post, dated May 29, 2020 |
| Exhibit D | Photograph re Photojournalist |
| **Declaration of Joe Kieta [ECF No. 13-5]** | |
| **Declaration of Angel Jose Flores [ECF No. 13-6]** | |
| Exhibit A | Still Images re June 14, 2025 Arrest |
| Exhibit B | City of Modesto Press Release, dated August 11, 2025 |
| **Declaration of Julissa Ruiz Ramirez [ECF No. 13-7]** | |
| Exhibit A | Photograph re Ramirez in Modesto in June 2025 |
| **Declaration of Alyssa Leiva [ECF No. 13-8]** | |
| Exhibit A | Pictures re Doxxing Incident |
| **Declaration of Darleen Patrick [ECF No. 13-9]** | |
| **Declaration of Alexis Gerardo [ECF No. 13-10]** | |
| **Declaration of F.B. [ECF No. 13-11]** | |
| **Declaration of Efren Diaz [ECF No. 13-12]** | |
| Exhibit A | Central Valley Black Indigenous People of Color Coalition ("Coalition") Flyer for their ICE OUT protest in Modesto, dated June 14, 2025 |
| Exhibit B | Modesto Police Department ("MPD") Information Card re Modesto Municipal Codes for Public Demonstrations |
| Exhibit C | Photographs re Protesters |

### INDEX OF DECLARATIONS AND EXHIBITS
### IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

| Exhibit: | Description: |
| --- | --- |
| **Declaration of Richard Thompson Ford [ECF No. 13-13]** | |
| Exhibit A | Curriculum Vitae |
| **Declaration of Rohini Haar [ECF No. 13-14]** | |
| Exhibit A | Curriculum Vitae |
| **Declaration of Dylan Verner-Crist [ECF No. 13-15]** | |
| Exhibit A | California Public Records Act Request ("CPRA"), dated June 27, 2025 |
| Exhibit B | Email correspondence between MPD officers and other City officials re installation of a camera trailer |
| Exhibit C | Email correspondence between MPD officials re Modesto Bee request |
| Exhibit D | CPRA Request, dated July 10, 2025, by ACLU NorCal, re the Ordinance |
| Exhibit E | Email correspondence between MPD Chief Brandon Gillespie and the Modesto City Council re CVBIPOCC's press release |
| Exhibit F | Modesto Community Police Review Board's Ad Hoc Committee presentation, dated September 17, 2025, re the Ordinance |
| Exhibit G | Photographs by Verner-Crist, dated May 1, 2026, re MPD surveillance cameras |
| Exhibit H | Photographs by Verner-Crist, dated May 1, 2026, showing posted notices re the Ordinance |
| Exhibit I | MPD Facebook advertisement, dated October 18, 2025, re enforcement of the Ordinance |
| **Declaration of Dylan Verner-Crist Continued [ECF No. 13-15]** | |
| Exhibit J | MPD Facebook advertisement, dated March 28, 2026, re the Ordinance |
| Exhibit K | MPD Facebook post, dated March 13, 2026, re Automated License Plate Reader data sharing |
| Exhibit L | Table created by Verner-Crist, re types of facial coverings and safety gear that are allowed and prohibited under the Ordinance |

## INDEX OF DECLARATIONS AND EXHIBITS
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

| Exhibit: | Description: |
|---|---|
| **Declaration of Chessie Thacher [ECF No. 13-16]** | |
| Exhibit A | Letter, dated July 18, 2025, by ACLU to City of Modesto re the Ordinance |
| Exhibit B | Letter, dated August 15, 2025, by ACLU and First Amendment Coalition ("FAC") to the Modesto Community Police Review Board re the Ordinance |
| Exhibit C | Letter, dated October 9, 2025, by ACLU and FAC to City of Modesto re the Ordinance |
| Exhibit D | Letter, dated December 2, 2025, by ACLU and FAC to City of Modesto re the Ordinance |

# **INTRODUCTION**

Peaceful protest is fundamental to democracy. So is a free press. The government can intrude into these areas only for the most compelling reasons. More than a century of law confirms this exacting standard of constitutional review. And yet Defendants City of Modesto and Brandon Gillespie in his official capacity as Modesto Chief of Police (collectively, "the City" or "Modesto") ignore the weight of this law. In 2019, Modesto—motivated by a particular hostility to "the Proud Boys" and antifascist protesters who the City deemed to be "Antifa"—enacted an urgency ordinance entitled Restrictions on Use of Specified Items During Public Assembly ("Ordinance"). RJN 116-29. The City has twice amended the Ordinance for "public safety reasons," each time making it more sweeping and unwieldy.

The Ordinance's latest incarnation, adopted in December 2025, prohibits personal items like face coverings and scarves, and basic safety gear like eyewear, sports equipment, impact-resistant clothing, helmets, gas masks, and padded vests, among other things. RJN 128-9, § (a)(13)-(15) and (a)(18)-(19). Its result is a vaguely proscribed dress code that is both arbitrary and absurd. By the City's own interpretation, a person can dress up as a "dancing ninja" or in an "inflatable frog suit" concealing their full identity, but a protester with a bandana across their nose or a reporter in safety gear may face arrest and jail time. It all depends on how a police officer views the "accessory."

Plaintiffs Angel Jose Flores, Julissa Ruiz Ramirez, and Alyssa Leiva are a group of concerned individuals who seek to peacefully assemble and protest in Modesto, and Plaintiff Pacific Media Workers' Guild ("NewsGuild") is a reporter's union whose members seek to safely report on such demonstrations. Many of the personal items banned by the Ordinance are important to both Plaintiffs and the general public when attending or reporting on a protest. People often carry these items for expressive reasons, to protect their identities, or to keep themselves safe. Members of the press also regularly bring safety gear—helmets, vests, respirators, and goggles—while reporting on public demonstrations. In fact, press groups now recommend that reporters carry exactly this gear.

Not having access to these items, and not even knowing *what* exactly is prohibited by the Ordinance and *when*, chills constitutionally-protected free speech activities, raises due process concerns, and contravenes state statutory protections that allow journalists to continue reporting on

an assembly after a dispersal order is issued. *See* U.S. Const., Amends. I, XIV; Cal. Const. Art. I, §§ 2, 3, 7; Cal. Pen. Code § 409.7. These same constitutional concerns led a California Court of Appeal, nearly 50 years ago, to strike down a similar criminal statute that had banned face masks and "anonymous public appearances by persons exercising their First Amendment rights." *Ghafari v. Municipal Court*, 87 Cal. App. 3d 255, 261 (1978). Although Modesto has tried to sidestep *Ghafari* by removing this action, this court is still "bound to follow" a state court's construction of state law. *In re Watts*, 298 F.3d 1077, 1082 (9th Cir. 2022).

The harm this Ordinance causes is imminent and real. In the last year, federal and state law enforcement—many wearing masks themselves—have intensified their surveillance of and crackdowns on public demonstrations across the country. Peaceful protesters have been subjected to invasive facial recognition technology, tear gas, rubber bullets, and in California and around the country, violent force. The surveillance upends peoples' lives, work, and immigration status. The crowd control measures create havoc and harm too. They do not just target a single individual who might fail to comply with an order. They affect all in the vicinity, leading to severe injuries.

The City cites "public safety" as the reason for exposing people to these harms. But banning masks and safety gear is not narrowly tailored to this interest; it sweeps in all the lawful and expressive uses by Plaintiffs' and the public. And if unrest occurs at a protest, Modesto may employ the many state laws that criminalize acts like disturbing the peace, trespassing, and property destruction. It may also punish people who do such unlawful acts wearing a mask. *See* Cal. Penal Code § 185. Given the physical risks and constitutional injuries, and the fact that Plaintiffs are likely to prevail, the challenged sections of the Ordinance set forth at (a)(13)-(15) and (a)(18)-(19) should be enjoined.[1]

## STATEMENT OF FACTS

**I.      Events leading up to the Ordinance and Early Amendments by the City Council**

The original version of the Ordinance came together hastily over a few weeks. In August 2019, an applicant—whom the City considered to be "a member of the local Proud Boys

---

[1] The Ordinance's other sections are not at issue in this lawsuit.

PLAINTIFFS' MPA IN SUPP. OF PRELIM. INJ.                                                    PAGE 12
CASE NO. 2:26-CV-01623-JAM-CKD

organization"—applied for a permit to host a "Straight Pride" event in downtown Modesto. RJN 3. Public outcry followed. At a City Council meeting, then-Police Chief Galen Carroll proposed enacting an urgency ordinance, and in support, he presented images of the Proud Boys and Antifa. RJN 15-17, Tr. 20:12-22:13. The Council discussed their history and ideologies, with one councilmember commenting that she became supportive of legislative action as soon as she learned that "the Proud Boys and Antifa were . . . invited." *Id.*

Just days before the Straight Pride event, the City enacted the Ordinance. It set forth a list of enumerated items, mostly weapons and items which could be used as weapons, that a person could not "utilize, carry, or possess" while attending any "demonstration, rally, protest, counter-protest, picket line, march, or public assembly." RJN 7. The proscriptions also included: "wearing [] a mask, scarf, bandana, or any other accessory or item that covers or partially covers the face shielding the wearer's face from view and conceals the wearer's identity, except for coverings worn due to religious beliefs, practices or observances or due to medical necessity." *Id.* at 8. The Ordinance supported this ban with the finding that "Antifa groups are known to wear masks to obscure their identities and are reported to have been violent during [] protests." *Id.* at 4. The finding continued that these groups "utilize their anonymity to commit acts of violence and vandalism without concern of identification and apprehension[.]" *Id.*

Modesto next amended the Ordinance in 2021 before another Straight Pride protest, expanding the list of banned items to include gas masks, helmets, and impact-resistant gear. RJN 23. The legislative report asserted that "[n]on-authorized persons in possession of [gas] masks during a public assembly have no justification for their possession, other than a desire to overcome crowd control techniques used by law enforcement during an unlawful assembly." RJN 31. The report concluded that the gear was "confrontational attire," "neither designed nor intended to facilitate peaceful assembly or the exercise of constitutional rights." *Id.* at 32.

Police Lieutenant T.J. Moffett echoed these sentiments in a presentation to the City Council. RJN 37-39, Tr. 9:24-11:1, 13:23-14:25. During the presentation, he clarified that the Modesto Police Department enforces the Ordinance during events and via social media, community outreach, and posted notices. *Id.*, Tr. 16:2-16:25. But, the Lieutenant admitted, officers "only" enforce the

Ordinance when it has "information to believe that a specific event or events might lead to violence or other acts designed to prevent the exercise of constitutional rights." *Id.*, Tr. 7:13-7:16. During the public comment period, community members pushed back, suggesting that officers favored "white supremacist groups" and mistreated peaceful protesters. RJN 39-43, Tr. 17:21-32:22.

## II.    Selective and Disparate Ordinance Enforcement

Between 2019 and 2025, many demonstrations took place where attendees wore prohibited face coverings or carried banned items. The City's records include pictures of such attendees, RJN 72-94, and numerous witnesses recount seeing them. Patrick ¶ 17; Diaz ¶ 22, Ex. C. In 2021, a veteran reporter who was observing events after police declared an unlawful assembly even filmed Chief Gillespie with masked protesters whom, according to the reporter, looked like Proud Boys. Green ¶ 9, Ex. D. For nearly six years, these observed violations did not result in any arrests. In fact, the City admits "the first arrests under the Ordinance occurred on June 14, 2025." ECF No. 10 ¶ 26.

On that day, two protests took place in Modesto: a "No Kings" event organized as part of a national movement against the Trump administration and a locally organized "ICE Out" rally in solidarity with the immigrant community. Patrick ¶¶ 3, 7-12; Flores ¶¶ 4-5; Diaz ¶ 4; Gerardo ¶ 3. Modesto police prepared for the ICE Out rally by installing a camera at the protest location and by deploying aerial drones to surveil the protesters. ECF No. 10 ¶¶ 27-28; Verner-Crist ¶ 7, Ex. B. According to police estimates, the No Kings event had a crowd of approximately 2,000 to 3,000 people, while the ICE Out rally drew approximately 150 attendees. Verner-Crist ¶ 10, Ex. E. Though the No Kings crowd was diverse, it was far whiter than the ICE Out crowd, which mostly included people of color. Patrick ¶¶ 8, 10; Diaz ¶ 14.

Attendees at both events wore face coverings. Patrick ¶¶ 8-9; Diaz ¶ 14; F.B. ¶ 8. Yet the only five individuals ever arrested for wearing face coverings were participants in the ICE Out rally. Verner-Crist ¶ 10, Ex. E; ECF No. 10 ¶¶ 27-28. Police booked those individuals into jail and held them in custody for hours. Flores ¶ 15; Diaz ¶ 16. The City shared the arrestees' names with the Modesto Bee. Verner-Crist ¶ 8, Ex. C. Chief Gillespie characterized the arrests as having been made "early and intentionally to remove agitators who showed clear intent to not follow the law and potentially disrupt an otherwise lawful and peaceful gathering." *Id.* ¶ 10, Ex. E at 2. Pictures of the

day, however, reflect that the ICE Out protest was peaceful. Witnesses recount that the arrests by officers in tactical gear, jumping out of unmarked vehicles, felt shocking and arbitrary. Flores ¶¶ 10-15, Ex. A; Diaz ¶¶ 11-12, 16-17; Patrick ¶¶ 7-12; FB ¶¶ 8-9. The City later announced it would not file criminal charges concerning "the June 14 face-covering violations." Flores ¶ 16, Ex B.

The community was outraged by the police's differential treatment of the protesters. For months, members of the public consistently expressed their frustration at meetings of the City Council and the Community Police Review Board, which ultimately recommended that the Council amend the Ordinance. Verner-Crist ¶ 11, Ex. F. Numerous civil rights and press groups also urged that the Ordinance be reconsidered. The groups specifically highlighted that the Ordinance's safety gear ban put journalists and members of the public at tremendous and unnecessary risk. Thacher ¶¶ 3-6, Exs. A-D; Sciacca ¶ 23, Ex. C; Fitzgerald ¶ 14.

Amidst this advocacy, groups in Modesto worked hard to hold a No Kings protest on October 18. Patrick ¶¶ 4-6. The City threatened to enforce the Ordinance on social media and handed out cards warning that masks, bandanas, and tactical gear were illegal. Diaz ¶¶ 19, Ex. B; Verner-Crist ¶ 14, Ex. I. People found the enforcement more lenient than at the ICE Out protest. Diaz ¶¶ 17-19.

**III.     Recent Amendments Giving Rise to Absurd Results**

Under pressure, the City Council amended the Ordinance on December 2, 2025. RJN 117-26. The City modified the ban on helmets to include an exception for "softshell bicycle/sports helmets" and the ban on umbrellas to account for "extreme heat." *Id.* § (a)(13), (15), (17). The City also made significant changes to the Ordinance's mask ban provision. Previously, section (a)(13) included this grammatically disjointed language: "No person shall utilize, carry, or possess the following items or articles while attending or participating in any demonstration . . . (13) the wearing of a mask, scarf, bandana or any other accessory or item that covers or partially covers the face shielding the wearer's face from view and conceals the wearer's identity, except for coverings worn due to religious beliefs, practices or observances or due to medical necessity." RJN 123. The amendments left the problematic syntax, but expounded on section (a)(13), explaining that the "medical necessity exemption shall apply to any individuals who are wearing medical grade masks including but not limited to a surgical mask, disposable face mask, N95 mask, KN95 mask, elastomeric mask, and/or

PLAINTIFFS' MPA IN SUPP. OF PRELIM. INJ.                                    PAGE 15
CASE NO. 2:26-CV-01623-JAM-CKD

the functional equivalent but not for balaclavas, ski masks or the like[.]" *Id.* § (a)(13)(ii).

The City also added a new "costume exception" at section (a)(13)(iii) reading:

the restrictions of Section 4-23.02(a)(13) do not apply to costumes which obscure the face as part of the expressive function of the costume including, coverings worn as part of a costume in connection with a holiday event (e.g. Halloween), masquerade event (e.g. Mardi Gras), theatrical or other entertainment event, and/or the functional equivalent.

The City Council's legislative findings and amendment deliberations again invoked the Proud Boys and Antifa as a primary justification for the Ordinance and reiterated that the City did not want to "tak[e] a 'wait-and-see' approach." RJN 118, 120; *see also id.* at 47-9, 72-94. Councilmembers considered photographs of purported Proud Boy and Antifa protesters in Modesto between 2020 and 2022. Some were wearing banned items, but inexplicably not arrested despite the Ordinance's effect. RJN 72-94; *id.* at 99-100, Tr. 11:24-12:7, 14:22-15:2; ECF No. 10, ¶ 28. The legislative materials asserted that the amendments were "supported by the City's substantial interest in safeguarding its citizens against violence and in protecting its police force from the type of violence that has occurred at demonstrations in Los Angeles, Oakland, Berkeley, Chicago and Portland." RJN 49. The materials also gave little weight to concerns around protester anonymity, concluding that personal devices and "cameras are recording us constantly out in public spaces such as at City Hall, at the 10th Street Plaza or on major public rights-of ways." RJN 50 .

At the December 2 Council meeting, the City's specially retained counsel for issues relating to the Ordinance commented on the pictures presented, which showed protesters wearing balaclavas, gaiters, and ski masks alongside others wearing cloth or surgical masks, hats, and sunglasses. Even though many people had equally obscured facial features, counsel opined that the individuals wearing surgical masks with rainbows were "not a problem." RJN 101-2, Tr. 21:9-22:18. She then went on to explain the "costume exemption" as follows: "So let's be clear. If you're dressed as Snow White, or you're dressed as a dancing ninja, or a regular ninja, or you're . . . dressed as a frog, those are element[s] of expressive activity." *Id.* at 114, Tr. 72:3-6. Counsel provided no clarification as to how to determine when something was a permissible "costume" versus a criminalized accessory. Nor was it made clear if a sincere religious belief or documented "medical necessity" was needed to qualify for section (a)(13)'s exemptions.

The public was quick to highlight the illogical results. One community member asked: "So a person who comes in that Snow White costume with that mask, is now given more freedom than the same exact person who goes to their car, takes off the Snow White mask, puts on a yellow bandana, and walks back into the protest[?]" *Id.* at 106, Tr. 40:18-22. Another commenter objected that the Ordinance "likens peaceful protesters wearing masks to violent criminals." *Id.* at 109, Tr. 52:22-53:16. He asked: "Does the City seriously believe that on Halloween a person is any less dangerous"? "By creating an arbitrary exception, the City admits that a mask alone is not a danger. The perceived danger is a mask in a political setting." *Id.*

As forecasted, the amended Ordinance has led to absurd results and lingering confusion. Flores ¶ 20; Leiva ¶ 14; Diaz ¶ 21. The table below captures some of the photographs presented to the Council and depicts a few of the costumes to which the City's counsel referred. *See* RJN 76, 81, 88, 90, 93; Verner-Crist ¶ 17, Ex. L; Green ¶ 13, Ex. G. The difference between the attire is subtle, but the consequences are not. Confusion is also exacerbated by the fact that the City still posts signs and QR codes referencing the pre-December 2025 version of the Ordinance (which is the version that the Municode Library also displays) and by the fact that officers inconsistently enforce the Ordinance. Verner-Crist ¶¶ 13, 15, Exs. H-J; Patrick ¶ 15; ECF No. 10 ¶¶ 19, 153, 157; RJN 128-9.




**IV.    Protests are Fundamental to Democracy, but Present Unique Risks to Plaintiffs**

Modesto has an active civil society and robust free press—as evidenced by the extensive community engagement around the Ordinance. The Ordinance infringes and chills Plaintiffs' protected activities, including participation in peaceful protests, advocacy efforts, and news reporting. The Ordinance, on its face, similarly impacts the general public.[2]

**A.  Plaintiff Pacific Media Workers Guild ("the NewsGuild")**

The NewsGuild is a labor union that represents hundreds of journalists across over 20 newsrooms in California and Hawaii along with freelance journalists. Sciacca ¶ 2; Applegate ¶ 2. The journalists that the NewsGuild represents work at multiple newspapers serving the Central Valley. *Id.* The NewsGuild seeks to ensure that its journalists are safe on the job and advocates for members who are injured or arrested while working. Applegate ¶¶ 2-3, 10-11; *see also* Sciacca ¶¶ 3-4,18-22. NewsGuild members report on protests and often confront chaotic situations. Sciacca ¶¶ 6-11, 21-22. Journalists, including NewsGuild members, are often as close to the action as possible and easily swept up in law enforcement's deployment of "less lethal" crowd control weapons, including tear gas, rubber bullets, and flash bang grenades. Applegate ¶¶ 4-5, 8, 13, Ex. A; Sciacca ¶¶ 6-11, 12-15, 21-22. The NewsGuild and its members are concerned about these weapons because they are often aimed imprecisely and have collateral, diffuse, and long-lasting impacts. Sciacca ¶¶ 7-10; Applegate ¶¶ 4-6. Tear gas, for example, has rendered NewsGuild members unable to see, breathe, or continue reporting at the scene. Sciacca ¶ 9. The NewsGuild provides trainings, distributes guides about safety gear, and recommends that such gear—namely helmets, padded vests, goggles, and gas masks—be brought to every protest, no matter the perceived likelihood of violence or escalation. Sciacca ¶¶ 12-16, 18-20, Exs. A-B; Applegate ¶¶ 6-9, 11.

Of particular importance to the NewsGuild and its members are the statutory protections afforded journalists under California Penal Code § 409.7, which ensures journalists are able to remain in areas that have been declared unlawful assemblies and to continue reporting on the events

---

[2] Plaintiffs submit supporting declarations from the press (Decls. of Fitzgerald, Green, & Kieta); the community (Decls. of Diaz, F.B., Gerardo, & Patrick); and expert Decls. of Haar & Ford.

as they unfold. Sciacca ¶ 17; RJN 131-39. However, this makes it even more likely that a reporter will be injured when police use crowd control weapons in an area. Sciacca ¶ 17. As the NewsGuild wrote to the City last year, the Ordinance undercuts its work and makes journalist members less safe. Applegate ¶¶ 12-13; Sciacca ¶¶ 23-25, Ex. C. The criminalization of any journalist who utilizes, carries, or possesses safety gear at a protest compels NewsGuild members to rethink the way they cover protests—or if they cover them at all. Sciacca ¶¶ 23-25.

### B. The Individual Plaintiffs

ANGEL FLORES is a Modesto resident of Mexican American descent, a school bus driver, and a father. Flores ¶¶ 2, 5. He is also one of the only people that Modesto has ever arrested under the Ordinance for wearing a mask. *Id.* ¶ 19. Flores has long worn a gaiter mask in his day-to-day life, including while at work and at the gym. *Id.* ¶ 3. It helps him to regulate his breathing and control his anxiety. *Id.* Consistent with this practice, Flores brought prescription sunglasses and a gaiter mask with a skeleton design, along with an upside-down American flag, to the ICE Out protest. *Id.* ¶¶ 4-16, 19, Ex. A. He attended to raise awareness about ICE's aggressive tactics, but—within minutes of arriving and while peacefully listening to a speaker—officers arrested him. *Id.* Police transported Flores in an unmarked car, transferred him to an alley, booked him on a misdemeanor charge, and held him in custody for nearly twelve hours. *Id.* It was traumatizing and still causes Flores anxiety and night terrors. *Id.* ¶¶ 17-18. He now fears protesting, especially because it is unclear if his gaiter—with a skeleton and worn to address anxiety—would be treated as a costume, a medical exemption, or cause for arrest. *Id.* ¶¶ 20-21.

JULISSSA RUIZ RAMIREZ and ALYSSA LEIVA are members of the Central Valley Black, Indigenous, and People of Color Coalition ("Coalition"), an advocacy group centered in Stanislaus County that uses collective action to advocate on social justice issues. Ramirez ¶ 2; Leiva ¶¶ 2-3. Ramirez organizes local protests, town halls, vigils, and rallies for the Coalition, and both Ramirez and Leiva regularly attend these events as well as other protests in Modesto—often wearing face coverings to protect themselves, express certain messages, and honor their heritage. Ramirez ¶¶ 3-5, 13, 20, Ex. A; Leiva ¶¶ 4-8. In particular, they wear keffiyehs—a checkered scarf associated with Palestinian identity—to show support for Palestine and solidarity with activists arrested in the

U.S. for their pro-Palestine views. *Id.* Leiva sometimes wears a medical mask, then covers the same part of her face with a keffiyeh. Leiva ¶¶ 6-7.

Both Ramirez and Leiva believe that it is important to protect their identities at protests—especially when the protest concerns a controversial topics or when it might draw far right counterprotesters, who frequently film and post videos of protesters on social media with whom they disagree. Ramirez ¶¶ 6-13; Leiva ¶¶ 8-11. Ramirez was the victim of such doxxing in college and it led to terrifying physical threats. Ramirez ¶¶ 10-12. Due to her activism, Leiva was also doxxed and harassed online. Specifically, doxxers put up photos of Leiva, likened her to a troll, and disclosed parts of her credit history. Leiva ¶ 9, Ex. A. Ramirez and Leiva also worry about police surveillance and the use of crowd control weapons that can injure protesters, like themselves, who demonstrate peacefully and do not engage in violence or property destruction. Ramirez ¶¶ 12-18; Leiva ¶¶ 10, 13. They are aware, from news reports and their own experience, that peaceful protesters can get shot in the face, blinded by rubber bullets, and harmed by tear gas even when they are not the intended target of such force. *Id.* Because Ramirez has an injury that can make it difficult to move quickly, she especially worries about these weapons' collateral impacts and would like to carry goggles, a protective vest, and a helmet to protests just in case. Ramirez ¶¶ 18-21.

This summer, it is anticipated that the Coalition and other groups will organize a number of protests. Diaz ¶ 27; Gerardo ¶ 11; Ramirez ¶ 22; Patrick ¶¶ 2-4. But Ordinance enforcement at last year's ICE Out protest and confusion around what it bans have caused Ramirez and Leiva to draw back from their activities, as well as change the type of protests they are willing to attend. Ramirez ¶¶ 21-22; Leiva ¶¶ 11-15. They are concerned about Modesto's uneven enforcement, and though they wish to protest and organize, the Ordinance makes them reluctant to do so. *Id.*

## LEGAL STANDARD

A preliminary injunction should issue where, as here, a plaintiff can demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of "irreparable harm" in the absence of injunctive relief, and (3) that "the balance of equities" and "public interest" weigh in their favor. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (*quoting Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). In the First Amendment context, a plaintiff bears

only "the initial burden of making a colorable claim" that their free speech "rights have been infringed, or are threatened with infringement," and then "the burden shifts to the government to justify the restriction." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014) (citation omitted). Alternatively, the Ninth Circuit has stated that an injunction should issue when a plaintiff demonstrates "serious questions going to the merits" and that the "balance of hardships" tips sharply in their favor. *All. for the Wild Rockies*, 632 F.3d at 1135. Plaintiffs satisfy these tests.

**ARGUMENT**[3]

Plaintiffs bring this motion on the grounds that they are likely to succeed on the merits of their first five causes of action, which relate to federal and state constitutional freedom of speech and assembly claims (Claims I and III); federal and state constitutional due process claims (Claims II and IV); and California Penal Code § 409.7 (Claim V). ECF No. 1-2. Plaintiffs can readily demonstrate that the Ordinance violates these provisions both on its face and as applied to their constitutionally protected activities. This conclusion, in turn, leads "inexorably" to a finding of irreparable injury. *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017).

**I.    Plaintiffs are Likely to Prevail on Their Free Speech and Section 409.7 Claims**

**A. Heightened constitutional scrutiny applies.**

Constitutional principles protecting free expression and a free press are at their strongest when expressive activity takes place in parks or on public sidewalks—exactly where the Ordinance applies. *See Boos v. Barry*, 485 U.S. 312, 318 (1988). These public spaces are "traditional public fora that time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* (quotations omitted). In such places, the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).

---

[3] Plaintiffs' state claims arise from Article I, sections 2, 3, and 7, of the California Constitution, which protect free speech, free press, free assembly, and due process. As this Court has recognized, state and federal free speech rights are coextensive, but California law is "broader and more protective." *Kohls v. Bonta*, 752 F. Supp. 3d 1177,  1197 (E.D. Cal. 2025). The analysis for evaluating infringements is the same. *See Los Angeles All. for Survival v. City of Los Angeles*, 22 Cal. 4th 352, 367 (2000); *Braxton v. Municipal Court*, 10 Cal. 3d 138, 144 (1973).

For purposes of this analysis, a law is deemed to be content-based, subject to strict scrutiny, and "presumptively unconstitutional" if it is: (1) expressly targeted at speech on the basis of content; (2) facially content-neutral but borne of a discriminatory justification or purpose; or (3) prompted by the prospect of adverse audience response. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A content-based law fails strict scrutiny if it is not "narrowly tailored to serve compelling state interests." *Id.*; *see also Forsyth Cnty., GA v. Nationalist Mvmt.*, 505 U.S. 123, 134-35 (1992).

However, a law that is content-neutral and concerns the time, place, or manner of an expressive activity is subject to intermediate scrutiny. Under this test, the government must show that: (1) a law "furthers an important or substantial governmental interest;" (2) "the governmental interest is unrelated to the suppression of free expression;" and (3) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968); *see also McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals") (quotations omitted).

The Ordinance cannot survive the heightened scrutiny of either constitutional test.

**B. The Ordinance is content based and fails strict scrutiny.**

The Ordinance is "content based" for at least two reasons: it was adopted with a discriminatory "purpose," and it is "content based on its face." *Reed*, 576 U.S. at 166. The Ordinance and its subsequent amendments reflect a profound animus towards individuals whom the City regards to be Proud Boys or Antifa—which is not an organized group *per se*, but rather a loose movement of individuals advocating antifascist principles. Ford ¶ 22.

All of Modesto's legislative agenda reports, findings, deliberations, and presentations fixate on these two groups. RJN 2-18, 30-3. The City enacted and first amended the Ordinance as an urgency measure just ahead of "Straight Pride" events associated with the Proud Boys, and which the City worried that the Proud Boys and Antifa would attend. RJN 3-4 15-17 53, 63, 118 (Exs. A-B); Tr. 20:12-22:13. The City appears to have simply had a bias that individuals whom the City deemed to be Proud Boys or Antifa were likely to (1) to act violently or commit crimes; and (2) wear off-putting, "confrontational" masks and attire. RJN 4, 53, 99-100, 118, Tr.11:24-17:20.

Having identified this associational garb, the City then reverse-engineered the Ordinance to ban it. It is arguably common knowledge, but also borne out by Plaintiffs' proffered expert testimony, that groups like the Proud Boys often wear bandanas, gaiter style masks, militia attire, and padded vests, to public demonstrations; and that people who identify with Antifa are recognizable at protests because of their all-black clothing, black masks, and black head coverings. *See id.*; *see also* Ford ¶¶ 22-27; Green ¶¶ 2-6, Exs. A-B; Diaz ¶¶ 22-25, Ex. C.

Perhaps nowhere is the City's hostility more evident than in the content-based carve-out to the medical necessity exception set forth at section (a)(13)(ii). RJN 123. It stresses that, among the many "functional[ly] equivalent" masks one may wear, the exception in no way includes: "balaclavas, ski masks or the like," which the City associated with the Proud Boys and Antifa. RJN 47, 72 (referring to pictures of men in balaclavas and ski masks as "Proud Boys Masked Up"); *id*. at 119 (same); *see also id.* at 4, 102, Tr. 22:19-23. Juxtaposing the Ordinance's explicit ban on "balaclavas, ski masks, or the like" with its more favorable treatment of rainbow masks and full costumes suggests that Modesto is impermissibly motivated to pick speakers on the basis of "ideology" and "opinion or perspective." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 819 (9th Cir. 2013).

To reach this conclusion, the Court need not constrain itself to the Ordinance's text alone. Where, as here, First Amendment issues are implicated, "the city council's object" may be ascertained from "direct and circumstantial evidence." *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 540 (1993) (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). California law similarly directs that a court "not blind" itself to the discriminatory purposes behind facially neutral language. *Parr v. Municipal Court*, 3 Cal. 3d 861, 865 (1971) (invalidating facially-neutral law adopted to ban "hippies" who city viewed as "undesirable").

Modesto may not restrict First Amendment activities it associates with undesirable people "simply because prior similar activity led to or involved instances of violence." *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996). Instead, "the proper response to potential and actual violence is for the government to ensure an adequate police presence" at a protest so that it may arrest "those who actually engage in [unlawful] conduct, rather than [] suppress legitimate First Amendment

conduct as a prophylactic measure." *Id.* (discussing *Cox v. Louisiana*, 379 U.S. 536, 551 (1965)). Moreover, Modesto cannot restrict members of the public from engaging in First Amendment activities just because the City or others in attendance find their speech offensive or their look objectionable. As the Supreme Court famously ruled: because "one man's vulgarity is another's lyric," the "Constitution leaves matters of taste and style . . . largely to the individual." *Cohen v. California*, 403 U.S. 15, 25 (1971); *see also Coates v. City of Cincinnati*, 402 U.S. 611, 615 (1971); *Snyder v. Phelps*, 562 U.S. 443, 458 (2011).

Given the Ordinance's discriminatory purpose and content-based nature, it must satisfy strict scrutiny by employing the "the least restrictive means to further the articulated interest." *Foti v. City of Menlo Park,* 146 F.3d 629, 636 (9th Cir. 1998). The Ordinance does not clear this bar because, as set forth *infra*, it burdens substantially more speech than necessary and is not narrowly tailored.

**C.  Even if content-neutral, the Ordinance unreasonably burdens protected expression.**

If not content-based, the Ordinance is a time, place, manner restriction, and its constitutionality turns on whether the Ordinance is "narrowly tailored" so as to "not burden substantially more speech than is necessary" to achieve a "significant governmental interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). In First Amendment facial challenges like this one, "'a less demanding though still rigorous standard'" is substituted to "'provide breathing room for free expression.'" *Kohls*, 752 F. Supp. 3d at 1194 (quoting *Moody v. NetChoice*, 603 U.S. 707, 723 (2024)). The inquiry has two parts: first, a court "must assess the state laws' scope;" and second, it "must decide which of the laws applications violate the First Amendment, and measure them against the rest." *Id.* (cleaned up).

The Ordinance's scope is vast. It categorically bans certain personal items like face coverings and masks, and basic safety gear like sports equipment, impact-resistant clothing, helmets, gas masks, and padded vests at "any demonstration, rally, protest, counter-protest, picket line, march, or public assembly" in the City. RJN 127-29. Modesto asserts it has a "substantial interest in safeguarding" citizens, police, and property from harm. *Id.* at 121. It avers that this gear "heightens [the sense] that [people] can operate free of any accountability as to violent acts." *Id.* at 48. And it states the "face covering provision is needed because various individuals wish to conceal their

identity during public demonstrations so that they can be free from accountability for their criminal actions." *Id.* at 47. Although Plaintiffs quarrel with these premises, even taking the City's interests at face value reveals profound overbreadth problems. This next section identifies the ways in which the Ordinance problematically burdens rights protected under federal and state law.

### 1.   Robust safeguards exist to protect free speech and free press.

The "freedom of speech[,] a free press, [and] the right of peaceable assembly lie at the foundation of a government based upon the consent of an informed citizenry." *Bates v. City of Little Rock*, 361 U.S. 516, 522-23 (1960). Robust safeguards exist to defend these special freedoms from "frontal attack" and "subtle government interference." *Id.* They protect the act of protesting whether in the form of marches and demonstrations (*Edwards v. South Carolina*, 372 U.S. 229, 231 (1963)); picketing (*Mosley*, 408 U.S. at 92); or the distribution of leaflets (*Schneider v. Town of Irvington*, 308 U.S. 147, 156 (1939); *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 420 (1971)).

Equally robust protection exists for the press because "without some protection for seeking out the news, freedom of the press could be eviscerated." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) (quotations omitted). Such protections safeguard the newsgathering process and all predicates for it, including the press' ability to access places traditionally open to the public and observe events there. *Id.* at 576-77. For "a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491 (1975).

### 2.   Free speech can lead to unrest and expose people to the risk of injury.

Some measure of "unrest" at a protest must be tolerated. *Terminello v. Chicago*, 337 U.S. 1, 4 (1949). And unrest can lead to injury. But the risk is not driven by the bogeyman protester throwing his helmet or masking her face, or by the press wearing basic safety gear. Rather, it often comes from law enforcement's use of kinetic impact projectiles and chemical irritants to disperse an assembly. Haar ¶¶ 17-18, 20. Officers—who are authorized to use these "less lethal" crowd control measures under Penal Code section 13652—may deploy rubber bullets, beanbag rounds, tear gas, pepper balls, pepper spray, flash-bang grenades, and other harmful weapons at protests.

These crowd control measures do not just inflict a transient harm on a few "bad actors." *See* Haar ¶ 73. They have broadly diffuse impacts that can be very detrimental to anyone in the vicinity of their use—law-abiding protesters and journalists included. *Id.* ¶¶ 20, 34, 58-59, 66-72. For instance, rubber bullets have an irregular shape that can cause them to tumble and ricochet, resulting in unpredictable trajectories that lead to bystander injuries. *Id.* ¶ 58. Rubber bullets are also fired at high velocities and are capable of breaking bones, fracturing a skull, or destroying an eye socket. *Id.* ¶¶ 59-60. Easily dispersed tear gas can cause chemical burns, breathing problems, agitation, disorientation, sensations of suffocation, severe pain, and damage to the eyes or other mucous membranes. *Id.* ¶¶ 44-50. Sometimes, tear gas canisters and flash-bang grenades hit a person's head or body, causing skull fractures and even death. *Id.* ¶¶ 17, 43-44, 69.

Because these weapons can lead to long-lasting and severe health problems, courts have found that their use has "surely chilled speech" *Black Lives Matter Seattle-King Cnty. v. City of Seattle*, 466 F. Supp. 3d 1206, 1213 (W.D. Wash. 2020).

### 3. The Ordinance chills free speech by banning gear that mitigates risk.

The Ordinance bans safety gear that can lessen the detrimental effects of less-lethal crowd control measures when people are complying with dispersal orders. Groups like Physicians for Human Rights, Crisis Ready Media, and the Committee to Protect Journalists, which document the adverse health impacts of less lethal crowd control methods, advise that anyone attending a protest—and, particularly, members of the media—carry safety gear such as gas masks, padded vests, helmets, and goggles. Haar ¶¶ 7, 21, 73-78; Sciacca ¶ 20, Exs. A-B.

Contrary to the City's assertion, this gear is not just the province of people intent on violence and defying lawful police orders. Recent events in California and across the country demonstrate that peaceful protesters and bystanders can easily be injured when doing nothing wrong. Sciacca ¶¶ 8-10, 13; Green ¶¶ 11, 18, 23-24, Ex. E; Applegate ¶¶ 4, 13, Ex. A; Fitzgerald ¶ 6, Ex. A; Ramirez ¶¶ 15-16; Gerardo ¶ 8. Additionally, when police issue a dispersal order, they are required to give people notice of the order *and a reasonable time to comply*. Pen. Code § 409. The time for compliance is when a person following such an order, but fearing the impacts of crowd control weapons, might want to wear this gear. Gerardo ¶ 8; Ramirez ¶¶ 15-16; *see also Dubner v. City &*

*Cnty. of San Francisco*, 266 F.3d 959, 967-68 (9th Cir. 2001) (police must differentiate between participants engaging in unlawful conduct and "innocent bystanders").

Such is the case for Ms. Ramirez, who has an injury and may move slower than others. Ramirez ¶¶ 17-18. Individuals who are not attempting to break the law should be permitted to protect themselves from serious physical harm if they want to carry or use basic safety equipment at protests, when situations become highly volatile. The City—in trying to address the unlawful behavior of a few—has wrongly punished the many. *See Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 834 (9th Cir. 2020) ("The many peaceful protesters, journalists, and members of the general public cannot be punished for the violent acts of others.").

### 4.  The Ordinance prevents the press from being able to safely do their jobs and violates California Penal Code § 409.7.

Protests, and how the government responds to them, are matters of the utmost public concern. Accordingly, courts have recognized that the press may remain in active dispersal areas to report on ongoing events. *Index Newspapers*, 977 F.3d at 831; *Garcia v. County of Alameda*, 150 F.4th 1224, 1230 (9th Cir. 2025) (firsthand observation is "quintessential function of a reporter") (quotations omitted); *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 116 (D. Minn. 2021).

California also affords journalists strong statutory protections under Penal Code § 409.7, which ensures journalists' right to observe and record law enforcement once an unlawful assembly is declared and a dispersal order is given. In enacting this bill, California legislators recognized what Modesto does not: "Members of the press risk their personal safety and well-being each time they attend protest events to get the public the information they need, but rubber bullets, teargas, and even arrest cannot be the norm for an essential pillar of our democracy." RJN 133-34.

Absent the lens of a reporter, camera operator, or videographer, the public would not have the full picture of a demonstration, including the unruliness of a crowd and any uses of force. Fitzgerald ¶ 5; Applegate ¶ 4, Ex. A; Green ¶ 10. Nor would the public have a frame to push back against official narratives that may be misleading or even false. *See, e.g.,* Sciacca ¶¶ 12-13. Reporters take their on-scene duties seriously and often find themselves inadvertently, but directly, in harm's way. Sciacca ¶ 7; Green ¶ 10; Fitzgerald ¶ 6, Ex. A. In fact, a Modesto Police officer

injured photojournalist Jake Lee Green in 2022 while he was covering a protest in Modesto. Green ¶¶ 16-22, Exs. H-I. Although he identified himself as press, Green was not wearing safety gear at the time due to the Ordinance. *Id*. Reporters like Green know that they cannot do their jobs if they cannot see, breathe, or are injured. Green ¶¶ 23, 25-27; Sciacca ¶¶ 12-15; Fitzgerald ¶¶ 12, 17. Plaintiffs and other groups raised these concerns when Modesto amended the Ordinance in December, but the City did not acknowledge them. Thacher ¶¶ 3-6, Exs. A-D; Sciacca ¶ 23, Ex. C.

Journalists, including NewsGuild members, want to wear safety gear, and some newsrooms in Modesto have even purchased this gear. Sciacca ¶¶ 12-15; Applegate ¶¶ 6-7; Kieta ¶¶ 2-5. But the Ordinance prevents them from doing so without any good reason. It is a practical violation of press freedoms and a de facto exclusion of the press at public events when crowd dispersal measures are deployed. *See Garcia*, 150 F.4th at 1231 (First Amendment scrutiny applies to acts that restrict "predicate" actions for speech or are "inextricably intertwined with speech").

### 5. The Ordinance ignores privacy interests and exposes people to collateral harm.

The Ordinance similarly forces protesters to choose between exercising their First Amendment rights and protecting themselves online and in their community. Modesto acknowledges the ubiquity of surveillance cameras and drones in the City generally, and their use at protests specifically. ECF No. 10, ¶ 27; Verner-Crist ¶¶ 12, 16, Ex. G & K. Today, a single photograph of a person's face can be used to identify them almost instantaneously. There are many good reasons why one would want to avoid this surveillance. The reasons include wanting to protect yourself from doxxing, privacy invasions, and retaliation that might impact your work, education, or wellbeing. *See* Leiva ¶¶ 9-10, Ex. A; Ramirez ¶ 11.

Declarant FB, in particular, explains why they want to protest anonymously. As an immigrant from Saudi Arabia, they worry their speech in favor of Palestine will cause the government to target them for arrest, detention, and deportation to a hostile home country—incidents that have been reported frequently in the last year. F.B. ¶¶ 7, 11. F.B.'s situation is exactly why the *Ghafari* court struck California's mask ban and held: anonymity is "essential to the exercise of constitutional rights." 87 Cal. App. 3d at 260; *see also NAACP v. Alabama*, 357 U.S. 449, 462

(1958) ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association.")

Preventing people from protesting anonymously is chilling and, in California, arguably unlawful. *See Talley v. California*, 362 U.S. 60, 64 (1960) ("Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all."). There is no support for the Ordinance's overbroad face covering ban just because the City has concluded that all who wear masks do so for criminal purposes. Indeed, although anonymity and basic safety gear could lend themselves to some abuse, the law and "our society accord[] greater weight to the value of free speech than to the dangers of its misuse." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995).

### 6.   The Ordinance criminalizes protected symbolic expression.

The Ordinance leads to yet one more free speech injury. It curtails the rights of the public—including Plaintiffs—to engage in symbolic expressive speech conveyed by their choice of face masks and other accessories that cover or "partially cover" their faces. The First Amendment's protections extend beyond "actual speech" to encompass "symbolic or expressive conduct." *Virginia v. Black*, 538 U.S. 343, 358 (2003); *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (flag burning is protected speech); *Tinker v. Des Moines Independent*, *Community School Dist.*, 393 U.S. 503, 505 (1969) (wearing black armband at school in protest of Vietnam War is protected speech); *Brown v. Louisiana*, 383 U.S. 131, 141–142 (1966) (sit-in conveyed expressive message).

As explained by Professor Richard Thompson Ford, an expert in social movements and the expressive effect of attire at protests to communicate solidarity and a particularized message, people commonly wear masks and accessories around their heads to communicate a political message or reflect support for a particular group or movement. Ford ¶¶ 9, 14, 17-19, 25-26. Individuals wearing keffiyehs to Modesto protests do so as a form of expressive activity—as an "affirmation of [their] commitment to humanity," Leiva ¶ 6; to "mak[e] a political message," Ramirez ¶¶ 4, 20; and to "protest[] for freedom," F.B. ¶ 6. Others wear face coverings like bandanas for "cultural significance" and as "a statement of resistance." Gerardo ¶ 4. The Ordinance undermines all of this protected expression. There is no compelling, or even rational, reason why it needs to do so.

PLAINTIFFS' MPA IN SUPP. OF PRELIM. INJ.                                                    PAGE 29
CASE NO. 2:26-CV-01623-JAM-CKD

And while the City is correct that many people who identify as a Proud Boy or one who fights fascism wear attire that connects them in some form of solidarity, they miss two important points: that attire is protected and not all who dress the same act the same. Ford ¶¶ 20-27; Green ¶¶ 4-8; Diaz ¶¶ 23-26; *United States v. Mongol Nation*, 56 F.4th 1244, 1249 (9th Cir. 2023) (display of white nationalist group's collective membership marks constituted "expressive conduct").

**D.  The Ordinance is not narrowly tailored.**

The "existence of obvious, less burdensome alternatives is a relevant consideration in determining whether the fit between ends and means is reasonable." *Berger v. City of Seattle*, 569 F.3d 1029, 1041 (9th Cir. 2009) (quotation omitted). The Ordinance misses the mark because, quoting *Ghafari*, the City has obvious "legal armamentarium to deal effectively" with disturbances at public assemblies. 87 Cal. App. 3d at 260, 262; *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 950 (9th Cir. 2011) (available alternatives rendered law invalid).

California law allows Modesto to, for example,  declare an unlawful assembly (Pen. Code § 407). It also may arrest people for: inciting a riot (§ 404.6); assembling together for a rout (§ 406); participating in a rout or unlawful assembly (§ 408); remaining at the scene of a "riot, rout, or unlawful assembly" after having received a clear, lawful order to disperse with sufficient time to comply (§ 409); willfully resisting, delaying, or obstructing officers or emergency medical technicians (§ 148); disturbing the peace (§ 415); assembling "for the purpose of disturbing the public peace" (§ 416); vandalism (§ 594); looting (§ 463); burglary (§ 459); arson (§ 451); trespassing (§ 602); and defacing memorials (§ 594.4). Of course, if an individual were to wear a mask or "any personal disguise" to evade recognition while committing such unlawful acts, Modesto could also arrest and hold that person accountable under Penal Code section 185; *see also id.* § 11460 (imposing penalties where a riot involves a "paramilitary" organization).[4]

Given these many laws targeting Modesto's public safety concerns and the substantial overbreadth concerns discussed *supra*, the Ordinance cannot withstand any level of scrutiny.

---

[4] *But see In re Brown*, 9 Cal.3d 612, 617-24 (1973) (construing state law narrowly to comply with constitutional parameters); *NAACP v. Claiborne Hardware*, 458 U.S. 886, 908 (1982) (individual wrongdoing does not transform lawful assembly into unlawful assembly).

## II.   Plaintiffs Are Likely to Prevail on Their Due Process Claims

### A.  The Ordinance is unconstitutionally vague.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law must provide "explicit standards" to "avoid arbitrary and discriminatory enforcement." *Id.* Where, as here, First Amendment rights are at stake, "'[b]road prophylactic rules are suspect' and 'precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.'" *Castro v. Superior Court*, 9 Cal. App. 3d 675, 683 (1970) (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)). "The need for definiteness is also greater when the ordinance imposes criminal penalties." *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997); *Coates*, 402 U.S. at 611 (ruling public assembly ordinance unconstitutional for vagueness).

The Ordinance lacks the precision required by law because it is ambiguous as to *what* it bans and *when*. The Ordinance broadly prohibits utilizing, carrying, or possessing certain items at any "public assembly," without defining what public assembly means. Plaintiffs can only guess that it governs any time two or more people gather in public, consistent with Penal Code § 407. Modesto further confuses the landscape by stating officers "only" enforce the Ordinance if they have "information to believe that a specific event or events might lead to violence or other acts designed to prevent the exercise of constitutional rights." RJN 37, Tr. 7:13-7:16; *City of Houston v. Hill*, 482 U.S. 451, 451 (1987) (ordinance invalid because people violated its plain language "scores of times daily," but only "those [] chosen by the police in their unguided discretion" were arrested).

While some of the Ordinance's bans on tactical gear and impact-resistant clothing are vague, section (a)(13) is most infirm. It presents a labyrinth of confounding exceptions for medical necessity, religious beliefs, and costumes that confuse Plaintiffs and the public alike. Flores ¶ 20; Leiva ¶ 14; Diaz ¶ 21. It is unclear whether an actual medical or religious reason is needed to cover one's face, how an individual would substantiate such a reason to avoid punishment, what constitutes a "costume" or what is sufficiently "expressive," or how an officer would determine enforcement was appropriate. *See Valle*, 732 F.3d at 1019-20 (invalidating law due to incoherent language). It offers no rubric for assessing how much of one's face can be "partially" covered before

PLAINTIFFS' MPA IN SUPP. OF PRELIM. INJ.                                                    PAGE 31
CASE NO. 2:26-CV-01623-JAM-CKD

an otherwise ordinary accessory transforms into something criminal. And its references to the "functional equivalent" of exempted items are near indecipherable. Ambiguities far less opaque led the *Ghafari* court to find California's mask ban unworkable. 87 Cal. App. 3d at 264-65.

### B. The Ordinance's ambiguity leads to selective enforcement problems.

A law cannot "entrust lawmaking to the moment-to-moment judgment of the policeman on his beat," or confer "on police a virtually unrestrained power to arrest and charge persons with a violation." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citations omitted); *see also Williams v. Garcetti*, 5 Cal. 4th 561, 567-68 (1993). The fear is that officials will "resort" to enforcement "only against" those "whose messages the officer or the public dislikes." *Foti*, 146 F.3d at 639.

The Ordinance does exactly this. It fails to provide articulated standards and well-defined terms, giving rise to arbitrary, selective, and disproportionate enforcement. This scenario is not hypothetical, as demonstrated by the differential treatment of people at the ICE Out Protest and both the June and October No Kings Protests. Patrick ¶ 7; Flores ¶ 19; Diaz ¶ 14; RJN, Ex. E at 7:13-7:16. Where, as here, a law allows for rudderless enforcement of restrictions that impact free speech rights, it is subject to facial invalidation unless the government can identify a "binding judicial or administrative construction" or "well-established practice" confining enforcement. *City of Lakewood v. Plain Dealer Publ'g*, 486 U.S. 750, 751 (1988). Modesto has identified neither.

### C. The Ordinance invades protected due process liberty interests.

"The constitutional rights that may be affected by a dress code are not limited to those arising under the free speech clause of the First Amendment." *Gatto v. County of Sonoma*, 98 Cal. App. 4th 744, 771 (2002). "Even if a person's choice of dress and manner of appearance does not constitute the sort of expressive conduct protected by the First Amendment, it is nevertheless a form of individual expression that is constitutionally entitled to some protection against arbitrary governmental suppression." *Id.* at 772; *see also id.* (observing that "government regulation of dress or appearance on public streets has not fared well"). Modesto's Ordinance should suffer the same fate. No rational basis exists as to why it is legal to wear full-cover costumes, but illegal to wear bandanas, balaclavas, and gaiters. As the pictures demonstrate, the difference in banned attire is

subtle, but the consequences are not. Verner-Crist ¶17-18, Exs. L-M; RJN 73-94 (Ex. F).[5]

### D. The Ordinance violates due process equal protection.

The Ordinance treats groups of peaceful speakers at public assemblies differently, thereby violating equal protections under federal and state law. The Supreme Court has made clear that "the government must afford all points of view an equal opportunity to be heard." *Mosley*, 408 U.S. 92 at 96. The Ordinance skews this principle by dividing the public into two groups based on expressive purpose: those seeking to wear a face covering or costume at a "theatrical" or "entertainment event" (or "the functional equivalent" thereof); and those seeking to wear a face covering or banned accessory during an assembly to communicate on public issues. For the former, anonymity is permissible; but the latter faces arrest and jail time. This taxonomy cannot stand. *See Nunez*, 114 F.3d at 949 (curfew on juveniles violated due process on equal protection and vagueness grounds).

Moreover, even if this Court were not inclined to rule favorably on federal equal protection grounds, it should follow *Ghafari*'s reasoning for Plaintiffs' California claim. There, the court ruled the "distinction" "between anonymous entertainment or amusement and anonymous public issue communication" violated equal protection by "met[ing] out differential treatment based upon the content of the masked person's message." 87 Cal. App. 3d at 265-56.

### III. Plaintiffs will Face Irreparable Harm Absent a Court Order

Because Plaintiffs have established that the Ordinance chills their constitutional rights, they also establish irreparable harm. "Both the Ninth Circuit and Supreme Court 'have repeatedly held that the loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.'" *Kohls*, 752 F. Supp. 3d at 1198 (citing *Klein v. City of San Clemente*, 584 F. 3d 1196, 1207-08 (9th Cir. 2009)); *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The Ordinance harms Plaintiffs because it chills both them and other members of the general public from engaging in constitutionally protected activities. The Ordinance's ban on basic safety gear has a particularly acute impact on members of the press because it makes it far more difficult

---

[5] *Gatto* highlighted: *Williams v. Pryor*, 240 F.3d 944, 948 n.2 (11th Cir. 2001) ("attempts to regulate the dress . . . of adults" often is "irrationality); *DeWeese v. Town of Palm Beach*, 812 F.2d 1365, 1368-70 (11th Cir. 1987) (invalidating ordinance requiring male joggers to wear shirts).

for reporters to safely cover a protest, which in turn diminishes the news that the public receives about that event. Green ¶¶ 25-27; Applegate ¶ 12; Sciacca ¶¶ 24-25; Fitzgerald ¶¶ 16-17. The Ordinance ban on safety gear and facial coverings, coupled with the Ordinance's ambiguity, also chills free speech and free assembly. Ramirez ¶ 21; Leiva ¶¶ 13, 15; Flores ¶ 21; Gerardo ¶ 11; F.B. ¶ 11; Diaz ¶¶ 17, 27. The Ordinance's infliction of irreparable injury is easily demonstrated by the fact that it has intimidated Plaintiffs from organizing or attending lawful protests or public assemblies in Modesto. *See id.*

The City has given every indication that it intends to enforce the Ordinance when it so chooses. ECF No. 10, ¶¶ 19, 153, 157;  Diaz ¶ 17; Verner-Crist ¶¶ 10, 13-15, Exs. F, H-J. But groups in Modesto want to continue organizing, attending, and reporting on protests, just as they have always done. Plaintiffs are among these people. Leiva ¶¶ 11, 15; Ramirez ¶¶ 21-22; Flores ¶ 21. Plaintiffs' free speech and the City's enforcement are on a collision course. In such a situation where free speech rights are "being chilled daily," there is a "need for immediate injunctive relief without further delay." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (quotations omitted).

## IV.    The Balance of Equities and Public Interest Favors Granting an Injunction

The final factors—whether the public interest and the balance of equities favor an injunction—merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs have raised "'serious First Amendment questions,'" and "that alone compels a finding that the balance of hardships tips sharply" in their favor. *Meinecke v. City of Seattle*, 99 F.4th 514, 526 (9th Cir. 2024); *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012). It is "always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2002). Courts have consistently recognized the "gravity of First Amendment values" weigh strongly in favor of the public interest. *Kohls*, 752 F. Supp. 3d at 1198. The scale tips this way because "ongoing enforcement of potentially unconstitutional regulations would infringe not only on the free expression interests of plaintiffs, but also the interests of other people subjected to the same restrictions." *Id.* (quoting *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009)).

The public in Modesto has a significant interest in ensuring that people may freely assemble and that the press may freely report. If the Ordinance is not enjoined, these interests will continue to be harmed. Conversely, enjoining it will not harm the City. Modesto has arrested five people under the Ordinance since enacting it in 2019. ECF 10 ¶¶ 26, 28; Verner-Crist ¶ 10, Ex. E; Diaz ¶ 16; Patrick ¶ 11. And even with the Ordinance enjoined, the City would still have all the "legal armamentarium" identified above. The City may prefer the ease of broadly banning masks and basic safety gear, but that does not make it lawful. "A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency." *McCullen*, 573 U.S. at 495.

**V.    No Bond Should be Required**

Plaintiffs' high likelihood of success on the merits supports waiving any bond requirement. *See State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1326 (9th Cir.), *amended*, 775 F.2d 998 (9th Cir. 1985). Waiver is proper in cases, like here, where the requirement of "a bond would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public." *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996). A court may dispense with "a bond when there is no realistic likelihood of harm to the defendant." *Jorgenson v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003); *Bible Club v. Placentia Yorba Linda Sch. Dist.*, 573 F. Supp. 2d 1291, 1302 n.6 (C.D. Cal. 2008).

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their preliminary injunction motion.

Date: May 14, 2026

Respectfully Submitted,

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.

*/s/   Chessie Thacher*
Chessie Thacher (SBN 296767)
Angelica Salceda (SBN 296152
Shaila Nathu (SBN 314203)

*Attorneys for Plaintiffs*